## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| WICKES INC., | ) Case No. 04 B 02221 |
| | ) |
| Debtor. | ) Honorable Bruce W. Black |

### ORDER AUTHORIZING DEBTOR TO: (A) INCUR POSTPETITION DEBT ON AN EMERGENCY BASIS; (B) GRANT LIENS AND PROVIDE SECURITY, ADEQUATE PROTECTION AND OTHER RELIEF TO MERRILL LYNCH CAPITAL, A DIVISION OF MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., AS AGENT; AND (C) PROVIDE ADEQUATE PROTECTION TO HSBC BANK USA, A NEW YORK BANKING CORPORATION AND TRUST COMPANY, AS INDENTURE TRUSTEE

This matter came before this Court on the motion (the "Motion") of Wickes Inc. ("Debtor") requesting that this Court enter an order authorizing Debtor to: (a) incur Postpetition Debt on an emergency basis; (b) grant liens and other relief to Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., as agent ("Postpetition Agent"), for the benefit of itself and the other Postpetition Lenders; and (c) provide adequate protection to HSBC Bank USA, a New York banking corporation and trust company, as Collateral Agent and Mortgage Trustee under the Swap Debt Documents ("Swap Debt Indenture Trustee"), for the benefit of itself and the Swap Debt Holders. Unless otherwise indicated, all capitalized terms used as defined terms herein have the meanings ascribed thereto in Exhibit A attached hereto and by this reference are made a part hereof.

This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Filing Date.

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion and having completed a hearing pursuant to Code § 364 and Fed. R. Bankr. P. 4001(c), and objections, if any, having been withdrawn or resolved or overruled by the Court, **THE MOTION IS GRANTED, AND THE COURT HEREBY FINDS THAT:**

A.    On the Filing Date, Debtor filed a voluntary petition for relief under chapter 11 of the Code. Debtor has retained possession of its property and continues to operate its business as a debtor in possession pursuant to Code §§ 1107 and 1108.

B.    The Court has jurisdiction over the Case and this proceeding pursuant to 28 U.S.C. § 1334. Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue over this Motion is proper under 28 U.S.C. § 1409(a).

C.    Debtor has stipulated and represented to the Court that:    (1) the Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship between Debtor, Prepetition Agent, and Prepetition Lenders, and are valid and enforceable by Prepetition Agent against Debtor; (2) as of the Filing Date, Debtor is liable for payment of the Prepetition Debt, and the Prepetition Debt shall be an allowed claim, in an amount not less than, exclusive of accrued fees and expenses, $62,367,289.16; (3) the Prepetition Debt constitutes the legal, valid and binding obligation of Debtor, enforceable in accordance with the terms of the Prepetition Documents; (4) no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to avoidance or subordination pursuant to the Code or applicable nonbankruptcy law; (5) the Prepetition Liens, among other things, secure payment of all of the Prepetition Debt; and (6) the Prepetition Liens are First Priority Liens, subject to Prepetition Permitted Liens. Effective upon entry of the Final Order, Debtor hereby releases, discharges, and acquits Prepetition Agent and each Prepetition Lender and their respective officers, directors, agents, attorneys, predecessors in interest, and successors and assigns of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of the entry of this Order with respect to or in connection with the Prepetition Debt or the Prepetition Documents.

D.    Debtor represents, and the Court finds that for purposes of Code §§ 506(c) and 507(b), the liquidation value of the Prepetition Collateral as of the Filing Date was not less than $70,000,000; provided, however, that Prepetition Agent, Prepetition

-2-

Lenders, Postpetition Agent and Postpetition Lenders shall each have the right to challenge such representations and such findings at any time.

      E.     No Committee has been appointed in this Case.

      F.     Even if Debtor was authorized to use all available Cash Collateral upon a showing of adequate protection of the interests therein of Prepetition Agent and Prepetition Lenders, such Cash Collateral would be insufficient to provide Debtor with the working capital necessary to prevent immediate and irreparable harm to Debtor. Debtor requires the ability to incur additional debt in order to prevent such harm.

      G.     Debtor is unable to obtain unsecured credit allowable under Code § 503(b)(1) sufficient to finance the operations of Debtor's business. Debtor is unable to obtain credit allowable under Code §§ 364(c)(1), (c)(2) or (c)(3) on terms more favorable than those offered by Postpetition Agent and Postpetition Lenders.

      H.     Prepetition Agent and Prepetition Lenders are unwilling to consent to Debtor's grant of a security interest in the Prepetition Collateral to Postpetition Agent and Postpetition Lenders with priority over the security interests therein pursuant to Code § 364(d) unless, as adequate protection of their interests in the Prepetition Collateral, the Prepetition Debt is paid in accordance with this Order and the other provisions of this Order are entered. Any attempt by Debtor to grant Postpetition Agent and Postpetition Lenders a lien on the Prepetition Collateral with priority over the security interests of Prepetition Agent and Prepetition Lenders therein over objections would not succeed, would consume precious time and resources of Debtor at a crucial time, and would not be in the best interests of Debtor or its creditors.

      I.     Consequently, an immediate need exists for Debtor to obtain the Postpetition Debt in order to minimize disruption to and avoid the termination of its business operations, and to enhance the possibility of successful reorganization.

      J.     In order to prevent immediate and irreparable harm to the estate pending the Final Hearing, Debtor needs to incur Postpetition Debt on an emergency basis as provided herein through the conclusion of such Final Hearing.

K.      Postpetition Agent and Postpetition Lenders have indicated a willingness to extend the Postpetition Debt, but only on the terms and conditions set forth in this Order and the Postpetition Documents. Under the circumstances of the Case, the terms and conditions of this Order are a fair and reasonable response to Debtor's request to incur Postpetition Debt, and the entry of this Order is in the best interests of Debtor's estate and its creditors. Such terms and conditions have been negotiated in good faith and at arms' length, and the Postpetition Debt is being extended in good faith, as that term is used in Code § 364(e).

L.      The notice provided by Debtor of the Motion, the hearing on the Motion, and the entry of this Order satisfy the requirements of Fed. R. Bankr. P. 2002, 4001(c) and 9014 and Code §§ 102(1) and 364 or were otherwise sufficient and appropriate under the circumstances.

## WHEREFORE, IT IS HEREBY ORDERED THAT:

1.      Authorization to Incur Postpetition Debt.

(a)      Postpetition Documents.  As consideration for the extension of the Postpetition Debt, the Postpetition Documents and all of the terms and conditions thereof (including all fees, charges and expenses set forth in Sections 2.3, 2.5, 4.7, 9.4 and 10.1 of the Postpetition Loan Agreement, each of which shall be nonrefundable once paid), are hereby approved in their entirety.  Debtor is hereby authorized and directed to:  (1) execute the Postpetition Documents, including all documents that the Postpetition Agent and Postpetition Lenders deem necessary to implement the transactions contemplated by the Postpetition Documents; and (2) perform each of its obligations under and comply with all of the terms and provisions of the Postpetition Documents and this Order.  Upon execution and delivery thereof, the Postpetition Documents shall constitute valid and binding obligations of the Debtor, enforceable in accordance with their terms.

(b)      Permitted Uses of Postpetition Debt.    Debtor is hereby authorized and directed to incur Postpetition Debt:  (1) solely in accordance with and pursuant to the terms and provisions of this Order and the Postpetition Documents; (2) other than as set forth in Paragraph 1(c) of this Order, solely to the extent required to pay those

-4-

expenses enumerated in the Budget as and when such expenses become due and payable; and (3) prior to entry of the Final Order, in an amount not to exceed $32,000,000. Notwithstanding anything to the contrary in this Paragraph 1(b), however: (1) Debtor is hereby authorized and directed to incur Postpetition Debt to pay the Postpetition Charges and the Estate Professionals Carveout when due and payable; and (2) if Postpetition Agent advances monies to Debtor and Debtor uses such monies other than in accordance with the terms and provisions of this Order or the Postpetition Documents, such advances shall be considered Postpetition Debt for purposes of this Order.

(c)  Payment of Remaining Prepetition Debt Upon Entry of Final Order.  Upon entry of the Final Order, Debtor is hereby authorized and directed to incur Postpetition Debt under Sections 2.1 and 2.2 of the Postpetition Loan Agreement to pay the then-outstanding Prepetition Debt in full on a provisional basis.  All payments of the Prepetition Debt under this Order shall become final and binding on all parties in interest in the Case and their respective successors and assigns, including any Trustee, unless any Committee timely files with the Court, within the time period specified in Paragraph 10(a) of this Order, an adversary proceeding challenging the Prepetition Debt or the Prepetition Liens. If no such proceeding is timely commenced, Prepetition Agent is directed to, upon the expiration of such period, execute and deliver to Postpetition Agent such releases, waivers, terminations and assignments which Postpetition Agent deems necessary or desirable from time to time to extinguish the Prepetition Liens.  If such a proceeding is timely commenced, and Prepetition Agent or any Prepetition Lender is required to disgorge any monies received from Debtor, Postpetition Agent, or any Postpetition Lender in satisfaction of Prepetition Debt or otherwise, such monies shall be remitted directly to Postpetition Agent and shall, without further Court order, be applied by Postpetition Agent to the Postpetition Debt in accordance with Paragraph 7(a) of this Order.

2.  Procedure for Delivery of Cash Proceeds.

(a)  Delivery of Cash Proceeds to Postpetition Agent.  Debtor is authorized and directed to deposit all Cash Proceeds, regardless of the source of such Cash Proceeds, now or hereafter in its possession or under its control into the Blocked Accounts

(or to otherwise deliver all such Cash Proceeds to Postpetition Agent in a manner satisfactory to Postpetition Agent) promptly upon receipt thereof. Postpetition Agent shall thereafter apply such Cash Proceeds in accordance with Paragraph 7(a) of this Order.

        (b)     <u>Account Debtors</u>. Without further order of court, Debtor is hereby directed to instruct all account debtors of existing and future accounts receivable included in the Collateral to make payments directly into the Blocked Accounts or such other accounts satisfactory to Postpetition Agent, in which event all such Cash Proceeds shall be applied in accordance with Paragraph 7(a) of this Order.

        (c)     <u>Cash Proceeds in Postpetition Agent's Possession</u>. Postpetition Agent is authorized to collect upon, convert to Cash Proceeds and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or under its control which constitute Collateral or proceeds of Collateral.

        3.     <u>Superpriority Administrative Expense Status; Postpetition Liens</u>. The Postpetition Debt is hereby granted superpriority administrative expense status under Code § 364(c)(1), with priority over all costs and expenses of administration of the Case that are incurred under any provision of the Code, other than the Estate Professionals Carveout. In addition, Postpetition Agent is hereby granted, pursuant to Code §§ 364(c)(2), 364(c)(3), and 364(d), for the benefit of itself and each Postpetition Lender, the Postpetition Liens to secure the Postpetition Debt. The Postpetition Liens: (1) are and shall be First Priority Liens, subject only to Permitted Liens, without any further action by Debtor, Postpetition Agent, or Postpetition Lenders and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (2) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Case. Notwithstanding the foregoing, Debtor is authorized and directed to execute and deliver to Postpetition Agent such financing statements, mortgages, instruments, bank account agency agreements and other documents as Postpetition Agent may deem necessary or desirable from time to time. Any such financing statements, mortgages, instruments, or other documents filed by Postpetition Agent shall be deemed to have been filed as of the Filing Date.

4.    Adequate Protection of Interests of Prepetition Lenders in the Prepetition Collateral. As adequate protection of the interests of Prepetition Agent and the Prepetition Lenders in the Prepetition Collateral:

(a)    Replacement Liens. Prepetition Agent is hereby granted, for the benefit of itself and each Prepetition Lender, the Replacement Liens. The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be First Priority Liens (subject only to the Postpetition Liens, Prepetition Permitted Liens, and Permitted Liens) that are properly perfected, valid, and enforceable without any further action by Debtor or Lender and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Case. Notwithstanding the foregoing, Debtor is authorized and directed to execute and deliver to Prepetition Agent such financing statements, mortgages, instruments, bank account agency agreements and other documents as Prepetition Agent may deem necessary or desirable from time to time.

(b)    Allowed Code § 507(b) Claim. If and to the extent the adequate protection of the interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral granted to Prepetition Agent and Prepetition Lenders between the Filing Date and the entry of the Final Order pursuant to this Order proves insufficient, Prepetition Agent, for the benefit of itself and each Prepetition Lender, shall have an allowed claim under Code § 507(b) in the amount of any such insufficiency, with priority over: (1) all costs and expenses of administration of the Case that are incurred under any provision of the Code, including Code §§ 503(b), 506(c), 507(a), or 552(b); and (2) the claims of any other party in interest, including the Swap Debt Indenture Trustee and any Swap Debt Holder, under Code § 507(b).

5.    Carveout Terms. (a) The Estate Professionals Carveout shall consist of the lesser of (1) the aggregate weekly line item amounts for professional fees and expenses of the Estate Professionals (excluding any success or transaction fees) as provided in the Budget, and (2) the aggregate of such amounts that have accrued and are unpaid as of the Termination Date, (b) the Estate Professionals Carveout shall be reduced on a dollar for

dollar basis by any payments of fees or expenses of the Estate Professionals (excluding any payment of any success or transaction fees), (c) all property of the estate (other than property subject to an unavoidable lien in favor of Prepetition Agent, and prepetition retainers) shall be used to pay any allowed professional fees and expenses of any of the Estate Professionals before any payments of such professional fees or expenses are made from the Postpetition Debt or the Collateral, (d) Postpetition Agent shall have the right to establish reserves in accordance with the Postpetition Loan Agreement with respect to the Estate Professionals Carveout, (e) upon the Termination Date, and with the exception of the Estate Professionals Carveout, Postpetition Agent shall have no obligation to fund any fees or expenses of the Estate Professionals accrued prior to, on or after the Termination Date, and (f) the Estate Professionals Carveout shall not include, and no Postpetition Debt or Collateral may be used to pay, any fees or expenses incurred by any entity, including Debtor or the Committee, or any of the Estate Professionals, in connection with claims, actions or services adverse to Prepetition Agent, Prepetition Lenders, Postpetition Agent, Postpetition Lenders, or any of their interests in any of the Collateral, including (a) preventing, hindering or delaying enforcement or realization by Prepetition Agent or Postpetition Agent upon any of the Collateral once an Event of Default has occurred, (b) using or seeking to use Cash Proceeds or selling any other Collateral without the consent of Prepetition Agent and Postpetition Agent, (c) incurring indebtedness without the consent of Prepetition Agent and Postpetition Agent, except as expressly permitted by the Postpetition Documents, or (d) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Prepetition Debt, the Prepetition Liens, the Postpetition Debt, or the Postpetition Liens or any other rights or interests of Prepetition Agent, Prepetition Lenders, Postpetition Agent, or Postpetition Lenders, or in asserting any claims or causes of action, including any actions under chapter 5 of the Code, against Prepetition Agent, Prepetition Lenders, Postpetition Agent, or Postpetition Lenders; provided, however, that up to $50,000 may be used by counsel for the Committee to investigate the validity, extent, amount, perfection, priority, or enforceability of the Prepetition Liens. Nothing herein shall be construed as consent to the allowance of any fees,

costs or expenses of the Estate Professionals, or shall affect the right of Prepetition Agent or Postpetition Agent to object to the allowance and payment of such fees, costs or expenses.

      6.    <u>Termination of Right To Incur Postpetition Debt</u>.

      (a)    <u>Termination Date</u>.  Unless extended by the Court upon the written agreement of Postpetition Agent, this Order and Debtor's authorization to incur Postpetition Debt pursuant to this Order will automatically terminate on the Termination Date without further notice or order of Court.

      (b)    <u>Rights Upon Termination</u>.  Upon the Termination Date, without further notice or order of the Court, at the election of Postpetition Agent: (1) the Postpetition Debt shall be immediately due and payable; (2) Postpetition Agent shall be entitled to apply or set off any Cash Proceeds in Postpetition Agent's possession or control to the Postpetition Debt in accordance with Paragraph 7(a) of this Order, until such Postpetition Debt is indefeasibly and finally paid in full; and (3) Debtor shall be prohibited from using any Cash Proceeds for any purpose other than application to the Postpetition Debt in accordance with Paragraph 7(a) of this Order, until the Postpetition Debt is indefeasibly and finally paid in full. On the fifth Business Day after the Termination Date: (1) at the election of Postpetition Agent, with written notice to counsel for Debtor, counsel for Swap Debt Indenture Trustee, counsel for any Committee and any other parties included in the "Master Service List" established pursuant to a case management order entered in this Case, but without further order of the Court, Postpetition Agent shall have automatic and immediate relief from the automatic stay with respect to the Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to it under the Postpetition Documents and applicable nonbankruptcy law with respect to the Collateral; and (2) Debtor shall be authorized and directed to surrender the Collateral and to otherwise cooperate to assist Postpetition Agent in the exercise of the rights and remedies available to Postpetition Agent under the Postpetition Documents and applicable nonbankruptcy law with respect to the Collateral (provided, however, that during the four Business Day period following the Termination Date, the Debtor shall have the right to obtain an order of this Court determining that the Termination Date has not occurred, but that during such four Business Day

period, the Debtor may not use Cash Proceeds unless such use is agreed to in writing by Postpetition Agent, and Postpetition Agent shall have no obligation to advance Postpetition Debt to Debtor).

      7.    <u>Additional Consideration For Postpetition Debt</u>.  As additional consideration for the extension of the Postpetition Debt:

      (a)    <u>Application of Cash Proceeds</u>.  Postpetition Agent, at its election, is authorized to apply all Cash Proceeds (and all monies received from Prepetition Agent or Prepetition Lenders under Paragraph 1(c) of this Order) now or hereafter coming into Postpetition Agent's possession or control as follows:  (1) first, to payment of then-outstanding Prepetition Debt consisting of Allowable 506(b) Amounts; (2) second, to payment of other then-outstanding Prepetition Debt; (3) third, to payment of Postpetition Charges; and (4) fourth, to payment of other Postpetition Debt in accordance with the Postpetition Documents.  All such applications shall be final and not subject to challenge by any person, including any Trustee, subject only to:  (1) a challenge under Paragraph 10(a) of this Order; and (2) the right of parties in interest to object solely to applications to Postpetition Charges consisting of attorneys' fees and expenses under and in accordance with Paragraph 8(a) of this Order.  Any amounts disgorged in connection with any such challenge or objection shall be first applied to repay other Postpetition Debt in accordance with this Paragraph 7(a).

      (b)    <u>Prohibition Against Use of Cash Collateral</u>.  Debtor will not use or seek to use Cash Collateral, unless, in addition to the satisfaction of all requirements of Code § 363 for the use of such Cash Collateral:  (i) Postpetition Agent has consented to such order; (ii) at the time of the entry of such an order, there is no Postpetition Debt outstanding, and no obligation of Postpetition Agent to extend additional Postpetition Debt; or (iii) such Cash Collateral are first used to immediately and indefeasibly finally pay the Postpetition Debt in cash in full.

      (c)    <u>Prohibition Against Additional Debt</u>.  Debtor will not incur or seek to incur debt secured by a lien which is equal to or superior to the Postpetition Liens, or which is given superpriority administrative expense status under Code § 364(c)(1), unless, in

addition to the satisfaction of all requirements of Code § 364 for the incurrence of such debt: (a) Postpetition Agent has consented to such order; (b) at the time of the entry of such an order, there is no Postpetition Debt outstanding and no obligation of Postpetition Lenders to extend additional Postpetition Debt; or (c) such credit or debt is first used to immediately and indefeasibly finally pay the Postpetition Debt in full.

(d)   No Surcharge.  Effective upon entry of the Final Order, at no time during the Case shall the surcharge provisions of Code § 506(c), the enhancement of collateral provisions of Code § 552, or any other legal or equitable doctrine (including unjust enrichment) be imposed upon Postpetition Agent, any Postpetition Lender, or any of the Collateral for the benefit of any party in interest, including Debtor, any of the Estate Professionals, or any Trustee.

(e)   Right to Credit Bid.   In all events, pursuant to Code § 363(k), Postpetition Agent shall have the right to use the Postpetition Debt or any part thereof to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Collateral.

8.   Miscellaneous Provisions.

(a)   Notice of and Objections to Postpetition Charges.  Postpetition Agent shall provide Debtor's counsel, counsel for Swap Debt Indenture Trustee, counsel for any Committee, and the United States Trustee with copies of all invoices (edited to delete any attorney-client or other confidential information) with respect to Postpetition Agent's attorneys' fees and related costs and expenses asserted as Postpetition Charges that are incurred after the entry of this Order.  Any such party may object to the reasonableness of any such fees, costs and expenses. However, any such objection shall be forever waived and barred unless, within twenty (20) days of receipt of the invoice to which the objection relates: (1) the objection is filed with the Court and served upon Postpetition Agent and its counsel; and (2) the objection describes with particularity the items or categories of fees, costs and expenses that are the subject of the objection and provides the specific basis of the objection to each such item or category of fees, costs and expenses.  Any hearing on an objection to the fees, costs and expenses set forth on any invoice shall be limited to the reasonableness or

necessity of the particular items or categories of the fees, costs and expenses which are the subject of such objection. The disallowance of any such fees and expenses shall not affect Postpetition Agent's right to collect such amounts from any person or entity other than Debtor.

(b)     Force and Effect of Postpetition Documents. To the extent there exists any conflict among the Motion, the Postpetition Documents, and the terms of this Order, this Order shall govern and control. Notwithstanding anything to the contrary in this Order, including the foregoing sentence, Postpetition Agent shall elect to act, or elect to refrain from acting, solely in accordance with the direction of the requisite number of Postpetition Lenders under the Postpetition Loan Agreement.

(c)     Modification of Stay. The automatic stay of Code § 362 is hereby modified with respect to Postpetition Agent and Postpetition Lenders to the extent necessary to effectuate the provisions of this Order, including, after the Termination Date, to permit Postpetition Agent to exercise its rights contemplated by Paragraph 6(b) above.

(d)     Financial Information. Debtor is hereby directed to deliver to Postpetition Agent and Postpetition Lenders such financial and other information and reports concerning the business and affairs of Debtor and any of the Collateral as may be required pursuant to the Postpetition Documents and as Postpetition Agent and Postpetition Lenders shall reasonably request from time to time. Debtor is also directed to allow Postpetition Agent and all Postpetition Lenders access to its premises in accordance with the terms of the Postpetition Loan Agreement.

(e)     No Waiver. The failure of Postpetition Agent, any Postpetition Lender, Swap Debt Indenture Trustee or any Swap Debt Holder, at any time or times hereafter, to require strict performance by Debtor (or by any Trustee) of any provision of this Order (or the Postpetition Documents or Swap Debt Documents, as the case may be) shall not waive, affect or diminish any right of such party, as the case may be, thereafter to demand strict compliance and performance therewith. No delay on the part of Postpetition Agent, any of the Postpetition Lenders, Swap Debt Indenture Trustee or any Swap Debt Holder, in the exercise of any right or remedy under this Order (or the Postpetition Documents or Swap

Debt Documents, as the case may be) shall preclude any other or further exercise of any right or remedy. None of the Postpetition Agent, any of the Postpetition Lenders, Swap Debt Indenture Trustee or any Swap Debt Holder, shall be deemed to have suspended or waived any of such party's rights or remedies under this Order, the Postpetition Documents or the Swap Debt Documents (as the case may be), the Code, or other applicable law unless such suspension or waiver is in writing, signed by a duly authorized officer of such party, and directed to Debtor.

9.    <u>Adequate Protection of Interests of Swap Debt Indenture Trustee and Swap Debt Holders in the Swap Debt Collateral</u>. As adequate protection of the interests of the Swap Debt Indenture Trustee and Swap Debt Holders in the Swap Debt Collateral:

(a)    <u>Code § 507(b) Claim</u>. If and to the extent the adequate protection granted to Swap Debt Indenture Trustee pursuant to this Order proves insufficient, Swap Debt Indenture Trustee shall have a superpriority administrative claim under Code § 503(b) and Code § 507(b), junior to the Postpetition Liens, the Replacement Liens, the Prepetition Liens, Permitted Liens, Prepetition Permitted Liens and all other liens and claims of Postpetition Agent, each Postpetition Lender, Prepetition Agent and each Prepetition Lender, including any claims of any such party under Code §§ 503, 507(b) or 364.

(b)    <u>Intercreditor Agreements</u>. Notwithstanding anything else to the contrary in this Order, Swap Debt Indenture Trustee and each Swap Debt Holder shall be bound by the terms of the Lien Subordination Agreement.

10.    <u>Binding Effect</u>.

(a)    <u>Stipulations, Representations and Findings</u>. The stipulations, representations and findings and the release contained in Paragraphs C and D of this Order shall be binding on all parties in interest in the Case and their respective successors and assigns, including any Trustee, subject only to the right of any Committee to file an adversary proceeding challenging such stipulations, representations, findings, and/or release within 75 days of the date of the entry of this Order.

(b)      Order.  Except as provided in Paragraph 10(a) herein, this Order shall be binding on all parties in interest in the Case and their respective successors and assigns, including any Trustee, except that any Trustee shall have the right to terminate this Order after notice and hearing.  If, in accordance with Code § 364(e), this Order does not become a final nonappealable order, if a Trustee terminates this Order, or if any of the provisions of the Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect (a) the stipulations, representations, findings and release contained in Paragraphs C and D of this Order, subject to Paragraph 10(a) of this Order; and (b) the priority, validity, enforceability or effectiveness of any lien, security interests or any other benefit or claim authorized hereby prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Order, and Prepetition Agent, Prepetition Lenders, Postpetition Agent and Postpetition Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Order, no third party is intended to be, or shall be deemed to be, a third party beneficiary of this Order.

(c)      Survival.  The provisions of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of any conflict with, any order which may be entered in the Case:  (1) confirming any chapter 11 plan; (2) converting the Case to a case under chapter 7; or (3) dismissing the Case. The terms and provisions of this Order, including the rights granted Postpetition Agent and Postpetition Lenders under Code §§ 364(c) and (d), shall continue in full force and effect until all of the Postpetition Debt is indefeasibly and finally paid in cash in full and discharged.  The rights granted to Swap Debt Indenture Trustee and the Swap Debt Holders under this Order shall continue in full force and effect until all of the Swap Debt is indefeasibly and finally paid in full and discharged or upon the effective date of a confirmed plan of reorganization of Debtor.

(d)    <u>Notice of Final Hearing</u>.  The Final Hearing is scheduled for February 12, 2004 at 1:15 P.M. (Central) and may be continued from time to time without further notice other than that given in open court.  Debtor is directed to serve a copy of this Order as soon as practicable by first class mail, postage prepaid, on Postpetition Agent, Prepetition Agent, Swap Debt Indenture Trustee, Debtor's other secured creditors, Debtor's twenty largest unsecured creditors, and the United States Trustee, which service shall constitute adequate and proper notice of the Final Hearing.  Any objection to the Order must be, no later than seventy-two hours prior to the commencement of such Final Hearing, filed with the Court and received by counsel for Debtor, Postpetition Agent, Prepetition Agent, Swap Debt Indenture Trustee, and the United States Trustee.  Any timely and properly filed and served objection will be heard at the Final Hearing.

Honorable Bruce W. Black
United States Bankruptcy Judge

Dated:  January 21, 2004

**EXHIBIT A**

**DEFINED TERMS**

1.    *Allowable 506(b) Amounts.*  Interest at the default rate, as set forth in the Prepetition Loan Agreement, and all fees, costs, expenses, and other charges due or coming due under the Prepetition Documents or in connection with the Prepetition Debt (regardless of whether such fees, costs, interest and other charges are included in the Budget) to the extent allowable under Code § 506(b), including all reasonable out-of-pocket filing and recording fees, attorneys' and paralegals' fees and expenses, external and internal audit fees and expenses, closing fees, unused facility fees, letter of credit fees, and all other costs and expenses incurred by Prepetition Agent under the Prepetition Documents with respect to the Prepetition Debt, including such fees, costs and charges incurred before, on, or after the Filing Date in connection with: (a) the negotiation, preparation and submission of this Order and any other order or document related hereto; and (b) the representation of Prepetition Agent in and in connection with the Case.

2.    *Blocked Accounts.*  Collectively, all lockbox and blocked accounts, all as referenced in Section 6.1 of the Postpetition Loan Agreement.

3.    *Budget.*  The budget attached to this Order as <u>Exhibit B</u>, as amended, modified or supplemented from time to time, for different amounts or different periods, all as may be agreed to by Postpetition Agent from time to time without the necessity for further Court approval.

4.    *Business Day.*  Any Business Day (as that term is defined in the Postpetition Loan Agreement).

5.    *Case.*  This chapter 11 case or any superseding chapter 7 case of the Debtor.

6.    *Cash Collateral.*  All "cash collateral," as that term is defined in Code § 363(a), in which Prepetition Agent and Prepetition Lenders have an interest, all deposits subject to setoff rights in favor of Prepetition Agent and Prepetition Lenders, and all cash arising from the collection or other conversion to cash of the Collateral, including from the sale of inventory and the collection of accounts receivable.  To the extent any such cash collected or received is not clearly identifiable as attributable to Prepetition Collateral or Collateral, such cash shall be deemed to be proceeds of Prepetition Collateral.

7.    *Cash Proceeds.*  All cash arising from the collection or other conversion to cash of the Collateral, including all Cash Collateral, and any other cash from the sale of inventory and the collection of accounts receivable, tax refunds, deposits subject to setoff, and insurance proceeds.

8.    *Code.*  The United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as amended, and any successor statute.  Unless otherwise indicated, all statutory section references in this Order are to the Code.

9.    *Collateral.*  All of the real and personal property of Debtor, including without limitation, the "Collateral," as that term is defined in the Postpetition Loan Agreement (but specifically excluding all claims and recoveries under Code §§ 544, 547, 548, 549, 550, and 553).

10.    *Committee.*  Any official creditors' committee appointed to represent unsecured creditors in this Case pursuant to Code § 1102.

11.    *Estate Professionals.*  Schwartz Cooper Greenberger & Krauss, Piper Rudnick LLP, Bridge Investments, and counsel for the Committee.

12.    *Estate Professionals Carveout.*  The aggregate amount set forth in Paragraph 5 of this Order for the purposes of enabling Debtor's estate to pay allowed fees and expenses (excluding any success or transaction fees) of the Estate Professionals as may be awarded from time to time pursuant to Code §§ 330 and 331; provided, however, that the Estate Professionals Carveout may be used only subject to the terms and provisions of Paragraph 5 of this Order.

13.    *Event of Default.*  Any one or more of the following:  (a) Debtor fails to comply with any of the Performance Covenants or commits any other Event of Default under the Postpetition Loan Agreement; or (b) Debtor fails to perform any of its obligations in strict accordance with the terms of, or otherwise fails to comply with any of the provisions of, this Order.

14.    *Filing Date.*  January 20, 2004.

15.    *Final Hearing.*  The final hearing on the Motion conducted in accordance with Fed. R. Bankr. P. 4001.

16.    *Final Order.*  A final order authorizing Debtor to incur Postpetition Debt entered at or in connection with the Final Hearing, in form and substance acceptable to Postpetition Agent and Postpetition Lenders.

17.    *First Priority Liens.*  Liens which are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to avoidance or subordination pursuant to any provisions of the Code, applicable nonbankruptcy law, or any agreement.

18.    *Lien Subordination Agreement.*  That certain Lien Subordination Agreement dated as of February 26, 2003, by and among Prepetition Agent, Debtor and Swap Debt Indenture Trustee.

19.    *Obligations.*  The Obligations, as that term is defined in the Postpetition Loan Agreement.

20.    ***Performance Covenants***.    Collectively, the covenants set forth in Article 7 of the Postpetition Loan Agreement.

21.    ***Permitted Liens***. Collectively, (a) all "Permitted Liens", as that term is defined in the Postpetition Loan Agreement, that (i) have priority under applicable law over the Postpetition Liens, (ii) are not subordinated by agreement or applicable law, and (iii) are non-avoidable, valid, properly perfected and enforceable; (b) the Estate Professionals Carveout; and (c) the claim of the United States Trustee for the payment of fees under 28 U.S.C. § 1930(a). For the avoidance of doubt, the Swap Debt Liens shall be Permitted Liens solely to the extent that the realized proceeds of the Real Estate Collateral exceed the "Real Estate Limit" (as that term is defined in the Postpetition Loan Agreement).

22.    ***Postpetition Charges***. Interest at the rate set forth in Sections 2.3(a) or 9.4 of the Postpetition Loan Agreement, as applicable, and all fees, costs, expenses and other charges due or coming due under the Postpetition Documents or in connection with the Postpetition Debt (including all attorneys' fees and paralegals' fees and expenses, financial advisor fees and expenses, appraiser fees and expenses, valuation related fees and expenses, consultant fees and expenses, out-of-pocket filing and recording fees, external and internal audit fees and expenses, closing fees, letter of credit fees, unused line fees, facility fees, administrative fees, agency fees, arrangement fees, deferred fees, consultant fees and expenses, and all other costs and expenses) that are incurred before, on, or after the Filing Date by Postpetition Agent with respect the preparation, negotiation or documentation of the Postpetition Documents, the Postpetition Debt, or the administration of the Postpetition Debt, even if incurred prior to the Filing Date.

23.    ***Postpetition Debt***.  (a) All indebtedness or Obligations of Debtor to Postpetition Agent or Postpetition Lenders incurred on or after the Filing Date pursuant to this Order, the Postpetition Documents, or otherwise, including any advances made by Postpetition Agent or any Postpetition Lenders to pay any Prepetition Debt, plus (b) the Postpetition Charges. The Postpetition Debt shall be deemed to include all "Existing Support Agreements" (as that term is defined in Section 2.5 of the Postpetition Loan Agreement).

24.    ***Postpetition Documents***. The Postpetition Loan Agreement, and other related agreements and documents (including the Financing Documents, as that term is defined in the Postpetition Loan Agreement), all as may be acceptable to the Postpetition Agent and Postpetition Lenders.

25.    ***Postpetition Lenders***. Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., The CIT Group/Business Credit, Inc., LaSalle Business Credit LLC, Comerica Bank and Congress Financial Corporation (Central), and any other lenders party from time to time to the Postpetition Loan Agreement.

26.    ***Postpetition Liens***. First Priority Liens in the Collateral, subject only to Permitted Liens.

27.    ***Postpetition Loan Agreement.***    That certain Debtor-In-Possession Credit Agreement by and among Debtor, Postpetition Agent, and Postpetition Lenders dated as of January 20, 2004, as amended, modified or supplemented from time to time, a copy of which is attached hereto as Exhibit C.

28.    ***Prepetition Agent.***    Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc.

29.    ***Prepetition Collateral.***    All of the Collateral (as that term is defined in the Prepetition Loan Agreement) existing as of the Filing Date, and all proceeds, rents, issues, profits and products thereof.

30.    ***Prepetition Debt.***    All indebtedness or obligations under the Prepetition Documents as of the Filing Date, including contingent liabilities under outstanding letters of credit, and all Allowable 506(b) Amounts.

31.    ***Prepetition Documents.***    The Prepetition Loan Agreement and the Financing Documents (as that term is defined in the Prepetition Loan Agreement), as amended, modified, or supplemented from time to time.

32.    ***Prepetition Lenders.***    Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., The CIT Group/Business Credit, Inc., LaSalle Business Credit LLC, Comerica Bank and Congress Financial Corporation (Central), and any other lenders party from time to time to the Prepetition Loan Agreement.

33.    ***Prepetition Liens.***    Prepetition Agent's asserted security interests in the Prepetition Collateral under the Prepetition Documents, subject only to Prepetition Permitted Liens.

34.    ***Prepetition Loan Agreement.***    That certain Credit Agreement dated as of February 26, 2003, by and among Debtor, Prepetition Agent, and Prepetition Lenders, as amended, modified and supplemented from time to time.

35.    ***Prepetition Permitted Liens.***    Collectively, all "Permitted Liens," as that term is defined in the Prepetition Loan Agreement, that, as of the Filing Date:  (a) had priority under applicable law over the Prepetition Liens;  (b) were not subordinated by agreement or applicable law; and (c) were non-avoidable, valid, properly perfected and enforceable.  For the avoidance of doubt, the Swap Debt Liens shall be Prepetition Permitted Liens solely to the extent that the realized proceeds of the Real Estate Collateral exceed the "Real Estate Limit" (as that term is defined in the Postpetition Loan Agreement).

36.    ***Real Estate Collateral.***    All Swap Debt Collateral that consists of real property.

37. **_Replacement Liens_.** First Priority Liens in all of the Collateral (other than the Prepetition Collateral), subject only to: (a) the Postpetition Liens; (b) Prepetition Permitted Liens; and (c) Permitted Liens.

38. **_Swap Debt_.** All indebtedness or obligations under the Swap Debt Documents as of the Filing Date.

39. **_Swap Debt Collateral_.** The "Collateral," as that term is defined in the Swap Debt Indenture.

40. **_Swap Debt Documents_.** The Swap Debt Indenture and all "Swap Debt Documents," as that term is defined in the Postpetition Loan Agreement.

41. **_Swap Debt Holders_.** Collectively, all holders of Swap Debt Indentures.

42. **_Swap Debt Indenture_.** The "Swap Debt Indenture," as that term is defined in the Postpetition Loan Agreement.

43. **_Swap Debt Liens_.** Swap Debt Indenture Trustee's asserted security interests in the Swap Debt Collateral under the Swap Debt Documents.

44. **_Termination Date_.** At Postpetition Agent's election, the earliest to occur of: (a) the date on which Postpetition Agent provides, via facsimile or overnight mail, written notice to counsel for Debtor, counsel for Swap Debt Indenture Trustee, and counsel for any Committee of the occurrence of an Event of Default; (b) the effective date of a confirmed plan in the Case; (c) the entry of an order converting this case to a case under chapter 7 of the Code or dismissing the case; (d) if the Final Order is not entered on or before such date, February 24, 2004; or (e) January 20, 2005.

45. **_Trustee_.** Any trustee appointed or elected in the Case.

## **EXHIBIT B**

**Wickes, Inc. - DIP Budget Analysis**
1/10/2004 15:37

| | | 17% | 14% | 37% | 13% | 19% | 23% | 27% | 27% | 23% | 27% | 27% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Inflows/Outflows | Annual | | | January | | | | February | | | | March |
| | | 14 to 10 | 18 to 24 | 7 | 15 to 21 | 29 to 6 | 14 to 20 |

| | Annual | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Inflows** | | | | | | | | | | | | |
| Cash Sales | | | | | | | | | | | | |
| A/R Collections (see schedule __) | | 6,034 | 4,969 | 13,133 | 4,614 | 6,744 | 7,326 | 8,600 | 8,600 | 7,326 | 7,106 | 8,341 | 8,341 |
| Other Cash Inflows (see schedule __) | | 300 | 247 | 653 | 230 | 335 | 308 | 361 | 361 | 308 | 360 | 422 | 422 |
| **Total Cash Inflows** | | 6,334 | 5,216 | 13,786 | 4,844 | 7,079 | 7,633 | 8,961 | 8,961 | 7,633 | 7,465 | 8,763 | 8,763 |
| | | | | | | | | | | | | |
| **Cash Outlays** | | | | | | | | | | | | |
| Material Purchases (see schedule __) | | 2,296 | 3,796 | 5,296 | 3,796 | 3,796 | 4,634 | 4,837 | 5,040 | 5,329 | 5,887 | 7,312 | 6,334 |
| | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | |
| Salaries & Wages | | 1,621 | | 1,665 | | 1,540 | | 1,621 | | 1,540 | | 1,621 | |
| Severance | | | | | | 100 | | | | | | | |
| KERP (see schedule __) | | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee Bonus / Incentive Comp (see schedule __) | | - | - | - | - | - | - | - | - | - | - | 157 | - |
| Payroll Taxes | | 810 | | 845 | | 770 | | 810 | | 770 | | 810 | |
| Insurances (see schedule __) | | - | 156 | 626 | 232 | 290 | 232 | 436 | 287 | 263 | 232 | 376 | 287 |
| | | | | | | | | | | | | |
| Other Operating Expenses | | | | | | | | | | | | |
| - Maint, Office, Travel, Utilities, Fuel | 100% | | 390 | 390 | 390 | 390 | | 485 | 485 | 485 | | 484 | 484 |
| - Professional Fees (see schedule __) | | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| - Property taxes (see schedule __) | | - | - | - | 35 | - | 105 | - | 95 | - | 31 | - | - |
| - Real estate rentals (see schedule __) | | 188 | - | - | - | 188 | - | - | - | - | 187 | - | - |
| - Tool rental equipment rentals (see schedule __) | | 45 | - | 70 | - | 45 | - | 70 | - | 45 | - | 70 | - |
| - Rolling stock rentals (see schedule __) | | 261 | 224 | 24 | - | 266 | 10 | 216 | 23 | 266 | 10 | 216 | 23 |
| - Marketing | | 18 | 18 | 175 | 18 | 18 | 260 | 18 | 18 | 18 | 22 | 22 | 22 |
| - Technology leases (see schedule __) | | 14 | 0 | 14 | - | 13 | 1 | 0 | 14 | 12 | 2 | 0 | 15 |
| - Vehicle licenses (see schedule __) | | 11 | 13 | 9 | 8 | 44 | 1 | 14 | 38 | 15 | 3 | 8 | 3 |
| | | | | | | | | | | | | |
| **Gross Cash Outflows** | | 5,673 | 4,617 | 9,134 | 4,499 | 7,479 | 5,748 | 8,527 | 6,020 | 8,764 | 6,878 | 11,096 | 7,188 |
| **EBITDA** | | 661 | 599 | 4,653 | 345 | (400) | 1,886 | 434 | 2,941 | (1,130) | 587 | (2,332) | 1,575 |
| | | | | | | | | | | | | |
| Restructuring Fees (see schedule __) | | | | | | | | | | | | |
| Debtor Fees | | - | - | 475 | - | - | - | - | - | 485 | - | - | - |
| Creditor Fees | | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | | - | - | - | - | - | - | - | - | - | - | - | - |
| Int. Expense on DIP Loan | 4.75% | | | - | | 114 | | - | | 148 | | | |
| Int. Expense on '05 Notes | | | | - | 355 | | | | 355 | | | | 355 |
| Capital expenditures | | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 |
| Sales taxes (see schedule __) | | - | 48 | 1,456 | 78 | 113 | 58 | 36 | 1,242 | 174 | 173 | 93 | 878 |
| Income & franchise taxes (see schedule __) | | - | - | - | - | - | - | - | 23 | - | - | - | 20 |
| Term Loan Interest | 5.00% | 22,375 | | | | 93 | | | | 93 | | | |
| DIP financing fees/expenses (see schedule __) | | | | 800 | | | 50 | | | | 30 | | |
| | | | | | | | | | | | | |
| **Free Cash Flows** | | 603 | 494 | 2,664 | (945) | (778) | 1,771 | 290 | 1,264 | (2,087) | 357 | (2,513) | 265 |
| | | | | | | | | | | | | |
| **Receivables** | | | | | | | | | | | | |
| Beginning Balance | | 48,641 | 47,720 | 49,863 | 43,842 | 47,340 | 48,709 | 48,117 | 46,252 | 44,386 | 43,795 | 44,560 | 44,089 |
| Credit Sales | | 4,710 | 6,710 | 6,710 | 7,710 | 7,710 | 6,353 | 6,353 | 6,353 | 6,353 | 7,425 | 7,425 | 7,425 |
| Sales Tax | | 403 | 403 | 403 | 403 | 403 | 381 | 381 | 381 | 381 | 446 | 446 | 446 |
| Collections | | 6,034 | 4,969 | 13,133 | 4,614 | 6,744 | 7,326 | 8,600 | 8,600 | 7,326 | 7,106 | 8,341 | 8,341 |
| Ending Balance | | 47,720 | 49,863 | 43,842 | 47,340 | 48,709 | 48,117 | 46,252 | 44,386 | 43,795 | 44,560 | 44,089 | 43,619 |
| Ineligibles | 14.6% | (7,100) | (7,100) | (7,100) | (7,100) | (7,100) | (7,110) | (7,110) | (7,110) | (7,110) | (6,393) | (6,393) | (6,393) |
| Eligible Receivables | 85% | 40,620 | 42,763 | 36,742 | 40,240 | 41,609 | 41,007 | 39,142 | 37,276 | 36,685 | 38,167 | 37,697 | 37,226 |
| | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | |
| Beginning Balance | | 43,210 | 43,242 | 41,675 | 39,108 | 37,241 | 35,375 | 36,108 | 36,841 | 37,575 | 38,308 | 39,698 | 41,088 |
| Cost of sales | | 3,764 | 5,363 | 5,363 | 6,162 | 6,162 | 5,059 | 5,059 | 5,059 | 5,059 | 5,902 | 5,902 | 5,902 |
| Purchases | | 3,796 | 3,796 | 2,796 | 4,296 | 4,296 | 5,793 | 5,793 | 5,793 | 7,293 | 7,293 | 7,293 | 7,293 |
| Ending Balance | | 43,242 | 41,675 | 39,108 | 37,241 | 35,375 | 36,108 | 36,841 | 37,575 | 38,308 | 39,698 | 41,088 | 42,479 |
| Ineligibles | 3.9% | (1,685) | (1,685) | (1,685) | (1,685) | (1,685) | (1,380) | (1,380) | (1,380) | (1,380) | (1,494) | (1,494) | (1,494) |
| Eligible Inventory | 60% | 41,557 | 39,990 | 37,423 | 35,556 | 33,690 | 34,729 | 35,462 | 36,195 | 36,928 | 38,204 | 39,594 | 40,985 |
| | | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 60.0% | 56.6% | 56.6% | 56.6% | 56.6% | 56.6% |
| Borrowing Base | | | 60,342 | 53,684 | 55,538 | 55,581 | 53,694 | 54,548 | 52,187 | 52,100 | 54,083 | 54,470 | 54,857 |
| Letters of credit, etc | | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) | (4,584) |
| Fee carveout | | - | - | - | (128) | (256) | (383) | (511) | (704) | (423) | (564) | (705) | (902) |
| Net borrowing base | | | 55,758 | 49,100 | 50,826 | 50,742 | 50,726 | 49,453 | 46,899 | 47,093 | 48,935 | 49,181 | 49,371 |
| | | | | | | | | | | | | |
| Beginning Revolver Balance | | | | 40,307 | 37,643 | 38,588 | 39,366 | 37,596 | 37,306 | 36,042 | 38,129 | 37,772 | 40,285 |
| Collections (Advances) | | | | 2,664 | (945) | (778) | 1,771 | 290 | 1,264 | (2,087) | 357 | (2,513) | 265 |
| Ending Revolver Balance | | | | 37,643 | 38,588 | 39,366 | 37,596 | 37,306 | 36,042 | 38,129 | 37,772 | 40,285 | 40,020 |
| | | | | | | | | | | | | |
| Excess availability | | | | | | | | | | | | |
| End of Week | | | | 11,457 | 12,238 | 11,376 | 13,131 | 12,147 | 10,858 | 8,964 | 11,163 | 8,896 | 9,351 |

**<u>EXHIBIT C</u>**

**DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**DATED AS OF JANUARY 21, 2004**

**AMONG**

**WICKES INC.,**
**Chapter 11 Debtor and Debtor-In-Possession, as Borrower,**

**MERRILL LYNCH CAPITAL,**
**a Division of Merrill Lynch Business Financial Services Inc.,**
**as Agent, Collateral Agent, Book Manager, Lead Arranger and as a Lender**

**AND**

**THE ADDITIONAL LENDERS
FROM TIME TO TIME PARTY HERETO**


**Merrill Lynch**

*ex C to interim order*
*recd  1-21-04*

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................................................ 1
    Section 1.1    Certain Defined Terms. ............................................................ 1
    Section 1.2    Accounting Terms and Determinations. .................................. 26
    Section 1.3    Other Definitional Provisions. ................................................ 26

ARTICLE 2 LOANS AND LETTERS OF CREDIT .................................................. 26
    Section 2.1    Term Loan. .............................................................................. 26
    Section 2.2    Revolving Loans. .................................................................... 29
    Section 2.3    Interest, Interest Calculations and Certain Fees. .................... 31
    Section 2.4    Notes. ...................................................................................... 35
    Section 2.5    Letters of Credit and Letter of Credit Fees. ........................... 35
    Section 2.6    General Provisions Regarding Payment; Loan Account. ........ 37
    Section 2.7    Maximum Interest. .................................................................. 38
    Section 2.8    Taxes. ...................................................................................... 39
    Section 2.9    Ancillary Services. ................................................................. 40

ARTICLE 3 REPRESENTATION AND WARRANTIES .......................................... 40
    Section 3.1    Existence and Power. .............................................................. 40
    Section 3.2    Organization and Governmental Authorization; No Contravention. ........ 41
    Section 3.3    Binding Effect. ........................................................................ 41
    Section 3.4    Capitalization. ......................................................................... 41
    Section 3.5    Financial Information. ............................................................. 41
    Section 3.6    Litigation. ............................................................................... 42
    Section 3.7    Ownership of Property. ........................................................... 42
    Section 3.8    No Default. .............................................................................. 42
    Section 3.9    Labor Matters. ........................................................................ 43
    Section 3.10   Regulated Entities. ................................................................. 43
    Section 3.11   Margin Regulations. .............................................................. 43
    Section 3.12   Compliance With Laws. ......................................................... 43
    Section 3.13   Taxes. ..................................................................................... 43
    Section 3.14   Compliance with ERISA. ...................................................... 44
    Section 3.15   Brokers. .................................................................................. 44
    Section 3.16   Budgets. ................................................................................. 45
    Section 3.17   Employment, Equityholders and Subscription Agreements. ... 45
    Section 3.18   Compliance with Environmental Requirements; No Hazardous
                 Materials. ............................................................................... 45
    Section 3.19   Intellectual Property. .............................................................. 46
    Section 3.20   Real Property Interests. .......................................................... 47
    Section 3.21   Matters Relating to Collateral. ............................................... 47
    Section 3.22   Swap Lien Subordination Agreement. .................................... 47
    Section 3.23   Prepetition Loan Documents. ................................................. 47
    Section 3.24   Full Disclosure. ...................................................................... 47

Section 3.25   Representations and Warranties Incorporated from Other Operative
Documents. ................................................................................. 48
Section 3.26   Subsidiaries. ................................................................................. 48

ARTICLE 4 AFFIRMATIVE COVENANTS ................................................................ 48
Section 4.1    Financial Statements and Other Reports. .......................................... 48
Section 4.2    Payment and Performance of Obligations. ........................................ 53
Section 4.3    Conduct of Business and Maintenance of Existence. .......................... 53
Section 4.4    Maintenance of Property; Insurance. ................................................ 54
Section 4.5    Compliance with Laws. .................................................................. 55
Section 4.6    Inspection of Property, Books and Records. ...................................... 55
Section 4.7    Use of Proceeds ............................................................................ 55
Section 4.8    Lenders' Meetings. ........................................................................ 56
Section 4.9    Hazardous Materials; Remediation. ................................................. 56
Section 4.10   Further Assurances ........................................................................ 56
Section 4.11   Cooperation. ................................................................................. 57
Section 4.12   Consultants. .................................................................................. 57

ARTICLE 5 NEGATIVE COVENANTS ..................................................................... 57
Section 5.1    Debt. ........................................................................................... 57
Section 5.2    Liens. .......................................................................................... 58
Section 5.3    Restricted Distributions. ................................................................ 59
Section 5.4    Restrictive Agreements. ................................................................. 59
Section 5.5    Payments and Modifications of Certain Debt. .................................... 59
Section 5.6    Consolidations, Mergers and Sales of Assets. ................................... 60
Section 5.7    Purchase of Assets, Investments. ..................................................... 61
Section 5.8    Transactions with Affiliates. ........................................................... 61
Section 5.9    Modification of Organizational Documents. ...................................... 61
Section 5.10   Fiscal Year. .................................................................................. 62
Section 5.11   Conduct of Business. ..................................................................... 62
Section 5.12   Prepetition Loan Documents ........................................................... 62
Section 5.13   Lease Payments. ........................................................................... 62
Section 5.14   Bank Accounts. ............................................................................. 62
Section 5.15   Hedging Transactions. ................................................................... 62
Section 5.16   Payments to Unsecured Creditors. ................................................... 63
Section 5.17   Pension Plan Payments. ................................................................. 63

ARTICLE 6 ACCOUNTS AND INVENTORY REPRESENTATIONS,  WARRANTIES,
COVENANTS AND AGREEMENTS .......................................................... 63
Section 6.1    Accounts and Account Collections. .................................................. 63
Section 6.2    Inventory. .................................................................................... 65

ARTICLE 7 PERFORMANCE COVENANTS .............................................................. 66
Section 7.1    Free Cash Flow. ............................................................................ 66
Section 7.2    Operating Expenses. ...................................................................... 67
Section 7.3    Inventory Purchases. ...................................................................... 67
Section 7.4    Inventory Sales ............................................................................. 68

ARTICLE 8 CONDITIONS ............................................................................ 68
    Section 8.1    Conditions to Effectiveness of this Agreement. ......................... 68
    Section 8.2    Conditions to Each Loan, Support Agreement and Letter of Credit......... 70

ARTICLE 9 EVENTS OF DEFAULT ........................................................... 71
    Section 9.1    Events of Default. ....................................................................... 71
    Section 9.2    Acceleration and Suspension or Termination of Revolving Loan
                  Commitment. ............................................................................... 75
    Section 9.3    Cash Collateral. ........................................................................... 75
    Section 9.4    Default Rate of Interest and Suspension of LIBOR Rate Options............ 75
    Section 9.5    Setoff Rights. ............................................................................... 75
    Section 9.6    Application of Proceeds................................................................. 76

ARTICLE 10 EXPENSES, INDEMNITY, TAXES AND RIGHT TO PERFORM .................. 76
    Section 10.1    Expenses. .................................................................................... 76
    Section 10.2    Indemnity. .................................................................................. 77
    Section 10.3    Taxes.......................................................................................... 78
    Section 10.4    Right to Perform. ........................................................................ 78

ARTICLE 11 AGENT ................................................................................... 78
    Section 11.1    Appointment and Authorization. ................................................. 78
    Section 11.2    Agent and Affiliates.................................................................... 78
    Section 11.3    Action by Agent.......................................................................... 79
    Section 11.4    Consultation with Experts........................................................... 79
    Section 11.5    Liability of Agent........................................................................ 79
    Section 11.6    Indemnification. .......................................................................... 80
    Section 11.7    Right to Request and Act on Instructions. ................................... 80
    Section 11.8    Credit Decision. .......................................................................... 80
    Section 11.9    Collateral Matters........................................................................ 80
    Section 11.10    Agency for Perfection................................................................ 81
    Section 11.11    Notice of Default........................................................................ 81
    Section 11.12    Successor Agent.......................................................................... 81
    Section 11.13    Disbursements of Revolving Loans; Payment............................. 82
    Section 11.14    Collateral Agent. ........................................................................ 84

ARTICLE 12 MISCELLANEOUS .................................................................. 84
    Section 12.1    Survival....................................................................................... 84
    Section 12.2    No Waivers. ................................................................................ 84
    Section 12.3    Notices. ....................................................................................... 85
    Section 12.4    Severability. ................................................................................ 85
    Section 12.5    Amendments and Waivers........................................................... 85
    Section 12.6    Assignments; Participations........................................................ 86
    Section 12.7    Headings. .................................................................................... 87
    Section 12.8    Confidentiality. ........................................................................... 87
    Section 12.9    GOVERNING LAW; SUBMISSION TO JURISDICTION. ................... 88
    Section 12.10    WAIVER OF JURY TRIAL......................................................... 89
    Section 12.11    Publication; Advertisement......................................................... 89
    Section 12.12    Counterparts; Integration. ........................................................... 89

# ANNEXES AND EXHIBITS

## ANNEXES

Annex A      -      Commitment Annex
Annex B      -      Closing Checklist

## EXHIBITS

Exhibit A    -      Assignment Agreement
Exhibit B    -      Compliance Certificate
Exhibit C    -      Borrowing Base Certificate
Exhibit D    -      Notice of Borrowing
Exhibit E    -      Scheduled Appraised Values
Exhibit F    -      Existing Support Agreements
Exhibit G    -      Final Budget
Exhibit H    -      Real Property Collateral

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of January 21, 2004 among WICKES INC., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession, as Borrower, the financial institutions from time to time parties hereto, each as a Lender (collectively, the "Lenders"), and MERRILL LYNCH CAPITAL, a division of Merrill Lynch Business Financial Services Inc., individually as a Lender and as Agent, Collateral Agent, Book Manager and Lead Arranger.

### RECITALS:

WHEREAS, Borrower desires that Lenders extend certain term credit and working capital facilities to Borrower to provide working capital financing for Borrower, to provide funds for other general business purposes of Borrower and to refinance Borrower's Prepetition Obligations;

WHEREAS, Borrower desires to secure all of its Obligations under the Financing Documents by granting to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of its personal and real property, including without limitation all of the outstanding capital stock or other equity securities, as applicable, of each Subsidiary; and

WHEREAS, each Subsidiary is willing to guaranty all of the Obligations of Borrower to Lenders under the Financing Documents, and to grant to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of its personal and real property;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower, Lenders and Agent agree as follows:

### ARTICLE 1
### DEFINITIONS

Section 1.1        Certain Defined Terms.

The following terms have the following meanings:

"**Accessions**" means "accessions" (as defined in Article 9 of the UCC) to other Collateral of Borrower and the Subsidiaries.

"**Accounts**" means "accounts" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries, including without limitation any and all rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, in each case, for purposes of calculating the Borrowing Base, net of any credits, rebates or offsets owed by Borrower to the respective customer.

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC.

"**Administration Fee**" has the meaning set forth in Section 2.3(d).

"**Affiliate**" means with respect to any Person (i) any Person that directly or indirectly controls such Person, (ii) any Person which is controlled by or is under common control, direct or indirect, with such controlling Person and (iii) in the case of an individual, the parents, descendants, siblings and spouse of such individual.  As used in this definition, the term "**control**" of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" means Merrill Lynch in its capacity as agent for the Lenders hereunder, as such capacity is established and subject to the provisions of Article 11 and the successors of Merrill Lynch in such capacity.

"**Agent Advances**" has the meaning set forth in Section 2.2(a)(ii).

"**Agreement**" means this Debtor-In-Possession Credit Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Ancillary Services**" means any service or facility (other than any Debt and/or Letter of Credit facility) extended to Borrower or any Subsidiary by any Designated Lender Affiliate in reliance on the agreement of a Lender to indemnify such Designated Lender Affiliate in respect of such service or facility.

"**Approved First Day Payments**" means any payments to vendors, customers, employees, contractors, professionals or other Persons approved in a first day order in the Bankruptcy Case and acceptable to Agent.

"**Asset Disposition**" means any sale, lease, license or other consensual disposition by any Credit Party of any asset, but excluding (i) dispositions of Inventory in the ordinary course of business, (ii) leases of tool rental equipment in the ordinary course of business, (iii) dispositions of Cash Equivalents, and (iv) collections in respect of Accounts.

"**Assignee**" has the meaning set forth in Section 12.6(a).

"**Assignment Agreement**" means an agreement substantially in the form of Exhibit A hereto.

"**Availability Block**" means an amount equal to $10,000,000; provided, that such amount shall be reduced to $8,700,000 for the period (i) commencing on the later of (a) February 14, 2004 and (b) the date on which Hilco Appraisal Services, LLC delivers to Agent the Inventory appraisal in process on the Filing Date and (ii) ending on March 31, 2004.  The Agent and Lenders agree to consider, in their sole and absolute discretion, a

request by Borrower for a further seasonal reduction in the Availability Block after receipt and review by Agent and Lenders of Borrower's long term projections described in Section 4.1(x).

"**Avoidance Action Recoveries**" means any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case in respect of any Avoidance Actions.

"**Avoidance Actions**" means any and all actions in the Bankruptcy Case under any and all of Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"**Bankruptcy Case**" means the case under Chapter 11 of the Bankruptcy Code in which Borrower is the debtor and the debtor-in-possession, pending before the Bankruptcy Court.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §101 et seq., as in effect on the Filing Date and as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois having jurisdiction over the Bankruptcy Case.

"**Bankruptcy Plan**" means a final plan of reorganization for Borrower confirmed by final order of the Bankruptcy Court in the Bankruptcy Case, in form and substance satisfactory to Agent and Lenders.

"**Blocked Account**" has the meaning set forth in Section 6.1(d).

"**Borrower**" means Wickes Inc., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession.

"**Borrower's Account**" means the account specified on the signature pages hereof below Borrower's name into which Loans (other than Agent Advances, which shall be disbursed by Agent in a manner permitted by Section 2.2(a)(ii)) shall, absent other written instructions, be made, or such other account as Borrower may specify by written notice to Agent.

"**Borrowing Base**" means, as of any date of calculation, a dollar amount calculated pursuant to the Borrowing Base Certificate most recently delivered to Agent in accordance with the terms hereof, equal to the sum of (i) 85% of Eligible Accounts; plus (ii) (1) during the period commencing on the Effective Date and ending on February 13, 2004, the lesser of (A) 60% of Eligible Inventory or (B) $35,000,000, and (2) at all times on and after February 14, 2004, the least of (A) 60% of Eligible Inventory, (B) 85% of a net recovery percentage (exclusive of commissions and operating expenses in connection with liquidation) recommended by an appraiser retained by Agent of Eligible Inventory, adjusted from time to time in light of the most recent appraisal delivered to Agent prior to the Effective Date or pursuant to Section 4.1(t) or other information provided to Agent by such appraiser or (C) $35,000,000; provided, that aggregate advances against otherwise Eligible Inventory in transit to Borrower, already paid for by Borrower and shipped by the vendor

shall not exceed $3,000,000; minus (iii) the Availability Block; and minus (iv) Reserves then established by Agent. Notwithstanding the foregoing, at all times that the Swap Indenture remains in existence, the Borrowing Base shall not exceed the sum of (a) 95% of the net book value of Borrower's Accounts and each Subsidiary's accounts plus (b) 75% of Borrower's Inventory and each Subsidiary's inventory. Agent may, from time to time, in the exercise of its reasonable credit judgment reduce or increase any percentage amount set forth in the immediately preceding sentence (any such increase not to exceed the percentages established on the Closing Date) based on either:   (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Agent, could reasonably be expected to adversely affect the Accounts and/or the Inventory, as determined by Agent in the exercise of its reasonable credit judgment.

**"Borrowing Base Certificate"** means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit C hereto.

**"Business Day"** means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Chicago are authorized by law to close and, in the case of a Business Day which relates to a LIBOR Loan, a day on which dealings are carried on in the London interbank eurodollar market.

**"Capital Lease"** of any Person means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

**"Carveout"** has the meaning provided in the then-applicable Financing Order.

**"Cash Equivalents"** means any Investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, (ii) commercial paper rated at least A-1 by Standard & Poor's Ratings Service and P-1 by Moody's Investors Services, Inc., (iii) time deposits with, including certificates of deposit issued by, any office located in the United States of any bank or trust company which is organized under the laws of the United States or any State thereof and has capital, surplus and undivided profits aggregating at least $500,000,000 and which issues (or the parent of which issues) certificates of deposit or commercial paper with a rating described in clause (ii) above, (iv) repurchase agreements with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, provided in each case that such Investment matures within one year from the date of acquisition thereof by any Credit Party, or (v) any money market or mutual fund which invests only in the foregoing types of investments and the liquidity of which is satisfactory to Agent.

-4-

"**Chattel Paper**" means "chattel paper" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Closing Checklist**" means Annex B to this Agreement.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all property, now existing or hereafter acquired (and whether or not acquired or generated prior or subsequent to the Filing Date), mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to the Security Documents, including without limitation all of Borrower's and each Subsidiary's (i) Accounts; (ii) Chattel Paper; (iii) Commercial Tort Claims; (iv) Deposit Accounts, all cash, and other property deposited therein or otherwise credited thereto from time to time and other monies and property in the possession or under the control of Agent or any Lender or any affiliate, representative, agent or correspondent of Agent of any Lender; (v) Documents; (vi) General Intangibles, including without limitation any and all Intellectual Property, (vii) Goods, including without limitation any and all Inventory, any and all Equipment and any and all Fixtures; (viii) Instruments; (ix) Investment Property; (x) Letter of Credit Rights; (xi) Supporting Obligations; (xii) any and all other personal property and interests whether or not subject to the UCC; (xiii) any and all books and records, in whatever form or medium, that at any time evidence or contain information relating to any of the foregoing properties or interests in properties or are otherwise necessary or helpful in the collection thereof or realization thereon; (xiv) all Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; (xv) all Proceeds and products of the foregoing, and all insurance pertaining to the foregoing and proceeds thereof; and (xvi) all Real Property; provided, that the Collateral shall not include any Avoidance Action Recoveries.

"**Commercial Tort Claims**" means "commercial tort claims" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Commitment Annex**" means Annex A to this Agreement.

"**Commitment Expiry Date**" means January 21, 2005; provided, that such date may be extended for up to 2 successive additional 90 day periods through and including July 19, 2005 at the request of Borrower and the Subsidiaries and with the consent of Agent and Lenders, in their sole discretion.

"**Commitment Fee**" has the meaning provided in Section 2.3(c).

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit B hereto.

"**Concentration Account**" has the meaning set forth in Section 6.1(d).

"**Consolidated Subsidiary**" means at any date any Subsidiary or other Person the accounts of which would be consolidated with those of Borrower in its consolidated financial statements if such statements were prepared as of such date.

"**Continuing Director**" means a director who either is a member of Borrower's board of directors as the date hereof or who became a director subsequent to such date and whose election was duly approved by a majority of the Continuing Directors then on the board of directors of Borrower.

"**Controlled Group**" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"**Credit Exposure**" means any period of time during which the Revolving Loan Commitment is outstanding or any Loan, Reimbursement Obligation or other Obligation remains unpaid or any Letter of Credit or Support Agreement remains outstanding; provided, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim with respect thereto.

"**Credit Party**" means Borrower and each Subsidiary.

"**Debt**" of a Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid in the ordinary course of business, (iv) all Capital Leases of such Person, (v) all liabilities arising under Interest Rate Agreements and Lumber Hedging Agreements of such Person, (vi) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit or similar instrument, (vii) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (viii) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (ix) "carnouts" and similar payment obligations and (x) all Debt of others Guaranteed by such Person.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement or reimbursement required pursuant to the terms of any Financing Documents.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Deposit Account Control Agreement**" means an agreement, in form and substance satisfactory to Agent, among Agent, Borrower or a Subsidiary of Borrower maintaining a Deposit Account at any bank, and such bank, which agreement provides that (x) such bank shall comply with instructions originated by Agent directing disposition of the funds in such Deposit Account without further consent by Borrower or such Subsidiary (as applicable), and (y) such bank shall agree that it shall have no Lien on, or right of setoff against, such Deposit Account or the contents thereof, other than in respect of commercially reasonable fees and other items expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including (i) as to any such agreement pertaining to any Blocked Account, providing that all items received or deposited in such Blocked Account are the property of Agent, and that such bank shall wire, or otherwise transfer, including by reverse ACH transfer, in immediately available funds, on a daily basis to the Concentration Account all funds received or deposited into such Blocked Account and (ii) as to any such agreement pertaining to the Concentration Account, providing that all items received or deposited in the Concentration Account are the property of Agent, and that such bank shall wire or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited in the Concentration Account.

"**Designated Lender Affiliates**" means any Affiliate of Agent or any Lender that (i) from time to time makes Ancillary Services available to Borrower or any Subsidiary and (ii) in the case of an Affiliate of a Lender other than Merrill Lynch, is expressly identified in writing by Agent, in its sole discretion, as a Designated Lender Affiliate.

"**Documents**" means "documents" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**EBITDA**" has the meaning as defined pursuant to the terms of the Compliance Certificate.

"**Effective Date**" means the date upon which all conditions contained in Section 8.1 have first been satisfied.

"**Eligible Account**" means any Account of Borrower that Agent, in its reasonable credit judgment exercised in good faith, deems to be an Eligible Account. Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

       (i)     it does not arise from the actual and bona fide sale and delivery of goods or the performance of services by Borrower in the ordinary course of its business, which transactions are completed substantially in accordance with the terms and provisions contained in any documents related thereto;

       (ii)    (a) Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (including any Account that

arises from a sale on consignment, guaranteed sale, sale and return, sale on approval or other terms under which payment by the Account Debtor may be conditioned or contingent) or (b) Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(iii)    an invoice relating to such Account, acceptable to Agent in form and substance, has not been sent by Borrower to the applicable Account Debtor;

(iv)    it is unpaid more than thirty (30) days after the due date therefor, or (except as provided in clause (v) below) it is unpaid more than seventy-one (71) days after the date of the original invoice therefor;

(v)    it is unpaid more than thirty (30) days after the due date therefor, or it is unpaid more than one hundred twenty (120) days after the date of the original invoice therefor, provided that Accounts unpaid between seventy-two (72) days and one hundred twenty (120) days after the original invoice date shall be ineligible under this clause (v) to the extent the aggregate amount thereof exceeds eight percent (8%) of the dollar amount of all Accounts of Borrower;

(vi)    it is owed by an Account Debtor obligated in respect of Accounts constituting more than ten percent (10%) of the aggregate dollar amount of all Accounts (but the portion of the Accounts not in excess of the applicable percentage may be deemed Eligible Accounts); provided that Agent may, in its reasonable credit judgment exercised in good faith, may increase such percentage to a percentage greater than ten percent (10%) but not in excess of fifteen percent (15%);

(vii)    it is the obligation of an Account Debtor if twenty percent (20%) or more of the dollar amount of all Accounts owing by that Account Debtor are ineligible because they are unpaid more than thirty (30) days after the due date thereof;

(viii)    it consists of progress billings (such that the obligation of the Account Debtors with respect to such Account is conditioned upon Borrower's satisfactory completion of any further performance under the agreement giving rise thereto), bill and hold invoices or retainage invoices (such that the Account Debtor is permitted to hold all or a portion of the payment thereof until completion of the applicable project), except as to bill and hold invoices, if Agent shall have received an agreement in writing from the Account Debtor, in form and substance satisfactory to Agent, confirming the unconditional obligation of the Account Debtor to take the goods related thereto and pay such invoice;

(ix)    it arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity which has any common officer or director with any Credit Party;

(x)    and to the extent that such Account exceeds any credit limit established by Agent, in its reasonable credit judgment exercised in good faith;

(xi)    it is payable in any currency other than U.S. dollars;

(xii)    and to the extent that any Credit Party has a payable, or is liable, for goods sold or services rendered by the applicable Account Debtor to such Credit Party, but only to the extent of such payable or liability;

(xiii)    and to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account;

(xiv)    it (a) is not owned by Borrower or (b) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Agent, on behalf of itself and Lenders and other than the Carveout;

(xv)    it is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state or municipality or department, agency or instrumentality thereof unless Agent, in its sole discretion, has agreed to the contrary in writing and Borrower, if necessary or required by Agent, has complied in a manner acceptable to Agent with the Federal Assignment of Claims Act of 1940 or any applicable state statute or municipal ordinance of similar purpose and effect, with respect to such obligation;

(xvi)    it is the obligation of an Account Debtor located in a foreign country unless (a) the Account Debtor has delivered to Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to Agent and payable only in the United States of America and in U.S. dollars, sufficient to cover such Account, in form and substance satisfactory to Agent and, if required by Agent, the original of such letter of credit has been delivered to Agent or Agent's agent, and Borrower has assigned the proceeds of such letter of credit to Agent pursuant to documentation in form and substance acceptable to Agent or otherwise named Agent as transferee beneficiary thereunder, as Agent may specify, (b) such Account is subject to credit insurance payable to Agent issued by an insurer and on terms and in an amount acceptable to Agent, or (c) such Account is otherwise acceptable in all respects to Agent (subject to such limits or lending formulae with respect thereto as Agent may determine);

(xvii)    any facts, events or occurrences exist which, in the reasonable credit judgment of Agent exercised in good faith, could reasonably be expected to impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder, including without limitation (a) Accounts owing by Account Debtors as to which Borrower has suspended further sales due to rejection of a credit application or increased credit limit request, or due to unauthorized delinquent sales or lack of creditworthiness; provided, however, that Borrower's internal coding of an Account or an Account Debtor to indicate that Borrower is reviewing, or has requested current information from the Account Debtor with respect to, such Account Debtor's financial condition, shall not in and of itself be a basis for rendering any Account ineligible pursuant to this clause; and (b) Accounts placed for collection;

(xviii)    any proceedings or actions known to any Credit Party (or to Agent) are threatened or pending against the Account Debtor with respect to such Account

which could reasonably be expected to have a material adverse change in any such Account Debtor's financial condition (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(xix)    Agent's Lien therein, on behalf of itself and Lenders, is not a first priority perfected Lien, or as to which the goods giving rise thereto are not, and were not at the time of the applicable sale, subject to any Lien in favor of Agent, on behalf of itself and Lenders;

(xx)    to the extent that it consists of a debit to clear customer credit balances, an accrual for credit memos relating to dilution, a finance or delinquency charge, a framing installation or other installation charge relating to services not yet completed by Borrower and accepted by the Account Debtor, or an installation use tax;

(xxi)    any of the representations or warranties pertaining to such Account set forth in any Financing Document is untrue in any material respect;

(xxii)    to the extent that such Account is evidenced by a judgment, Instrument or Chattel Paper; and

(xxiii)    it is otherwise unacceptable to Agent in its reasonable credit judgment exercised in good faith;

provided, that Agent may, from time to time, in the exercise of its reasonable credit judgment, change the criteria for Eligible Accounts set forth in the Borrowing Base Certificate, based on either:  (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the judgment of Agent, could reasonably be expected to adversely affect the Accounts as determined by Agent in the exercise of its reasonable credit judgment.  For purposes of this Agreement, the net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts less any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time.   Any Accounts which are not Eligible Accounts shall nevertheless be part of the Collateral.

"**Eligible Inventory**" means any Inventory of Borrower that Agent, in its reasonable credit judgment exercised in good faith, deems to be Eligible Inventory.  Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory if:

(i)    it is not owned by Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments, the rights of a surety that has issued a bond to assure performance with respect to that Inventory, except the Liens in favor of Agent, on behalf of itself and Lenders, except for

the Carveout and except for the reclamation rights of sellers of Inventory (which are addressed in the Financing Orders)),;

    (ii) it is not of a type held for sale in the ordinary course of Borrower's business;

    (iii) it consists of work-in-process Inventory;

    (iv) it is placed on consignment, it has been direct-shipped to the customer but has not yet been invoiced;

    (v) it is in transit, unless or it has been paid for in full by Borrower and is in transit to one of Borrower's locations;

    (vi) it consists of power equipment and machinery rented or to be rented to customers;

    (vii) in Agent's reasonable determination or in the determination of Borrower's management, it is excess, obsolete, unsaleable, shopworn, seconds, damaged or unfit for sale;

    (viii) it consists of display items, samples or packing or shipping materials, manufacturing supplies or replacement or spare parts;

    (ix) it is not covered by casualty insurance acceptable to Agent;

    (x) it is bill and hold Inventory;

    (xi) it consists of vendor managed Inventory or other Inventory delivered to Borrower but not yet invoiced to Borrower;

    (xii) it is (a) not located on premises owned by Borrower or (b) is located on premises leased by Borrower, or stored with a bailee, warehouseman, processor or similar Person, unless Agent has given its prior consent thereto and unless (i) a Lien waiver and collateral access agreement, in form and substance satisfactory to Agent has been delivered to Agent, together with any and all duly authorized UCC financing statements required by Agent naming such Person as debtor, Borrower as secured creditor and Agent as assignee or (ii) Reserves satisfactory to Agent have been established with respect thereto (which will be in the amount of at least two (2) month's rental and other charges relating to such location), or (c) located at any site if the aggregate book value of Inventory at any such location is less than $250,000;

    (xiii) Agent's Lien therein, on behalf of itself and Lenders, is not a first priority perfected Lien;

    (xiv) any of the representations or warranties pertaining to such Inventory set forth in any Financing Document is untrue in any material respect;

(xv)   it consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(xvi)   it is covered by a negotiable document of title, unless such document has been delivered to Agent; and

(xvii)   it is otherwise unacceptable to Agent in its reasonable credit judgment exercised in good faith;

provided, that Agent may, from time to time, in the exercise of its reasonable credit judgment exercised in good faith, change the criteria for Eligible Inventory set forth in the Borrowing Base Certificate, based on either:  (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Agent, could reasonably be expected to adversely affect the Inventory as determined by Agent in the exercise of its reasonable credit judgment.  For purposes of this Agreement, the amount of Eligible Inventory shall be determined on a first-in, first-out, lower of cost or market basis in accordance with GAAP.  Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

"**Emergency Financing Order**" means a financing order entered in the Bankruptcy Case within 5 days following the Filing Date, but prior to the satisfaction of the fifteen (15) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing Borrower to obtain the financing and to grant the Liens contemplated by and described in this Agreement, in form and substance satisfactory to Agent and Lenders, as amended, modified or supplemented from time to time with the prior consent of all Lenders; provided, however, that if the purpose of such amendment, modification or supplement is solely to reflect an amendment, modification or supplement to the Agreement, then such amendment, modification or supplement of the Emergency Financing Order shall only require the approval of such number of Lenders as would be required to approve such amendment, modification or supplement under Section 12.5 of the Agreement.

"**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements and governmental restrictions, whether now or hereafter in effect, relating to the environment or the effect of the environment on human health or to emissions, discharges or releases of pollutants, contaminants, Hazardous Materials or wastes into the environment, including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Materials or wastes or the clean-up or other remediation thereof.

"**Equipment**" means, collectively, "equipment" and "fixtures" (as each term is defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Event of Default**" has the meaning set forth in Section 9.1.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day and (ii) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"**Filing Date**" means January 20, 2004.

"**Final Budget**" means a budget of Borrower, including balance sheets, income statements, cash flow statements, Net Borrowing Availability projections and a cash receipts and disbursements schedule that reflects, on a line-item basis, anticipated cash receipts and expenditures, all set forth on a weekly basis for each week occurring in the first 9-week period following the Filing Date, in form and substance acceptable to Agent and Lenders.

"**Final Financing Order**" means a final order entered in the Bankruptcy Case after the satisfaction of the fifteen (15) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing Borrower to obtain the financing and to grant the Liens contemplated by and described in this Agreement, in form and substance substantially similar to the Emergency Financing Order and otherwise in form and substance satisfactory to Agent and Lenders, as amended, modified or supplemented from time to time with the prior consent of all Lenders; provided, however, that if the purpose of such amendment, modification or supplement is solely to reflect an amendment, modification or supplement to the Agreement, then such amendment, modification or supplement of the Final Financing Order shall only require the approval of such number of Lenders as would be required to approve such amendment, modification or supplement under Section 12.5 of the Agreement.

"**Financing Documents**" means this Agreement, the Notes, the Security Documents, the Information Certificate, the applicable Financing Order, the Swap Lien Subordination Agreement and all other documents, instruments and agreements contemplated herein or thereby and executed concurrently herewith or at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Financing Order**" means the Emergency Financing Order or the Final Financing Order, as applicable.

"**Fiscal Year**" means a fiscal year of Borrower, ending on the last Saturday of each calendar year.

"**Fixtures**" means "fixtures" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Free Cash Flow**" means, for any period, Borrower's (i) aggregate cash sales, collections in respect of Accounts and other cash received during such period minus (ii) the sum of (a) materials purchases during such period, plus (b) Operating Expenses during such period, plus (c) financing fees paid during such period, plus (d) cash interest expense paid during such period, plus (e) unfinanced Capital Expenditures during such period, plus (f) taxes paid or accrued during such period.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" means "general intangibles" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Goods**" means "goods" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.   The term "Guarantee" used as a verb has a corresponding meaning.

"**Hazardous Materials**" means (i) any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) petroleum, its derivatives, by-products and other hydrocarbons, and (v) any other toxic, radioactive, caustic or otherwise hazardous substance regulated under Environmental Laws.

-14-

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personality, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**HSBC**" means HSBC Bank USA (formerly known as Marine Midland Bank).

"**Imagine**" means Imagine Investments, Inc., a Delaware corporation.

"**Imagine Parties**" means, collectively, Imagine, Consolidated National Corporation, a Florida corporation and their respective Affiliates.

"**Indemnitees**" has the meaning set forth in Section 10.2.

"**Information Certificate**" means that certain Information Certificate of even date herewith executed by Borrower and delivered to Agent.

"**Instrument**" means an "instrument" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Intellectual Property**" means, with respect to any Person, all patents, trademarks, trade names, copyrights, technology, know-how and processes, and all applications therefor, used in or necessary for the conduct of business by such Person.

"**Interest Period**" means, as to any LIBOR Loan, the period commencing on the date such Loan is borrowed or continued as, or converted into, a LIBOR Loan and ending on the date one (1), two (2) or three (3) months thereafter, as selected by Borrower pursuant to Section 2.3(g); provided, that: (a) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the following Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day; (b) any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; (c) Borrower may not select any Interest Period for a Revolving Loan which would extend beyond the Commitment Expiry Date; and (d) Borrower may not select any Interest Period for the Term Loan if, after giving effect to such selection, the aggregate principal amount of the Term Loan having Interest Periods ending after any date on which an installment of the Term Loan is scheduled to be repaid would exceed the aggregate principal amount of the Term Loan scheduled to be outstanding after giving effect to such repayment.

"**Interest Rate Agreement**" shall mean any interest rate protection agreement, interest rate future, interest rate option, interest rate swap, interest rate cap or other interest rate hedge or arrangement under which Borrower or any Subsidiary is a party or beneficiary and that is entered into in relation to interest on Debt of Borrower or such Subsidiary.

**"Interim Amount"** means $32,000,000.

**"Interim Period"** means the period commencing with the entry of the Emergency Financing Order and ending on the earlier to occur of (a) the entry of the Final Financing Order and (b) the date that is 35 days after the Filing Date.

**"Inventory"** means "inventory" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"Investment"** means any investment in any Person, whether by means of acquiring or holding securities, capital contribution, loan, time deposit, advance, Guarantee or otherwise.

**"Investment Property"** means "investment property" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"LC Issuer"** means Merrill Lynch or a bank or trust company reasonably acceptable to Merrill Lynch, as issuer of one or more Letters of Credit outstanding at any time.

**"Lender"** means each of (i) Merrill Lynch, (ii) each other financial institution party hereto, (iii) each other Person that becomes a holder of a Note pursuant to Section 12.6, (iv) Agent, to the extent of any Agent Advances and other Revolving Loans made by Agent which have not been settled among the Lenders pursuant to Section 11.13, and (v) the respective successors of all of the foregoing, and Lenders means all of the foregoing. In addition to the foregoing, for the purpose of identifying the Persons entitled to share in the Collateral and the proceeds thereof under, and in accordance with the provisions of, this Agreement and the Security Documents, the term "Lender" shall include Designated Lender Affiliates.

**"Letter of Credit"** means a standby letter of credit issued for the account of Borrower by an LC Issuer which expires by its terms within one year after the date of issuance and in any event at least thirty (30) days prior to the Commitment Expiry Date. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiry date for one or more successive one (1) year periods provided that the LC Issuer that issued such Letter of Credit has the right to terminate such Letter of Credit on each such annual expiration date and no renewal term may extend the term of the Letter of Credit to a date that is later than the thirtieth (30th) day prior to the Commitment Expiry Date.

**"Letter of Credit Liabilities"** means, at any time of calculation, the sum of (i) the amount then available for drawing under all outstanding Letters of Credit (without regard to whether any conditions to drawing thereunder can then be met), plus (ii) the aggregate unpaid amount of all reimbursement obligations in respect of previous drawings made under such Letters of Credit.

**"Letter of Credit Rights"** means "letter of credit rights" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

-16-

"**LIBOR**" means, with respect to any LIBOR Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/16 of 1%) equal to (i) the rate of interest which is identified and normally published by Bloomberg Professional Service Page BBAM 1 as the offered rate for loans in U.S. dollars for the applicable Interest Period under the caption British Bankers Association LIBOR Rates as of 11:00 a.m. (London time), on the second full Business Day next preceding the first day of such Interest Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by (ii) the sum of one minus the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).  If Bloomberg Professional Service no longer reports the LIBOR or Agent determines in good faith that the rate so reported no longer accurately reflects the rate available to Agent in the London Interbank Market or if such index no longer exists or if Page BBAM 1 no longer exists or accurately reflects the rate available to Agent in the London Interbank Market, Agent may select a replacement index or replacement page, as the case may be.

"**LIBOR Loans**" means any Loans which accrue interest by reference to the LIBOR, in accordance with the terms of this Agreement.

"**LIBOR Margin**" means 3.25% per annum with respect to the Revolving Loans and other Obligations (other than the Term Loan) and 4.00% per annum with respect to the Term Loan.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.  For the purposes of this Agreement and the other Financing Documents, Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Loans**" means the Term Loan and the Revolving Loans, or any combination of the foregoing, as the context may require.

"**Lumber Hedging Agreement**" means any lumber futures contract or similar agreement or arrangement entered into by Borrower or any Subsidiary and designed to protect Borrower or such Subsidiary against fluctuations in the price of lumber actually used in the ordinary course of Borrower's business.

"**Major Casualty Proceeds**" means (i) the aggregate insurance proceeds received in connection with one or more related events under any Property Insurance Policy or (ii) any award or other compensation with respect to any condemnation of property (or any transfer or disposition of property in lieu of condemnation).

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a material adverse effect upon, any of (i) the financial condition, operations, business, properties or prospects of the Credit Parties, taken as a whole, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, or (iv) the existence, perfection or priority of any security interest granted in any Financing Document or the value of any material Collateral.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7(b).

"**Merrill Lynch**" means Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., and its successors.

"**Multiemployer Pension Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any member of the Controlled Group may have any liability.

"**Net Borrowing Availability**" means, at any time, the positive amount, if any, by which the Revolving Loan Limit at such time exceeds the Revolving Loan Outstandings at such time.

"**Net Cash Proceeds**" means, with respect to any transaction or event, an amount equal to the cash proceeds received by the Credit Party from or in respect of such transaction or event (including proceeds of any non-cash proceeds of such transaction), less (i) any out-of-pocket expenses reasonably incurred by such Person in connection therewith and (ii) in the case of an Asset Disposition, the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such Asset Disposition and any taxes paid or payable by such Person in respect of such Asset Disposition.

"**Notes**" means the Term Notes and the Revolving Loan Notes, or any combination of the foregoing, as the context may require.

"**Notice of Borrowing**" means a written notice of a Responsible Officer, appropriately completed and substantially in the form of Exhibit D hereto, which shall include a written certification to the effect that (a) the proposed Loan and its intended use are consistent with the terms of this Agreement and the Final Budget, and is necessary in order to satisfy Borrower's obligations in the ordinary course of business or as otherwise permitted under the Financing Documents, (b) all conditions to borrowing contained in this Agreement

and the other Financing Documents have been satisfied in all material respects, and (c) no Event of Default or Default is in existence.

"**Notice of LC Credit Event**" means a written notice from a Responsible Officer to Agent with respect to any issuance, increase or extension of a Letter of Credit specifying: (i) the date of issuance or increase of a Letter of Credit; (ii) the expiry date of such Letter of Credit; (iii) the proposed terms of such Letter of Credit, including the face amount; and (iv) the transactions or additional transaction or transactions that are to be supported or financed with such Letter of Credit or increase thereof, and which shall also contain certifications similar to those contained in the Notice of Borrowing form.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. The Obligations shall include, without limitation, all obligations, liabilities and indebtedness arising from or in connection with all Letters of Credit, all Support Agreements and all Ancillary Services.

"**Operating Expenses**" means for any period, all operating expenses of Borrower for such period as reflected in the Final Budget.

"**Operative Documents**" means the Financing Documents, the Subordinated Debt Documents and the Swap Debt Documents.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

"**Participant**" has the meaning set forth in Section 12.6(b).

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by notice to Borrower.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any "employee benefit pension plan", as such term is defined in Section 3(1) of ERISA, and any "employee welfare benefit plan", as such term is defined in Section 3(2) of ERISA, in each case which is subject to Title IV of ERISA (other than a Multiemployer Pension Plan), and to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a

substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

**"Permitted Contest"** means a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; provided that compliance with the obligation that is the subject of such contest is effectively stayed during such challenge.

**"Permitted Liens"** means Liens permitted pursuant to Section 5.2.

**"Person"** means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

**"Prepetition Agent"** means Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services, Inc.

**"Prepetition Collateral"** means all collateral securing the Prepetition Obligations.

**"Prepetition Credit Agreement"** means the Credit Agreement dated as of February 26, 2003 among Prepetition Agent, individually and as Agent, Collateral Agent, Book Manager and Lead Arranger, the Prepetition Lenders from time to time party thereto and Wickes Inc., as amended through the Filing Date.

**"Prepetition Lenders"** means the lenders under the Prepetition Credit Agreement.

**"Prepetition Loan Documents"** means the Prepetition Credit Agreement and all other agreements, instruments or documents evidencing or securing the Prepetition Obligations.

**"Prepetition Obligations"** means all of the Debt and obligations outstanding as of the Filing Date under the Prepetition Loan Documents.

**"Prepetition Revolving Loans"** means revolving loans made pursuant to the Prepetition Credit Agreement.

**"Prime Rate"** means a variable per annum rate, as of any date of determination, equal to the greater of (i) the Federal Funds Rate plus one-half of one percent (0.50%) per annum and (ii) the rate from time to time published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as

of the date of publication in The Wall Street Journal of a Prime Rate that is different from that published on the preceding Business Day. In the event that The Wall Street Journal shall, for any reason, fail or cease to publish the Prime Rate, Agent shall choose a reasonably comparable index or source to use as the basis for the Prime Rate and provide prompt written notice thereof to Borrower.

"**Prime Rate Loans**" means Loans, which accrue interest by reference to the Prime Rate, in accordance with the terms of this Agreement.

"**Prime Rate Margin**" means 2.00% per annum with respect to the Revolving Loans and other Obligations (other than the Term Loan) and 2.75% per annum with respect to the Term Loan.

"**Proceeds**" means "proceeds" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Property Insurance Policy**" means any insurance policy maintained by any Credit Party covering losses with respect to tangible real or personal property or improvements or losses from business interruption.

"**Pro Rata Share**" means (i) with respect to a Lender's right to receive payments of principal and interest with respect to the Term Loan, the Term Loan Commitment Percentage of such Lender, (ii) with respect to a Lender's obligation to make Revolving Loans, such Lender's right to receive payments of principal and interest with respect thereto, such Lender's right to receive the Unused Line Fee described in Section 2.3(b), and such Lender's obligation to share in Letter of Credit Liability and to receive the related Letter of Credit fee described in Section 2.5(b), the Revolving Loan Commitment Percentage of such Lender and (iii) for all other purposes (including without limitation the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by dividing (x) the sum of the Revolving Loan Commitment Amount of such Lender (or, in the event the Revolving Loan Commitment shall have been terminated, such Lender's then existing Revolving Loan Outstandings), plus such Lender's then outstanding principal amount of the Term Loan by (y) the sum of the Revolving Loan Commitment (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings of all Lenders), plus the then outstanding principal amount of the Term Loan.

"**Real Estate Limit**" means an amount equal to $26,811,400.

"**Real Property**" means the real property of Borrower or any of the Subsidiaries, together with the related rights more particularly described in Exhibit H hereto, including without limitation all buildings, structures and other improvements thereon, and all licenses, easements and appurtenances related thereto.

"**Reimbursement Obligations**" means, at any date, the obligations of Borrower then outstanding to reimburse Merrill Lynch for payments made by Merrill Lynch under a Support Agreement or under a Letter of Credit issued by Merrill Lynch as LC Issuer.

"**Reinvestment Reserve**" has the meaning set forth in Section 2.1(c).

"**Required Lenders**" means at any time Lenders holding (i) sixty-six and two thirds percent (66 2/3%) or more of the sum of the Revolving Loan Commitment and the outstanding principal balance of the Term Loan or (ii) if the Revolving Loan Commitment has been terminated, sixty-six and two thirds percent (66 2/3%) or more of the sum of (x) the aggregate outstanding principal balance of the Loans plus (y) the aggregate amount of Reimbursement Obligations.

"**Reserves**" means such amounts as Agent may from time to time establish and revise, in each case in the exercise of its reasonable credit judgment exercised in good faith, reducing the amount of Revolving Loans, Letters of Credit and Support Agreements which would otherwise be available to Borrower under the lending formula(s) provided for herein: (a) to reflect events, conditions, contingencies or risks which, as determined by Agent in the good faith exercise of its reasonable credit judgment, adversely affect, or could reasonably be expected to adversely affect, any of: (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of any Credit Party or (iii) the Liens and other rights of Agent or any Lender in the Collateral (including the enforceability, perfection and priority thereof), (b) to reflect Agent's good faith belief that any collateral report or financial information furnished by or on behalf of any Credit Party to Agent is or may have been incomplete, inaccurate or misleading in any material respect, (c) to reflect accrued and unpaid interest and fees or (d) to reflect the amount of existing tax liens, judgments, mechanic's liens and similar liens and claims, if any. To the extent Agent may, in accordance with any other terms hereof, revise the lending formula(s) used to determine the Borrowing Base or establish new criteria or revise existing criteria for Eligible Accounts or Eligible Inventory, Agent shall not also establish a Reserve for the same purpose. The amount of any Reserve established by Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as determined by Agent in good faith. Without limitation of the foregoing, Agent shall have the right to establish Reserves relating to matters such as (1) the dilution of Accounts, with dilution referring to all actual and potential offsets to an Account, (2) accruals for sales taxes collected from customers, (3) physical inventory shrink adjustments and monthly shrink reserves, (4) lumber pricing markups, (5) volume rebates from vendors, (6) material decline in the appraised value of fixed assets and (7) purchase discounts. As of the Closing Date, Agent has established special Reserves in the amounts from time to time of (x) the aggregate amount owing by Borrower to Irene Solondz in respect of the certain Promissory Note dated September 30, 2001 in the original amount of $950,000 and secured by a mortgage Lien on Borrower's Kenvil, New Jersey property, (y) the accrued and unpaid amount of the Carveout, and (z) the amount of accrued and unpaid cash interest in respect of the Swap Notes to the extent that Borrower has agreed or has been ordered to pay such amounts on a current basis. Agent will provide Borrower with prompt notice of the imposition of new Reserve categories