## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In re:             )   Chapter 11
                     )   Case Nos. 04 B 02221

WICKES INC.        )   Honorable Bruce W. Black
                     )   Hearing Date: Wednesday,

     Debtor.        )   February 25, 2003 at 1:15 p.m.
                     )   Objection Deadline: Prior to the Hearing

### NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on Wednesday, February 25, 2004, at 1:15 p.m., we shall appear before the Honorable Bruce W. Black, United States Bankruptcy Judge, Everett McKinley Dirksen Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, Courtroom 615, or, in his absence, before any other Judge who may be sitting in his place or stead and shall then and there present the attached *Debtors' Emergency Motion For Interim and Final Orders Pursuant to 11 U.S.C. § 364 (I) Authorizing Debtor to Incur Postpetition Debt; (II) Granting Priming Liens and Other Relief to LC Capital Master Fund, Ltd.; (III) Granting Adequate Protection, as Appropriate, to Merrill Lynch Capital, as Agent, and to the 2005 Bondholders; and (IV) Modifying the Interim Financing Order Entered on January 21, 2004* and *Debtor's Memorandum of Law in Support* thereof. The deadline for filing an objection to the Motion is Prior to the Hearing, pursuant to the Order Pursuant to 11 U.S.C. §§ 102 and 105(a), Bankruptcy Rules 2002(m) and 9007, and Local Rules 1000-2(A) and 7016-1 Establishing Omnibus Hearing Dates and Certain Notice, Case Management and Administrative Procedures dated January 29, 2004.

Dated: Chicago, Illinois                Respectfully submitted,
        February 24, 2004

                              **WICKES INC.**

                              By: _____

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

FEB 2 4 2004

KENNETH S. GARDNER, CLERK
**PS REP. - JJ**

                              David N. Missner (ARDC No. 01928988)
                              Marc I. Fenton (ARDC No. 06180633)
                              Steven J. Christenholz (ARDC No. 06224666)
                              **PIPER RUDNICK LLP**
                              203 North LaSalle Street, Suite 1800
                              Chicago, Illinois 60601-1293
                              (312) 368-4000



## CERTIFICATE OF SERVICE

Nina H. Taylor, a non-attorney, under penalty of perjury, certifies that on the 24th day of February, 2004, she caused the *Debtors' Emergency Motion For Interim and Final Orders Pursuant to 11 U.S.C. § 364 (I) Authorizing Debtor to Incur Postpetition Debt; (II) Granting Priming Liens and Other Relief to LC Capital Master Fund, Ltd.; (III) Granting Adequate Protection, as Appropriate, to Merrill Lynch Capital, as Agent, and to the 2005 Bondholders; and (IV) Modifying the Interim Financing Order Entered on January 21, 2004* and *Debtor's Memorandum of Law in Support* thereof to be served by messenger upon parties located in downtown Chicago and by facsimile and electronic mail upon all other parties listed on the attached service list.

_____
Nina H. Taylor

I DECLARE UNDER PENALTY OF PERJURY
THAT THE FOREGOING IS TRUE AND CORRECT.

Catherine L. Steege
Jenner & Block
One IBM Plaza, 38th Floor
330 North Wabash Avenue
Chicago, IL 60611

Mark Gertzof, Director
Kenneth S. Pardue, Vice President
Merrill Lynch Capital Corporate Finance
222 North LaSalle Street, 16th Floor
Chicago, Illinois 60601

Kevin E. Posen
Harold Stotland
Teller, Levit & Silvertrust, P.C.
Suite 800
11 East Adams
Chicago, IL 60603

Roman L. Sukley
Attorney Office of the U.S. Trustee
  Northern District of Illinois
227 West Monroe Street, Suite 3350
Chicago, Illinois  60606

Richard M. Bendix
David E. Beker
Mark B. Butterman
Christopher M. Cahill
Schwartz, Cooper, Greenberger & Krauss
Suite 2700
180 North LaSalle Street
Chicago, IL  60601

Alan P. Solow
Andrew R. Cardonick
David Dranoff
Goldberg Kohn Bell Black
  Rosenbloom & Moritz, Ltd.
55 East Monroe Street, Suite 3700
Chicago, Illinois  60603-5802

Fruman Jacobson
Robert E. Richards
Patrick C. Maxcy
Sonnenschein Nath & Rosenthal LLP
Sears Tower, Suite 8000
233 South Wacker Drive
Chicago, IL 60606

Robert M. Fishman, Esq.
Brian L. Shaw, Esq.
Shaw Gussis Fishman Glantz Wolfson  & Towbin
321 North Clark Street, Suite 800
Chicago, Illinois  60610

Susan Barnes de Resendiz
Jason J. Goitia
Gardner Carton & Douglas LLP
Suite 3700
191 North Wacker Drive
Chicago, IL  60606

## UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) Case No. 04 B 2221 |
| WICKES INC., | ) The Honorable Bruce Black |
| | ) Hearing Date:  February 25, 2004 |
| | ) Hearing Time:  1:15 p.m. |
| Debtor. | ) Objection Deadline:  Prior to the Hearing |

### DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. § 364 (I) AUTHORIZING DEBTOR TO INCUR POSTPETITION DEBT; (II) GRANTING PRIMING LIENS AND OTHER RELIEF TO LC CAPITAL MASTER FUND, LTD.; (III) GRANTING ADEQUATE PROTECTION, AS APPROPRIATE, TO MERRILL LYNCH CAPITAL., AS AGENT;AND TO THE 2005 BONDHOLDERS, AND (IV) MODIFYING THE INTERIM FINANCING ORDER ENTERED ON JANUARY 21, 2004

Wickes Inc. ("**Wickes**"), the debtor and debtor-in-possession (the **"Debtor"**) in the above-captioned chapter 11 case (the **"Case"**), presents this emergency motion (the **"Motion"**) for the entry of interim and final Orders authorizing it to obtain postpetition financing ("**Postpetition Debt**") from LC Capital Master Fund, Ltd. ("**LC Capital**") secured by, *inter alia*, a priming lien under section 364(d)(1) of the United States Bankruptcy Code, 11 U.S.C. 101 *et seq.* (the "**Bankruptcy Code**"), granting LC Capital a superpriority administrative claim under section 364(c)(1) of the Code, granting the prepetition and purported postpetition lenders adequate protection, as appropriate, and modifying the Merrill Interim Order (as defined below), as necessary, to provide that the relief sought herein shall not constitute an event of default under the terms of the Merrill Interim Order or the related credit agreement.  In support of this Motion, the Debtor has filed its Memorandum of Law (the **"Memorandum of Law"**) in support of its Emergency Motion For Interim and Final Orders Pursuant to 11 U.S.C. § 364 (I) Authorizing Debtor to Incur Postpetition Debt; (II) Granting Priming Liens and Other Relief to LC Capital

Master Fund, Ltd.; (III) Granting Adequate Protection, as Appropriate, to Merrill Lynch Capital, as Agent; and to the 2005 Bondholders (defined below); and (IV) Modifying the Interim Financing Order Entered on January 21, 2004, and respectfully represents as follows:

## BACKGROUND

### A.    Current Business Operations

1.    With its non-debtor subsidiaries, GLC Division Inc. and Lumber Trademark Company, Wickes is a leading supplier of building materials and manufacturer of building components in the United States. Wickes sells its products and services primarily to residential and commercial building professionals, repair and remodeling contractors and, to a lesser extent, consumers involved in major home improvement projects. Wickes operates 52 sales and distribution facilities and 10 component manufacturing facilities that produce and distribute roof and floor trusses, framed wall panels, and pre-hung door units principally in the Midwestern, Northeastern, and Southern regions of the United States.

### B.    Prepetition Secured Indebtedness

2.    Prior to the Petition Date, Merrill Lynch, a division of Merrill Lynch Business Financial Services Inc., as administrative agent (**"Merrill Lynch"** or the **"Agent"**) on behalf of a group of lenders (the **"Senior Lenders"** or **"Prepetition Lenders"**), provided the Debtor with a $110,000,000 senior credit facility (the **"Senior Credit Facility"**), the proceeds of which were used to refinance certain of the Debtor's then existing indebtedness and to provide working capital for operation of Wickes' business. The Senior Credit Facility consisted of (a) an $85,000,000 revolving credit facility due February 26, 2007, and (b) a $25,000,000 term loan due February 26, 2007. As of the Petition Date, the Debtor owed the Senior Lenders approximately $39,000,000 on the revolving credit facility and approximately $22,375,000 on the term loan. The Senior Credit Facility is part of the Prepetition Debt.

3.      Prior to the petition date, the Debtor issued a series of bonds ( the **"2005 Bonds"**)

secured by (a) a lien on the Debtor's real estate in excess of $26.3 million, and (b) a junior lien

on the Debtor's machinery and equipment. As of the Petition Date, the face amount of the 2005

Bonds was approximately $36 million.

## C.      Events Leading to the Case

4.      In November 2003, the Debtor made an exchange offer (the **"Exchange Offer"**)

of cash or cash and new notes for all $21,123,000 in face amount of its 11 5/8% Subordinated

Notes due 2003 (the **"2003 Notes"**). After an extension of the offer period, holders of the 2003

Notes did not tender sufficient notes, and the Exchange Offer was withdrawn. The 2003 Notes

matured on December 15, 2003 and have not been paid.

5.      The Debtor filed the Case because the Debtor (a) was unable to retire a sufficient

amount of debt through the Exchange Offer, (b) has not acquired alternative financing of its note

obligations and other obligations, (c) is experiencing limited borrowing availability under the

revolving loan portion of the Senior Lending Facility and (d) is having restrictive credit terms

imposed on it by vendors.

## D.      Financing History in Chapter 11 Case

6.      On January 20, 2004 (the **"Petition Date"**), the Debtor filed its voluntary petition

in this Court for reorganization relief under chapter 11 of the Bankruptcy Code. Since that time,

the Debtor has continued to operate its business and manage its property as debtor-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code

7.      On or about January 26, 2004, the United States Trustee appointed the Official

Committee of Unsecured Creditors of the Debtor (the **"Creditors' Committee"**). No trustee or

examiner has been appointed in this Case.

8.    Immediately upon filing its petition, Debtor filed a motion (the **"Merrill Financing Motion"**) to obtain postpetition financing from Merrill Lynch, as agent for the Prepetition Lenders. The Merrill Financing Motion was granted, on an interim basis, on January 21, 2004, which gave Debtor the authority to borrow up to $32 million from the Prepetition Lenders on a postpetition basis (the **"January 21 Order"**). The Merrill Financing Motion was set for final hearing on February 12, 2004. On February 9, 2004, the Official Committee of Unsecured Creditors (the **"Creditors' Committee"**), which was formed subsequent to the entry of the January 21 Order, filed an objection to the entry of a final order granting the Merrill Financing Motion on the terms set forth in the Merrill Interim Order.[1]  On February 12, 2004, the Court entered an order (a) continuing the Merrill Financing Motion to February 25, 2004, under the terms of the January 21 Order, (b) rescheduling the final hearing on the Merrill Financing Motion for that date, and (c) modifying the January 21 Order to allow the Debtor to borrow up to $42 million pending a final hearing (the **"February 12 Order"**). On February 24, 2004, the Debtor, the Prepetition Lenders, the 2005 Bondholders, and the Committee agreed to modify the terms of the January 21 Order to allow the Debtor to borrow up to $47 million pending a final hearing (the **"February 24 Agreement"** and, together with the January 21 Order and the February 12, 2004 Order, the **"Merrill Interim Order"**).

9.    Pursuant to the terms of the Merrill Interim Order, monies collected by the Debtor postpetition were to be applied to repay the prepetition Senior Credit Facility. However, as set forth above, the Creditors' Committee has filed an objection to the Merrill Interim Order that relates to, among other things, the payment of Prepetition Lenders' Senior Credit Facility on a

---

[1] The Objection of the Official Committee of Unsecured Creditors to DIP Financing as Currently Proposed lists numerous provisions of the Merrill Interim Order and related creditor agreement that it finds objectionable including, *inter alia*, the following: the "roll-up" of the prepetition debt into postpetition debt, the restrictions on

postpetition basis.  In the event that the Court finds that the provisions of the Merrill Interim Order relating to the payment of the prepetition Senior Credit Facility are valid and enforceable, as of the date of this Motion, the revolving portion of the Senior Credit Facility will have been paid in full, and replaced by the postpetition revolving loan.  Thus, since the Petition Date, the Debtor has not borrowed any funds from the Prepetition Lenders on a postpetition basis, but have, instead, actually paid the Prepetition Lenders sufficient funds to reduce the total indebtedness to the Prepetition Lenders by approximately $5 million.

10.     At the time it requested entry of the Merrill Interim Order, the Debtor believed that the financing authorized by such Order was sufficient to operate the Debtor's business.  That belief was predicated on the assumption that vendors would provide the Debtor with approximately the same amount of postpetition trade credit that they had provided to the Debtor prior to the Petition Date.  However, due to the restrictions on availability contained in the credit agreement provisionally approved in the Merrill Interim Order, the Prepetition Lenders' apparent lack of commitment to fund the Debtor's spring inventory purchases, and certain other issues raised in the Creditors' Committee's objection to the Merrill Financing Motion, the Debtor's vendors have refused to provide the expected level of trade credit. As a result, the Debtor has been unable to purchase sufficient inventory to meet the anticipated sales of the upcoming construction season.  The lack of sufficient inventory will have dire consequences for the Debtor, its employees and its creditors and will seriously and irreparably impair the Debtor's reorganization efforts.

11.     Since the entry of the Merrill Interim Order, the Debtor has conducted extensive negotiations with the Prepetition Lenders to modify the Merrill Interim Order and the credit

---

availability, the technical and subjective default provisions, the prohibition on the Debtor seeking the use of cash collateral, the scope of certain releases, the potential liens on avoidance actions, and the pricing and fee structure.

agreement related thereto, with the goal of reducing the existing block on availability so that the Debtor can provide vendors with sufficient comfort to provide the required level of trade credit. This increased lending by the Prepetition Lenders combined with the extension of trade credit from its vendors would allow the Debtor to purchase inventory in preparation for the construction season, which will support the Debtor's efforts to sell its business as a going concern or to formulate a plan of reorganization. To date, the Prepetition Lenders have refused to modify the terms of the interim financing so as to provide the requested availability or address, in any concrete manner, the issues raised by the Creditors' Committee.

12.    Accordingly, in the exercise of its fiduciary duty to preserve the assets of the estate, the Debtor has continued to seek financing from other sources. As a result of its efforts, and with the assistance of the Creditors' Committee, the Debtor approached one such source, LC Capital (an affiliate of a member of the Creditors' Committee), of which it was unaware at the time of the entry of Merrill Interim Order, and entered into an agreement with LC Capital for postpetition financing. Copies of the Proposed Chapter 11 DIP Financing Term Sheet (the "**LC Capital Term Sheet**") and the draft Debtor-in-Possession Revolving Credit Agreement (the "**Credit Agreement**")[2] are attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively. Pursuant to its agreement with LC Capital, the Debtor would be able to obtain up to $20 million of postpetition financing secured by a priming lien on the same collateral as that of the Prepetition Lenders. While the Debtor has had discussions with two other potential sources of financing, both of whom would require a similar priming lien, the Debtor believes that the proposed LC

---

[2] The final terms and conditions of the Credit Agreement are still being negotiated. However, the Debtor submits that the final version of the Credit Agreement will be on terms that are substantially similar to those contained in the attached draft. In the event of a discrepancy between the provisions of the LC Capital Term Sheet and the draft Credit Agreement, the terms of the Credit Agreement shall control.

Capital financing arrangement is better than any of the other alternatives and more likely to be consummated.

13.     The Debtor believes that this additional financing will allow it to obtain the trade credit necessary to attain the inventory level needed to meet the anticipated demands of the upcoming selling season. This inventory build-up is critical to the Debtor's efforts to reorganize or sell its business as a going concern. If the relief requested in this Motion is not granted, the Debtor will likely be forced to liquidate its assets, which would make it unable to repay the 2005 Bondholders and the unsecured creditors.

## JURISDICTION

14.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

15.     The statutory predicate for relief sought herein is section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c).

## RELIEF REQUESTED

16.     By this Motion, the Debtor respectfully requests the entry of an interim and, eventually, a final Order (I) pursuant to section 364(d)(1) of the Bankruptcy Code, authorizing it to obtain postpetition financing from LC Capital secured by a priming lien senior to the liens of the Prepetition Lenders, any postpetition liens granted to the Prepetition Lenders under the Merrill Interim Order, and the liens of the holders of the 2005 Bonds; provided, however, that with respect to the Debtor's real estate, LC Capital's priming lien would extend only to the first $26.3 million of such real estate; (II) pursuant to section 364(c)(2) of the Bankruptcy Code, granting LC Capital first priority perfected liens on, and security interests in, all present and after-acquired property of the Debtor not presently subject to a lien or security interest; (III) pursuant to section 364(c)(1) of

the Bankruptcy Code, granting a superpriority administrative claim to LC Capital; all of the above

subject to certain exclusions set forth in the LC Capital Term Sheet and Credit Agreement; and

(IV) granting adequate protection, as necessary, to the Prepetition Lenders and the 2005

Bondholders.

## BASIS OF RELIEF REQUESTED

17.     At the time that the Debtor presented the Merrill Financing Motion, it believed

that it would be unable to operate postpetition solely through the use of cash collateral.

However, as of the date of this Motion, the Debtor's positive postpetition operating results and

receivable collections have allowed it operate without borrowing any funds from the Prepetition

Lenders pursuant to the Merrill Interim Order.  Instead, Debtor has operated solely through the

use of cash collateral.  In fact, the Debtor has actually paid the Prepetition Lenders sufficient

funds to reduce the total indebtedness to the Prepetition Lenders by approximately $5 million.

18.     In addition to the success of its postpetition operations thus far, the Debtor was

able to survive on cash collateral and pay down the indebtedness to the Prepetition Lenders due,

in part, to the fact that this is historically a slow time of the year for the Debtor's business.  As a

result, the Debtor has been contracting its inventory.  However, the Debtor is now on the cusp of

the construction season, which will require much higher inventory levels in order to properly

service its customers' needs and maximize the enterprise value of the business.  Thus, even if the

Debtor was authorized to use all available cash collateral, such cash collateral would be

insufficient to provide the Debtor with the working capital necessary to prevent immediate and

irreparable harm to the Debtor's business.  For the reasons set forth above, even the postpetition

financing provisionally authorized by this Court in the Merrill Interim Order will be insufficient

to allow the Debtor to operate through the spring and summer building seasons.  Therefore, the

Debtor requires the ability to incur additional credit in order to maximize the value of the estate for its creditors and other parties in interest. Despite serious and protracted negotiations, the Prepetition Lenders have refused to increase the availability of funds to the Debtor. However, LC Capital has agreed to fund the Debtor's ongoing business operations in a manner that will allow for the necessary build up of inventory.

19. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code sufficient to finance the operations of the Debtor's business. In addition, the Debtor has been unable to obtain credit allowable under section 364(c)(1), (c)(2) or (c)(3) of the Bankruptcy Code on terms more favorable than those offered by LC Capital. As suggested by the attached Credit Agreement, the terms of the proposed financing are far more favorable and beneficial to this estate, its creditors and other parties in interest than the current facility with the Prepetition Lenders.

20. LC Capital is unwilling to provide the necessary funding unless it is given the protections provided for in the Proposed Interim Order.

21. Consequently, an immediate need exists for the Debtor to obtain authorization to incur the Postpetition Debt in order to minimize disruption to, and avoid the termination of, its business operations, and to enhance the possibility of successful reorganization and the value of its estate.

22. In order to prevent immediate and irreparable harm to the estate pending a final hearing on this Motion, the Debtor needs to incur Postpetition Debt on an emergency basis as provided herein through the conclusion of such final hearing.

23. Pursuant to the LC Capital Term Sheet and the Proposed Interim Order, pending the entry of a Final Order, the Debtor would be permitted to incur up to $10 million in

Postpetition Debt. Upon entry of a final order, the Debtor would be permitted to borrow up to an additional $10 million (for a total of $20 million), as provided in the LC Capital Term Sheet.

24.    Except with respect to the first $26.3 million in value of the Debtor's real estate, the Postpetition Debt would be secured by first priority liens in all of Debtor's assets. The lien would prime all other liens, including, but not limited to, any liens purportedly granted by the Merrill Interim Order. The Postpetition Liens (a) are and shall be First Priority Liens, subject only to Permitted Liens, without any further action by Debtor, or LC Capital, and without the execution, filing or recordation of any financing statements, security agreement, mortgages or other documents or instruments, (b) shall not be subject to any security interest or lien preserved under section 551 of the Bankruptcy Code and (c) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Case.

25.    Despite the addition of the Postpetition Debt, the Prepetition Lenders will have a more than sufficient equity cushion in their collateral to adequately protect their interests in the Debtor's property. However, as additional adequate protection of the interests of the Prepetition Lenders, the Debtor's request that the Court (a) grant the Prepetition Lenders perfected, valid and enforceable replacement liens, junior to those granted to LC Capital, in the assets on which the Prepetition Lenders presently hold liens, (b) allow the Debtor to make periodic payments to the Prepetition Lenders consisting of interest at the contract rate on the outstanding balance of the indebtedness, and (c) in the event that the proposed adequate protection of the interests of the Prepetition Lenders proves insufficient, grant an allowed claim pursuant to section 507(b) of the Bankruptcy Code for the amount of any insufficiency, with priority over costs of administering the Debtor's estate and the claims of any other party in interest, other than any claim of LC Capital under section 364(c)(1) of the Bankruptcy Code. The Debtor submits that the protections

10

provided for herein are adequate to safeguard the interests of the Prepetition Lenders because (i) the Prepetition Lender's collateral is worth more than $20 million in excess of their debt, (ii) the infusion of the new postpetition financing is expected to allow the Debtor to operate, at the very least, at a breakeven basis, and therefore not generate losses that would erode the assets of Debtor's estate, (iii) the proposed financing will help to preserve and increase the value of the Prepetition Lenders' collateral by enhancing the going concern value of the Debtor's business, (iv) the Debtor anticipates that it will be able to complete a sale or confirm a plan of reorganization within six months, and (v) the payments of monthly interest will stop the Prepetition Lenders' claims from increasing during the Case and cutting into its equity cushion.

26.    In the event that the holders of the 2005 Bonds are entitled to adequate protection of their interests, the Debtor and the Prepetition Lenders previously agreed to provide such adequate protection retroactive to the filing of this Case. In order to insure that the interests of the 2005 Bondholders are adequately protected[3] as part of the proposed financing transaction, the Debtor requests that the Court (a) grant the 2005 Bondholders perfected, valid and enforceable replacement liens, junior to those granted to LC Capital and the Prepetition Lenders, in the assets on which the 2005 Bondholders presently hold liens, (b) allow the Debtor to make periodic payments to the 2005 Bondholders for a period not to exceed four months in amounts equal to the contract rate for the monthly interest due on the outstanding balance of the Bonds,[4] and (c) grant the 2005 Bondholders perfected, valid and enforceable postpetition liens, junior to those granted to LC Capital and those held by the Prepetition Lenders, in the Debtor's accounts receivable and inventory to the extent that the Bondholder's establish diminution in the value of

_____

[3]   In the event that a final order is not entered granting this Motion, the Debtor expressly reserves any and all rights to object to the rights of the 2005 Bondholders to receive adequate protection.

their interests in the Debtor's machinery and equipment during the pendency of this Case. The Debtor submits that the protections provided herein are more than adequate to protect the interests of the 2005 Bondholders because (i) the postpetition liens requested in favor of the 2005 Bondholders serve to protect them from any diminution in value of their collateral during the course of the Case, (ii) the infusion of the new postpetition financing is expected to allow the Debtor to operate, at the very least, at a breakeven basis, and therefore not generate losses that would erode the assets of Debtor's estate, (iii) the proposed financing will help to preserve and increase the value of the 2005 Bondholders' collateral by enhancing the going-concern value of the Debtor's business, (iv) the Debtor anticipates that it will be able to complete a sale or confirm a plan of reorganization within six months, and (v) the monthly payments will stop the claims of the 2005 Bondholders from increasing during the Case.

27.     LC Capital has indicated a willingness to lend the Postpetition Debt, but only on the terms and conditions set forth in the Proposed Interim Order and the Term Sheet. Under the circumstances of the Case, the terms and conditions of the Proposed Interim Order are a fair and reasonable response to the Debtor's request to incur Postpetition Debt, and the entry of the Proposed Interim Order is in the best interests of Debtor's estate and its creditors. Such terms and conditions have been negotiated in good faith and at arms' length, and the Postpetition Debt is being extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

28.     Good cause exists for the entry of the Proposed Interim Order because, among other things, entry of the Proposed Interim Order will minimize disruption of the Debtor's business and operations and permit it to meet payroll and other operating expenses, obtain needed supplies and retain customer and supplier confidence by demonstrating an ability to

---

[4]   This payment is intended to provide the 2005 Bondholders with adequate protection and not to pay interest on the debt owed to the 2005 Bondholders. The Debtor expressly reserves any and all rights to object to any claim by the

maintain normal operations. Put simply, the financing arrangement requested herein is vital to maximizing the value the Debtor's assets and avoiding immediate and irreparable harm to the Debtor's business and, thus, its estate. Accordingly, consummation of such financing would be in the best interests of the Debtor's estate, its creditors and other parties in interest.

29.    The following are material provisions of the Postpetition Loan Agreement:

| | |
|---|---|
| Borrower: | Wickes Inc., Debtor in Possession. |
| Guarantors: | All current and future subsidiaries of Borrower. |
| Lender: | LC Capital Master Fund, Ltd or Affiliate to be named. |
| Purpose: | Ongoing working capital needs, subject to a budget satisfactory to Lender. No portion of the loans shall be used to commence or prosecute an action against Lender or its affiliates. |
| Commitment Amount: | Up to $20 million aggregate principal amount revolving credit loans outstanding (the "DIP Facility"), with $10 million for use on an interim basis (the "Interim Funding Limit") until final approval within 21 days of entry of the interim approval order ("Interim Order"). Loans under the DIP Facility may be borrowed, repaid and re-borrowed in minimum increments of $500,000 until the Maturity Date. |
| Letters of Credit: | Sub-facility of the DIP Facility for Letters of Credit to be discussed. |
| Availability: | Subject to the Interim Funding Limit, after the entry of a final order, the amount available under the DIP Facility shall be the lesser of (i) the Commitment Amount, and (ii) the maximum amount of loans available to the Borrower such that the outstanding loans would not exceed the Borrowing Base. |
| Borrowing Base: | 85% of Eligible Accounts Receivable, plus the lesser of (i) 60% of Eligible Inventory, and (ii) 85% net recovery percentage recommended by an appraiser. |
| Maturity Date: | Earliest of (i) September 30, 2004, subject to extension thereafter by mutual agreement of Lender and Borrower, and (ii) the occurrence of an Event of Default. |
| Collateral and Priority: | All obligations of Borrower under the DIP Facility and related documents, including without limitation all interest, principal, costs, fees, expenses (collectively, the "DIP Obligations") shall be secured by: (i) under section 364(c)(2) of the Bankruptcy Code, first priority perfected liens on, and security interests in, all present and after-acquired property of Borrower presently not subject to a lien or security interest; (ii) under section 364(d)(1) of the Bankruptcy Code, first priority senior priming perfected liens on, and security |

Bondholders for the payment of interest on its claim or claims against the Debtor's estate.

interest in, all property of Borrower subject to preexisting liens and security
interests (provided, that, respecting real property, the priming lien would extend
to only the first $26.3 million of real property value/proceeds); and (iii) under
section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim;
all of the above subject to the following exclusions: (x) the Carveout (defined
below), (y) avoidance action recoveries and (z) certain "permitted" liens (to be
discussed, but intended to address certain tax and lease-type liens). Repayment
of any advances made pursuant to the existing interim DIP Facility (i.e., the
Merrill DIP) shall be subordinate to repayment of the DIP Facility.

| | |
|---|---|
| **Mandatory Prepayments:** | If the outstanding loans under the DIP Facility exceed the Borrowing Base, the Borrower must prepay outstanding loans in the amount of such excess. In addition, certain "excess cash flows" (to be discussed) shall be required to be applied to prepay outstanding loans. |
| **Interest:** | LIBOR plus 3.25% per annum, payable monthly. |

**Fees:**

| | |
|---|---|
| Unused Line Fee: | .50% |
| Commitment Fee: | 1.50% |
| Administration Fee: | $200,000; $50,000 for 90 day extensions. |
| Prepayment Fee: | N/A |
| Closing Fee: | N/A |
| Letter of Credit Fees: | Open |
| Success Fee: | $100,000 |
| Expense Deposit: | $ 50,000 |

| | |
|---|---|
| **Carveout:** | An appropriate carveout for retained professionals for Debtor and Committee and US Trustee quarterly fees. |
| **Representations, Warranties And Covenants:** | Usual and customary for a debtor in possession loan of this nature. |
| **Financial Covenants:** | Usual and customary for a debtor in possession loan of this nature and at least as favorable to Borrower as under currently proposed Merrill Lynch DIP loan. Satisfactory cash management arrangements. |
| **Events of Default:** | Usual and customary for a debtor in possession loan of this nature. |
| **Lender's Costs:** | Borrower to reimburse Lender's actual out of pocket expenses (travel, due diligence and reasonable counsel costs) in connection with its due diligence, negotiation and preparation of documentation and court and related expenses, including all reasonable fees and disbursements of counsel, whether or not the loan documentation contemplated hereby is executed or the DIP Facility is consummated. Expense deposit payable upon execution of Letter of Intent. |

Conditions Precedent:    Lender's obligation to make the loans described herein shall be subject in all respects to its complete satisfaction with due diligence and mutually satisfactory definitive documentation and Bankruptcy Court approval.

30.    The Debtor is still working with LC Capital on the provisions of an interim order granting the relief requested herein (the **"Proposed Interim Order"**). However, a copy of the Proposed Interim Order will be provided to the Court and other interested parties prior to the hearing on this Motion.

## RELIEF FROM CERTAIN PROVISIONS
## OF THE MERRILL INTERIM ORDER

31.    For the reasons set forth in the Memorandum of Law filed contemporaneously with this Motion, the Debtor respectfully requests that the Court order that, to the extent that the terms of the Merrill Interim Order are inconsistent with the terms of the Proposed Interim Order, the terms and conditions of the Proposed Interim Order shall supercede and control over those of the Merrill Interim Order.

## NOTICE

32.    Notice of this Motion has been given to (a) the United States Trustee for the Northern District of Illinois; (b) counsel for the Prepetition Lenders; (c) counsel for the current postpetition lenders; (d) counsel for the ad-hoc committee of 2005 Bondholders; (e) counsel for the Creditors' Committee; and (f) any other parties required by the administrative procedures order entered in this Case.

33.    The final hearing on the Merrill Financing Motion is scheduled for February 25, 2004. While the Debtor and LC Capital have been working diligently on the terms of the proposed financing, the parties reached agreement on the principle terms of the credit agreement only hours prior to the filing of this Motion. In fact, the credit agreement and related documents

are still being modified. However, the Debtor expects that the terms of the final credit agreement will be the same or better than those provided in this Motion and will submit to the Court the final credit agreement and related documents at the time of the hearing on this Motion. The Debtor believes that the Creditors' Committee and the 2005 Bondholders support the relief requested in this Motion. Given the exigent circumstances and the importance of the relief requested in this Motion to the Debtor's ability to reorganize and maximize the value of its assets for the benefit of its creditors and other parties in interest, the Debtor requests that this Court hear this Motion on an emergency basis and find that the notice provided was sufficient and that no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the Proposed Interim Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as is just and proper under the circumstances.

Dated: February 23, 2004

WICKES, INC.

By: _____
    David N. Missner (ARDC # 01928988)
    Marc I. Fenton (ARDC #06180633)
    Steven J. Christenholz (ARDC #06224666)
    **PIPER RUDNICK LLP**
    203 North La Salle Street, Suite 1800
    Chicago, Illinois 60601-1293
    312-368-4000

    *Attorneys for Debtor and
    Debtor-in-Possession*

CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY
DATED FEBRUARY 19, 2004

## PROPOSED CHAPTER 11 DIP FINANCING TERM SHEET

| | |
|---|---|
| Borrower: | Wickes, Inc., Debtor in Possession. |
| Guarantors: | All current and future subsidiaries of Borrower. |
| Lender: | LC Capital Master Fund, Ltd or Affiliate to be named. |
| Purpose: | Ongoing working capital needs, subject to a budget satisfactory to Lender. No portion of the loans shall be used to commence or prosecute an action against Lender or its affiliates. |
| Commitment Amount: | Up to $20 million aggregate principal amount revolving credit loans outstanding (the "DIP Facility"), with an amount to be determined for use on an interim basis (the "Interim Funding Limit") until final approval within 21 days of entry of the interim approval order ("Interim Order"). Loans under the DIP Facility may be borrowed, repaid and reborrowed in minimum increments of $500,000 until the Maturity Date. |
| Letters of Credit: | Sub-facility of the DIP Facility for Letters of Credit to be discussed. |
| Availability: | Subject to the Interim Funding Limit, after the entry of a final order, the amount available under the DIP Facility shall be the lesser of (i) the Commitment Amount, and (ii) the maximum amount of loans available to the Borrower such that the outstanding loans would not exceed the Borrowing Base. |
| Borrowing Base: | 85% of Eligible Accounts Receivable, plus the lesser of (i) 60% of Eligible Inventory, and (ii) 85% net recovery percentage recommended by an appraiser. |
| Maturity Date: | Earliest of (i) September 30, 2004, subject to extension thereafter by mutual agreement of Lender and Borrower, and (ii) the occurrence of an Event of Default. |
| Collateral and Priority: | All obligations of Borrower under the DIP Facility and related documents, including without limitation all interest, principal, costs, fees, expenses (collectively, the "DIP Obligations") shall be secured by: (i) under section 364(c)(2) of the Bankruptcy Code, first priority perfected liens on, and security interests in, all present and after-acquired property of Borrower presently not subject to a lien or security interest; (ii) under section 364(d)(1) of the Bankruptcy Code, first priority senior priming perfected liens on, and security interests in, all property of Borrower subject to preexisting liens and security interests (provided, that, respecting real property, the priming lien would extend to only the first $26.3 million of real property value/proceeds); and (iii) under section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim; all of the above subject to the following exclusions: (x) the Carveout (defined below), (y) avoidance action recoveries and (z) certain "permitted" liens (to be discussed, but intended to address certain tax and lease-type liens). Repayment of any advances made pursuant to the existing interim DIP facility (i.e., the Merrill DIP) shall be |

Exhibit A

subordinate to repayment of the DIP Facility.

| Mandatory Prepayments: | If the outstanding loans under the DIP Facility exceed the Borrowing Base, the Borrower must prepay outstanding loans in the amount of such excess. In addition, certain "excess cash flows" (to be discussed) shall be required to be applied to prepay outstanding loans. |
|---|---|

| Interest: | LIBOR plus 3.25% per annum, payable monthly. |
|---|---|

Fees:

| | |
|---|---|
| Unused Line Fee: | .50% |
| Commitment Fee: | 1.50% |
| Administration Fee: | $200,000; $50,000 for 90 day extensions. |
| Prepayment Fee: | N/A |
| Closing Fee: | N/A |
| Letter of Credit Fees: | Open |
| Success Fee: | $100,000 |
| Expense Deposit: | $50,000 |

| Carveout: | An appropriate carveout for retained professionals for Debtor and Committee and US Trustee quarterly fees. |
|---|---|

| Representations, Warranties and Covenants: | Usual and customary for a debtor in possession loan of this nature. |
|---|---|

| Financial Covenants: | Usual and customary for a debtor in possession loan of this nature and at least as favorable to Borrower as under currently proposed Merrill Lynch DIP loan. Satisfactory cash management arrangements. |
|---|---|

| Events of Default: | Usual and customary for a debtor in possession loan of this nature. |
|---|---|

| Lender's Costs: | Borrower to reimburse Lender's actual out of pocket expenses (travel, due diligence and reasonable counsel costs) in connection with its due diligence, negotiation and preparation of documentation and court and related expenses, including all reasonable fees and disbursements of counsel, whether or not the loan documentation contemplated hereby is executed or the DIP Facility is consummated. Expense deposit payable upon execution of Letter of Intent. |
|---|---|

| Conditions Precedent: | Lender's obligation to make the loans described herein shall be subject in all respects to its complete satisfaction with due diligence and mutually satisfactory definitive documentation and Bankruptcy Court approval. |
|---|---|

*THIS SUMMARY OF TERMS IS NOT A COMMITMENT AND IS FOR DISCUSSION PURPOSES ONLY. THIS SUMMARY OF TERMS IS INTENDED AS AN OUTLINE ONLY AND DOES NOT SUMMARIZE ALL COVENANTS, CONDITIONS, TERMS,*

***REPRESENTATIONS, WARRANTIES AND OTHER PROVISIONS THAT WOULD BE
INCLUDED IN DEFINITIVE DOCUMENTATION.***

02979.0001 #464218v2

SEWARD & KISSEL LLP

# DRAFT

2/24/04

## DEBTOR-IN-POSSESSION
## REVOLVING CREDIT AGREEMENT

Dated as of February __, 2004

Between

## WICKES INC.,
### Chapter 11 Debtor and Debtor-In-Possession,
as Borrower,

and

## I.C CAPITAL MASTER FUND, LTD,
as Lender

02979.0004 #466112

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS..............................................................................................1
    Section 1.1    Certain Defined Terms..................................................................1
    Section 1.2    Accounting Terms and Determinations. ....................................20
    Section 1.3    Other Definitional Provisions. ..................................................20

ARTICLE 2 LOANS    ........................................................................................21
    Section 2.1    Loans................................................................................................21
    Section 2.2    Interest, Interest Calculations and Certain Fees.......................23
    Section 2.3    Notes. ..............................................................................................26
    Section 2.4    General Provisions Regarding Payment; Loan Account. ........26
    Section 2.5    Maximum Interest.........................................................................26
    Section 2.6    Taxes. .............................................................................................27

ARTICLE 3 REPRESENTATION AND WARRANTIES...........................................28
    Section 3.1    Existence and Power. ....................................................................28
    Section 3.2    Organization and Governmental Authorization; No Contravention. ........28
    Section 3.3    Binding Effect. ..............................................................................28
    Section 3.4    Capitalization. ...............................................................................28
    Section 3.5    Financial Information....................................................................29
    Section 3.6    Litigation. ......................................................................................29
    Section 3.7    Ownership of Property. ................................................................29
    Section 3.8    No Default......................................................................................30
    Section 3.9    Labor Matters. ...............................................................................30
    Section 3.10    Regulated Entities. .......................................................................30
    Section 3.11    Margin Regulations......................................................................30
    Section 3.12    Compliance With Laws.................................................................30
    Section 3.13    Taxes. .............................................................................................31
    Section 3.14    Compliance with ERISA..............................................................31
    Section 3.15    Brokers. ..........................................................................................31
    Section 3.16    Budgets. .........................................................................................32
    Section 3.17    Employment, Equityholders and Subscription Agreements. ....32
    Section 3.18    Compliance with Environmental Requirements; No Hazardous
        Materials. ......................................................................................32
    Section 3.19    Intellectual Property.....................................................................33
    Section 3.20    Real Property Interests. ................................................................34
    Section 3.21    Matters Relating to Collateral......................................................34
    Section 3.22    Swap Lien Subordination Agreement. ........................................34
    Section 3.23    Preexisting Loan Obligations.......................................................34
    Section 3.24    Full Disclosure. .............................................................................34
    Section 3.25    Representations and Warranties Incorporated from Other Operative
        Documents. ...................................................................................34

Section 3.26   Subsidiaries. ........................................................................... 35

ARTICLE 4 AFFIRMATIVE COVENANTS........................................................... 35
Section 4.1   Financial Statements and Other Reports. ................................. 35
Section 4.2   Payment and Performance of Obligations. ............................... 39
Section 4.3   Conduct of Business and Maintenance of Existence. ............... 40
Section 4.4   Maintenance of Property; Insurance. ....................................... 40
Section 4.5   Compliance with Laws. ............................................................ 41
Section 4.6   Inspection of Property, Books and Records. ............................ 41
Section 4.7   Use of Proceeds. ....................................................................... 41
Section 4.8   Lender's Meetings. ................................................................... 42
Section 4.9   Hazardous Materials; Remediation. ......................................... 42
Section 4.10  Further Assurances. ................................................................. 42
Section 4.11  Cooperation. ............................................................................. 42
Section 4.12  Consultants. .............................................................................. 42

ARTICLE 5 NEGATIVE COVENANTS ................................................................ 43
Section 5.1   Debt. .......................................................................................... 43
Section 5.2   Liens. ......................................................................................... 43
Section 5.3   Restricted Distributions. .......................................................... 44
Section 5.4   Restrictive Agreements. ........................................................... 44
Section 5.5   Payments and Modifications of Certain Debt. ......................... 45
Section 5.6   Consolidations, Mergers and Sales of Assets. ......................... 46
Section 5.7   Purchase of Assets, Investments. ............................................. 46
Section 5.8   Transactions with Affiliates. .................................................... 47
Section 5.9   Modification of Organizational Documents. ............................ 47
Section 5.10  Fiscal Year. ............................................................................... 47
Section 5.11  Conduct of Business. ................................................................ 47
Section 5.12  Lease Payments. ....................................................................... 47
Section 5.13  Bank Accounts. ......................................................................... 48
Section 5.14  Hedging Transactions. ............................................................. 48
Section 5.15  Payments to Unsecured Creditors. ........................................... 48
Section 5.16  Pension Plan Payments. ........................................................... 48

ARTICLE 6 ACCOUNTS AND INVENTORY REPRESENTATIONS, WARRANTIES,
COVENANTS AND AGREEMENTS ............................................... 48
Section 6.1   Accounts and Account Collections. .......................................... 48
Section 6.2   Inventory. .................................................................................. 50

ARTICLE 7 PERFORMANCE COVENANTS ....................................................... 51
Section 7.1   Free Cash Flow. ........................................................................ 51
Section 7.2   Operating Expenses. ................................................................. 52
Section 7.3   Inventory Purchases. ................................................................ 52
Section 7.4   Inventory Sales. ........................................................................ 53

ARTICLE 8 CONDITIONS ................................................................................... 53
Section 8.1   Conditions to Effectiveness of this Agreement. ....................... 53
Section 8.2   Conditions to Each Loan.......................................................... 54

ARTICLE 9 EVENTS OF DEFAULT .......................................................................... 55
    Section 9.1    Events of Default. .................................................................... 55
    Section 9.2    Acceleration and Suspension or Termination of Loan
                     Commitment. ........................................................................... 58
    Section 9.3    Default Rate of Interest and Suspension of LIBOR Rate Options............ 58
    Section 9.4    Setoff Rights. .......................................................................... 58
    Section 9.5    Application of Proceeds. ........................................................... 58

ARTICLE 10 EXPENSES, INDEMNITY, TAXES AND RIGHT TO PERFORM .................. 59
    Section 10.1    Expenses. ............................................................................... 59
    Section 10.2    Indemnity. .............................................................................. 59
    Section 10.3    Taxes. .................................................................................... 60
    Section 10.4    Right to Perform. .................................................................... 60


ARTICLE 11 MISCELLANEOUS ............................................................................ 60
    Section 11.1    Survival. ................................................................................. 60
    Section 11.2    No Waivers. ............................................................................ 61
    Section 11.3    Notices. .................................................................................. 61
    Section 11.4    Severability. ........................................................................... 61
    Section 11.5    Amendments and Waivers. ...................................................... 61
    Section 11.6    Assignments and Participations. .............................................. 65
    Section 11.7    Headings. ............................................................................... 61
    Section 11.8    Confidentiality. ...................................................................... 62
    Section 11.9    Delegation of Administrative Duties                63
    Section 11.10  GOVERNING LAW; SUBMISSION TO JURISDICTION. ................. 62
    Section 11.11  WAIVER OF JURY TRIAL. ..................................................... 63
    Section 11.12  Publication; Advertisement. ................................................... 63
    Section 11.13  Counterparts; Integration. ...................................................... 64

# EXHIBITS

## EXHIBITS

Exhibit A    -        Closing Checklist
Exhibit B    -        Compliance Certificate
Exhibit C    -        Borrowing Base Certificate
Exhibit D    -        Notice of Borrowing
Exhibit E    -        Scheduled Appraised Values
Exhibit F    -        Final Budget
Exhibit G    -        Real Property Collateral

## DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT dated as of February __, 2004 between WICKES INC., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession, as Borrower, and LC CAPITAL MASTER FUND, LTD, a Cayman Islands company, as lender (the "Lender").

### RECITALS:

WHEREAS, Borrower desires that Lender from time to time make loans to Borrower, to provide funds for the working capital and other general business purposes of Borrower;

WHEREAS, Lender is willing to make such loans to Borrower on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower and Lender agree as follows:

### ARTICLE 1
### DEFINITIONS

Section 1.1    Certain Defined Terms.

The following terms have the following meanings:

**"Accessions"** means "accessions" (as defined in Article 9 of the UCC) to other Collateral of Borrower and the Subsidiaries.

**"Accounts"** means "accounts" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries, including without limitation any and all rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, in each case, for purposes of calculating the Borrowing Base, net of any credits, rebates or offsets owed by Borrower to the respective customer.

**"Account Debtor"** means "account debtor", as defined in Article 9 of the UCC.

**"Adequate Protection Payments"** means payments of interest at the non-default contract rate on the outstanding obligations in the amount of $_____ under the Preexisting DIP Agreement.

**"Administration Fee"** has the meaning set forth in Section 2.2(d).

**"Affiliate"** means with respect to any Person (i) any Person that directly or indirectly controls such Person, (ii) any Person which is controlled by or is under common control, direct or indirect, with such controlling Person and (iii) in the case of an individual, the parents, descendants, siblings and spouse of such individual. As used in this definition, the term **"control"** of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the

direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Debtor-In-Possession Revolving Credit Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Approved First Day Payments**" means any payments to vendors, customers, employees, contractors, professionals or other Persons approved in an order in the Bankruptcy Case and acceptable to Lender. Lender's failure to object to such relief after proper notice to its counsel shall be deemed to mean such relief is acceptable to Lender.

"**Asset Disposition**" means any sale, lease, license or other consensual disposition by any Credit Party of any asset, but excluding (i) dispositions of Inventory in the ordinary course of business, (ii) leases of tool rental equipment in the ordinary course of business, (iii) dispositions of Cash Equivalents, and (iv) collections in respect of Accounts.

"**Avoidance Action Recoveries**" means any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case in respect of any Avoidance Actions.

"**Avoidance Actions**" means any and all actions in the Bankruptcy Case under any and all of Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"**Bankruptcy Case**" means the case under Chapter 11 of the Bankruptcy Code in which Borrower is the debtor and the debtor-in-possession, pending before the Bankruptcy Court.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §101 et seq., as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois having jurisdiction over the Bankruptcy Case.

"**Bankruptcy Plan**" means a final plan of reorganization for Borrower confirmed by final order of the Bankruptcy Court in the Bankruptcy Case.

"**Blocked Account**" has the meaning set forth in Section 6.1(d).

"**Borrower**" means Wickes Inc., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession.

"**Borrower's Account**" means the account specified on the signature pages hereof below Borrower's name into which Loans shall, absent other written instructions, be made, or such other account as Borrower may specify by written notice to Lender.

"**Borrowing Base**" means, as of any date of calculation, a dollar amount calculated pursuant to the Borrowing Base Certificate most recently delivered to Lender in accordance with the terms hereof, equal to the sum of (i) 85% of Eligible Accounts; plus (ii) the lesser of (A) 60% of Eligible Inventory, and (B) 85% of a net recovery percentage (exclusive of commissions and operating expenses in connection with liquidation) recommended by an

-2-

appraiser retained by Lender (or for the initial funding hereunder, reasonably acceptable to Lender) of Eligible Inventory, adjusted from time to time in light of the most recent appraisal delivered to Lender prior to the Effective Date or pursuant to Section 4.1(t) or other information provided to Lender by such appraiser <u>minus</u> (iii) Reserves then established by Lender. Lender may, from time to time, in the exercise of its reasonable credit judgment reduce or increase any percentage amount set forth in the immediately preceding sentence (any such increase not to exceed the percentages established on the Closing Date) based on either: (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Lender has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Lender, could reasonably be expected to adversely affect the Accounts and/or the Inventory, as determined by Lender in the exercise of its reasonable credit judgment.

"**Borrowing Base Certificate**" means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit C hereto.

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in New York City and Chicago, Illinois are authorized by law to close and, in the case of a Business Day which relates to a LIBOR Loan, a day on which dealings are carried on in the London interbank eurodollar market.

"**Capital Lease**" of any Person means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

"**Carveouts**" has the meaning provided in the then-applicable Financing Order.

"**Cash Equivalents**" means any Investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, (ii) commercial paper rated at least A-1 by Standard & Poor's Ratings Service and P-1 by Moody's Investors Services, Inc., (iii) time deposits with, including certificates of deposit issued by, any office located in the United States of any bank or trust company which is organized under the laws of the United States or any State thereof and has capital, surplus and undivided profits aggregating at least $500,000,000 and which issues (or the parent of which issues) certificates of deposit or commercial paper with a rating described in clause (ii) above, (iv) repurchase agreements with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, provided in each case that such Investment matures within one year from the date of acquisition thereof by any Credit Party, or (v) any money market or mutual fund which invests only in the foregoing types of investments and the liquidity of which is satisfactory to Lender.

"**Chattel Paper**" means "chattel paper" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Closing Checklist**" means Exhibit A to this Agreement.

"**Closing Date**" means the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all property, now existing or hereafter acquired (and whether or not acquired or generated prior to or subsequent to the Filing Date), mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Lender, pursuant to the Security Documents, including without limitation all of Borrower's and each Subsidiary's (i) Accounts; (ii) Chattel Paper; (iii) Commercial Tort Claims; (iv) Deposit Accounts, all cash, and other property deposited therein or otherwise credited thereto from time to time and other monies and property in the possession or under the control of Lender or any affiliate, representative, agent or correspondent of Lender; (v) Documents; (vi) General Intangibles, including without limitation any and all Intellectual Property; (vii) Goods, including without limitation any and all Inventory, any and all Equipment and any and all Fixtures; (viii) Instruments; (ix) Investment Property; (x) Supporting Obligations; (xi) any and all other personal property and interests whether or not subject to the UCC; (xii) any and all books and records, in whatever form or medium, that at any time evidence or contain information relating to any of the foregoing properties or interests in properties or are otherwise necessary or helpful in the collection thereof or realization thereon; (xiii) all Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; (xiv) all Proceeds and products of the foregoing, and all insurance pertaining to the foregoing and proceeds thereof; and (xv) all Real Property; provided, that the Collateral shall not include any Avoidance Action Recoveries.

"**Commercial Tort Claims**" means "commercial tort claims" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Commitment Expiry Date**" means September 30, 2004; provided, that such date may be extended for up to 2 successive additional 90 day periods through and including March 29, 2005 at the request of Borrower and with the consent of Lender, in its sole discretion.

"**Commitment Fee**" has the meaning provided in Section 2.2(c).

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case on January 26, 2004.

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit B hereto.

"**Concentration Account**" has the meaning set forth in Section 6.1(d).

"**Consolidated Subsidiary**" means at any date any Subsidiary or other Person the accounts of which would be consolidated with those of Borrower in its consolidated financial statements if such statements were prepared as of such date.

"**Continuing Director**" means a director who either is a member of Borrower's board of directors as the date hereof or who became a director subsequent to such date and whose election was duly approved by a majority of the Continuing Directors then on the board of directors of Borrower.

-4

"**Controlled Group**" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"**Credit Exposure**" means any period of time during which the Loan Commitment is outstanding or any Loan or other Obligation remains unpaid; provided, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim with respect thereto.

"**Credit Party**" means Borrower and each Subsidiary.

"**Debt**" of a Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid in the ordinary course of business, (iv) all Capital Leases of such Person, (v) all liabilities arising under Interest Rate Agreements and Lumber Hedging Agreements of such Person, (vi) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit or similar instrument, (vii) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (viii) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (ix) "carnouts" and similar payment obligations and (x) all Debt of others Guaranteed by such Person.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Deposit Account Control Agreement**" means an agreement, in form and substance satisfactory to Lender, among Lender, Borrower [or a Subsidiary of Borrower] maintaining a Deposit Account at any bank, and such bank, which agreement provides that (x) such bank shall comply with instructions originated by Lender directing disposition of the funds in such Deposit Account without further consent by Borrower or such Subsidiary (as applicable), and (y) such bank shall agree that it shall have no Lien on, or right of setoff against, such Deposit Account or the contents thereof, other than in respect of commercially reasonable fees and other items expressly consented to by Lender, and containing such other terms and conditions as Lender may require, including (i) as to any such agreement pertaining to any Blocked Account, providing that all items received or deposited in such Blocked Account are the property of Lender, and that such bank shall wire, or otherwise transfer, including by reverse ACH transfer, in immediately available funds, on a daily basis to the Concentration Account all funds received or deposited into such Blocked Account and (ii) as to any such agreement pertaining to the Concentration Account, providing that all items received or deposited in the Concentration Account are the property of Lender, and that such bank shall wire or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited in the Concentration Account.

-5

"**Documents**" means "documents" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**EBITDA**" has the meaning as defined pursuant to the terms of the Compliance Certificate.

"**Effective Date**" means the date upon which all conditions contained in Section 8.1 have first been satisfied.

"**Eligible Account**" means any Account of Borrower, excluding Accounts in which any of the following conditions or circumstances shall exist:

(i)      it does not arise from the actual and bona fide sale and delivery of goods or the performance of services by Borrower in the ordinary course of its business, which transactions are completed substantially in accordance with the terms and provisions contained in any documents related thereto;

(ii)      (a) Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (including any Account that arises from a sale on consignment, guaranteed sale, sale and return, sale on approval or other terms under which payment by the Account Debtor may be conditioned or contingent) or (b) Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(iii)      an invoice relating to such Account, acceptable to Lender in form and substance, has not been sent by Borrower to the applicable Account Debtor;

(iv)      it is unpaid more than sixty (60) days after the due date therefor, or (except as provided in clause (v) below) it is unpaid more than ninety-one (91) days after the date of the original invoice therefor;

(v)      it is unpaid more than sixty (60) days after the due date therefor, or it is unpaid more than one hundred fifty (150) days after the date of the original invoice therefor, provided that Accounts unpaid between ninety-two (92) days and one hundred fifty (150) days after the original invoice date shall be ineligible under this clause (v) to the extent the aggregate amount thereof exceeds eight percent (8%) of the dollar amount of all Accounts of Borrower;

(vi)      it is owed by an Account Debtor obligated in respect of Accounts constituting more than twenty-five percent (25%) of the aggregate dollar amount of all Accounts (but the portion of the Accounts not in excess of the applicable percentage may be deemed Eligible Accounts); provided that Lender may, in its reasonable credit judgment exercised in good faith, increase such percentage to a percentage greater than twenty-five percent (25%) but not in excess of thirty percent (30%);

(vii)      it is the obligation of an Account Debtor if twenty percent (20%) or more of the dollar amount of all Accounts owing by that Account Debtor are ineligible because they are unpaid more than thirty (30) days after the due date thereof;

(viii) it consists of progress billings (such that the obligation of the Account Debtors with respect to such Account is conditioned upon Borrower's satisfactory completion of any further performance under the agreement giving rise thereto), bill and hold invoices or retainage invoices (such that the Account Debtor is permitted to hold all or a portion of the payment thereof until completion of the applicable project), except as to bill and hold invoices, if Lender shall have received an agreement in writing from the Account Debtor, in form and substance satisfactory to Lender, confirming the unconditional obligation of the Account Debtor to take the goods related thereto and pay such invoice;

(ix) it arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity which has any common officer or director with any Credit Party;

(x) it is payable in any currency other than U.S. dollars;

(xi) and to the extent that any Credit Party has a payable, or is liable, for goods sold or services rendered by the applicable Account Debtor to such Credit Party, but only to the extent of such payable or liability;

(xii) and to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account;

(xiii) it (a) is not owned by Borrower or (b) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Lender, other than the Carveout;

(xiv) it is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state or municipality or department, agency or instrumentality thereof unless Lender, in its sole discretion, has agreed to the contrary in writing and Borrower, if necessary or required by Lender, has complied in a manner acceptable to Lender with the Federal Assignment of Claims Act of 1940 or any applicable state statute or municipal ordinance of similar purpose and effect, with respect to such obligation;

(xv) it is the obligation of an Account Debtor located in a foreign country unless (a) the Account Debtor has delivered to Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to Lender and payable only in the United States of America and in U.S. dollars, sufficient to cover such Account, in form and substance satisfactory to Lender and, if required by Lender, the original of such letter of credit has been delivered to Lender or Lender's agent, and Borrower has assigned the proceeds of such letter of credit to Lender pursuant to documentation in form and substance acceptable to Lender or otherwise named Lender as transferee beneficiary thereunder, as Lender may specify, (b) such Account is subject to credit insurance payable to Lender issued by an insurer and on terms and in an amount acceptable to Lender, or (c) such Account is otherwise acceptable in all respects to Lender (subject to such limits or lending formulae with respect thereto as Lender may determine);

(xvi) any facts, events or occurrences exist which, in the reasonable credit judgment of Lender exercised in good faith, could reasonably be expected to impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment

thereunder, including without limitation (a) Accounts owing by Account Debtors as to which Borrower has suspended further sales due to rejection of a credit application or increased credit limit request, or due to unauthorized delinquent sales or lack of creditworthiness; provided, however, that Borrower's internal coding of an Account or an Account Debtor to indicate that Borrower is reviewing, or has requested current information from the Account Debtor with respect to, such Account Debtor's financial condition, shall not in and of itself be a basis for rendering any Account ineligible pursuant to this clause; and (b) Accounts placed for collection;

(xvii)  any proceedings or actions known to any Credit Party (or to Lender) are threatened or pending against the Account Debtor with respect to such Account which could reasonably be expected to have a material adverse change in any such Account Debtor's financial condition (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(xviii)  Lender's Lien therein is not a first priority perfected Lien, or as to which the goods giving rise thereto are not, and were not at the time of the applicable sale, subject to any Lien in favor of Lender;

(xix)  to the extent that it consists of a debit to clear customer credit balances, an accrual for credit memos relating to dilution, a finance or delinquency charge, a framing installation or other installation charge relating to services not yet completed by Borrower and accepted by the Account Debtor, or an installation use tax;

(xx)  any of the representations or warranties pertaining to such Account set forth in any Financing Document is untrue in any material respect; and

(xxi)  to the extent that such Account is evidenced by a judgment, Instrument or Chattel Paper.

For purposes of this Agreement, the net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts less any and all returns, rebates, discounts (which may, at Lender's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time.  Any Accounts which are not Eligible Accounts shall nevertheless be part of the Collateral.

"**Eligible Inventory**" means any Inventory of Borrower, excluding any Inventory in which any of the following conditions or circumstances shall exist:

(i)  it is not owned by Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments, the rights of a surety that has issued a bond to assure performance with respect to that Inventory, except the Liens in favor of Lender, except for the Carveout and except for the reclamation rights of sellers of Inventory (which are addressed in the Financing Orders));

(ii)  it is not of a type held for sale in the ordinary course of Borrower's business;

(iii)    it consists of work-in-process Inventory;

(iv)    it is placed on consignment, it has been direct-shipped to the customer but has not yet been invoiced;

(v)    it is in transit, unless or it has been paid for in full by Borrower and is in transit to one of Borrower's locations;

(vi)    it consists of power equipment and machinery rented or to be rented to customers;

(vii)    in Lender's reasonable determination or in the determination of Borrower's management, it is excess, obsolete, unsaleable, shopworn, seconds, damaged or unfit for sale;

(viii)    it consists of display items, samples or packing or shipping materials, manufacturing supplies or replacement or spare parts;

(ix)    it is not covered by casualty insurance acceptable to Lender;

(x)    it is bill and hold Inventory;

(xi)    it consists of vendor managed Inventory or other Inventory delivered to Borrower but not yet invoiced to Borrower;

(xii)    it is (a) not located on premises owned by Borrower or (b) is located on premises leased by Borrower, or stored with a bailee, warehouseman, processor or similar Person, unless Lender has given its prior consent thereto and unless (i) a Lien waiver and collateral access agreement, in form and substance satisfactory to Lender has been delivered to Lender, together with any and all duly authorized UCC financing statements required by Lender naming such Person as debtor, Borrower as secured creditor and Lender as assignee or (ii) Reserves satisfactory to Lender have been established with respect thereto (which will be in the amount of at least two (2) month's rental and other charges relating to such location), or (c) located at any site if the aggregate book value of Inventory at any such location is less than $250,000;

(xiii)    Lender's Lien therein is not a first priority perfected Lien;

(xiv)    any of the representations or warranties pertaining to such Inventory set forth in any Financing Document is untrue in any material respect;

(xv)    it consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available; and

(xvi)    it is covered by a negotiable document of title, unless such document has been delivered to Lender.

-9

For purposes of this Agreement, the amount of Eligible Inventory shall be determined on a first-in, first-out, lower of cost or market basis in accordance with GAAP. Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

**"Environmental Laws"** means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements and governmental restrictions, whether now or hereafter in effect, relating to the environment or the effect of the environment on human health or to emissions, discharges or releases of pollutants, contaminants, Hazardous Materials or wastes into the environment, including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Materials or wastes or the clean-up or other remediation thereof.

**"Equipment"** means, collectively, "equipment" and "fixtures" (as each term is defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"ERISA"** means the Employee Retirement Income Security Act of 1974.

**"Event of Default"** has the meaning set forth in Section 9.1.

**"Federal Funds Rate"** means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day and (ii) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Lender on such day on such transactions as determined by Lender.

**"Filing Date"** means January 20, 2004.

**"Final Budget"** means a budget of Borrower, including balance sheets, income statements, cash flow statements, Net Borrowing Availability projections and a cash receipts and disbursements schedule that reflects, on a line-item basis, anticipated cash receipts and expenditures, all set forth on a weekly basis for each week occurring in the first 9-week period following the effective date of the Interim Financing Order, in form and substance acceptable to Lender.

**"Final Financing Order"** means a final order entered in the Bankruptcy Case after the satisfaction of the fifteen (15) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing Borrower to obtain the financing and to grant the Liens contemplated by and described in this Agreement and the Security Documents, in form and substance substantially similar to the Interim Financing Order and otherwise in form and substance satisfactory to Lender, as amended, modified or supplemented from time to time with the prior consent of the Lender.

-10

"**Financing Documents**" means this Agreement, the Notes, the Security Documents, the Information Certificate, the applicable Financing Order, [the Swap Lien Subordination Agreement] and all other documents, instruments and agreements contemplated herein or thereby and executed concurrently herewith or at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Financing Order**" means the Interim Financing Order or the Final Financing Order, as in effect from time to time.

"**Fiscal Year**" means a fiscal year of Borrower, ending on the last Saturday of each calendar year.

"**Fixtures**" means "fixtures" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Free Cash Flow**" means, for any period, Borrower's (i) aggregate cash sales, collections in respect of Accounts and other cash received during such period minus (ii) the sum of (a) materials purchases during such period, plus (b) Operating Expenses during such period, plus (c) financing fees paid during such period, plus (d) cash interest expense paid during such period, plus (e) unfinanced Capital Expenditures during such period, plus (f) taxes paid or accrued during such period.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" means "general intangibles" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Goods**" means "goods" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

-11-

**"Hazardous Materials"** means (i) any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) petroleum, its derivatives, by-products and other hydrocarbons, and (v) any other toxic, radioactive, caustic or otherwise hazardous substance regulated under Environmental Laws.

**"Hazardous Materials Contamination"** means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personality, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

**"HSBC"** means HSBC Bank USA (formerly known as Marine Midland Bank).

**"Indemnitees"** has the meaning set forth in Section 10.2.

**"Information Certificate"** means that certain Information Certificate of even date herewith executed by Borrower and delivered to Lender.

**"Instrument"** means an "instrument" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"Intellectual Property"** means, with respect to any Person, all patents, trademarks, trade names, copyrights, technology, know-how and processes, and all applications therefor, used in or necessary for the conduct of business by such Person.

**"Interest Period"** means, as to any LIBOR Loan, the period commencing on the date such Loan is borrowed or continued as, or converted into, a LIBOR Loan and ending on the date one (1), two (2) or three (3) months thereafter, as selected by Borrower pursuant to Section 2.2(g); provided, that: (a) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the following Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day; (b) any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; and (c) Borrower may not select any Interest Period for a Loan which would extend beyond the Commitment Expiry Date.

**"Interest Rate Agreement"** shall mean any interest rate protection agreement, interest rate future, interest rate option, interest rate swap, interest rate cap or other interest rate hedge or arrangement under which Borrower or any Subsidiary is a party or beneficiary and that is entered into in relation to interest on Debt of Borrower or such Subsidiary.

**"Interim Amount"** means $_____.

**"Interim Financing Order"** means a financing order entered in the Bankruptcy Case authorizing Borrower to obtain the financing and to grant the Liens contemplated by and

described in this Agreement and the Security Documents, in form and substance satisfactory to Lender, as amended, modified or supplemented from time to time with the prior consent of Lender.

"**Interim Period**" means the period commencing with the entry of the Interim Financing Order and ending on the earlier to occur of (a) the entry of the Final Financing Order and (b) the date that is [21] days after the entry of the Interim Financing Order.

"**Inventory**" means "inventory" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Investment**" means any investment in any Person, whether by means of acquiring or holding securities, capital contribution, loan, time deposit, advance, Guarantee or otherwise.

"**Investment Property**" means "investment property" (as defined in  Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Lender**" means LC Capital Master Fund, Ltd and its successors and assigns.

"**LIBOR**" means, with respect to any LIBOR Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/16 of 1%) equal to (i) the rate of interest which is identified and normally published by Bloomberg Professional Service Page BBAM 1 as the offered rate for loans in U.S. dollars for the applicable Interest Period under the caption British Bankers Association LIBOR Rates as of 11:00 a.m. (London time), on the second full Business Day next preceding the first day of such Interest Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by (ii) the sum of one minus the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).  If Bloomberg Professional Service no longer reports the LIBOR or Lender determines in good faith that the rate so reported no longer accurately reflects the rate available to Lender in the London Interbank Market or if such index no longer exists or if Page BBAM 1 no longer exists or accurately reflects the rate available to Lender in the London Interbank Market, Lender may select a replacement index or replacement page, as the case may be.

"**LIBOR Loans**" means any Loans which accrue interest by reference to the LIBOR, in accordance with the terms of this Agreement.

"**LIBOR Margin**" means 3.25% per annum.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.  For the purposes of this Agreement and the other Financing Documents, Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest

of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan Account**" has the meaning set forth in Section [2.4(b)].

"**Loan Commitment**" means $20,000,000. So long as no Default or Event of Default shall have occurred and be continuing, Borrower may at any time that Loans Outstanding exceed $18,000,000, request that Lender increase the Loan Commitment . Lender shall consider any such requested increase in good faith; provided, however, that no such increase shall become effective unless Lender in its sole discretion agrees in writing to such increase.]

"**Loan Limit**" means, at any time, the lesser of (i) the Borrowing Base, and (ii) either (a) during the Interim Period, the Interim Amount or (b) from and after the entry of the Final Financing Order, the Loan Commitment.

"**Loans**" has the meaning set forth in Section 2.1(a).

"**Loans Outstanding**" means at any time of calculation the then existing aggregate outstanding principal amount of Loans.

"**Lumber Hedging Agreement**" means any lumber futures contract or similar agreement or arrangement entered into by Borrower or any Subsidiary and designed to protect Borrower or such Subsidiary against fluctuations in the price of lumber actually used in the ordinary course of Borrower's business.

"**Major Casualty Proceeds**" means (i) the aggregate insurance proceeds received in connection with one or more related events under any Property Insurance Policy, including without limitation each insurance policy under Section 4.4 or (ii) any award or other compensation with respect to any condemnation of property (or any transfer or disposition of property in lieu of condemnation).

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a material adverse effect upon, any of (i) the financial condition, operations, business, properties or prospects of the Credit Parties, taken as a whole, (ii) the rights and remedies of Lender under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, or (iv) the existence, perfection or priority of any security interest granted in any Financing Document or the value of any material Collateral.

"**Maximum Lawful Rate**" has the meaning set forth in Section [2.5(b)].

"**Multiemployer Pension Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any member of the Controlled Group may have any liability.

"**Net Borrowing Availability**" means, at any time, the positive amount, if any, by which the Loan Limit at such time exceeds the Loans Outstanding at such time.

"**Net Cash Proceeds**" means, with respect to any transaction or event, an amount equal to the cash proceeds received by the Credit Party from or in respect of such transaction or event (including proceeds of any non-cash proceeds of such transaction), less (i) any out-of-pocket expenses reasonably incurred by such Person in connection therewith and (ii) in the case of an Asset Disposition, the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such Asset Disposition and any taxes paid or payable by such Person in respect of such Asset Disposition.

"**Notes**" has the meaning set forth in Section 2.3.

"**Notice of Borrowing**" means a written notice of a Responsible Officer, appropriately completed and substantially in the form of Exhibit D hereto, which shall include a written certification to the effect that (a) the proposed Loan and its intended use are consistent with the terms of this Agreement and the Final Budget, and is necessary in order to satisfy Borrower's obligations in the ordinary course of business or as otherwise permitted under the Financing Documents, (b) all conditions to borrowing contained in this Agreement and the other Financing Documents have been satisfied in all material respects, and (c) no Event of Default or Default is in existence.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of the Borrower and each other Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"**Operating Expenses**" means for any period, all operating expenses of Borrower for such period as reflected in the Final Budget.

"**Operative Documents**" means the Financing Documents, the [Subordinated Debt Documents and the Swap Debt Documents].

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of Borrower to Lender under the Financing Documents

shall be made, or such other account as Lender shall from time to time specify by notice to Borrower.

**"PBGC"** means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

**"Pension Plan"** means any "employee benefit pension plan", as such term is defined in Section 3(1) of ERISA, and any "employee welfare benefit plan", as such term is defined in Section 3(2) of ERISA, in each case which is subject to Title IV of ERISA (other than a Multiemployer Pension Plan), and to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

**"Permitted Contest"** means a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; provided that compliance with the obligation that is the subject of such contest is effectively stayed during such challenge.

**"Permitted Liens"** means Liens permitted pursuant to Section 5.2.

**"Person"** means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

**"Preexisting Collateral"** means the assets and properties of Borrower and its Subsidiaries securing the Preexisting Loan Obligations.

**"Preexisting DIP Agreement"** means the Debtor-in-Possession Credit Agreement dated as of January 21, 2004 among Borrower, Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services, Inc., individually and as agent, collateral agent, book manager and lead arranger and the other banks and financial institutions parties thereto, together with the agreements and documents entered into in connection therewith.

**"Preexisting Loan Agreements"** means the Credit Agreement dated February 26, 2003 among Borrower, Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services, Inc., individually and as agent, collateral agent, book manager and lead arranger and the other banks and financial institutions parties thereto, and the Preexisting DIP Agreement, together with the agreements and documents entered into in connection with each therewith.

**"Preexisting Loan Obligations"** means all Debt and obligations owing by the Borrower or any of its Subsidiaries under or in connection with the Preexisting Loan Agreements.

"**Prime Rate**" means a variable per annum rate, as of any date of determination, equal to the greater of (i) the Federal Funds Rate plus one-half of one percent (0.50%) per annum and (ii) the rate from time to time published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in The Wall Street Journal of a Prime Rate that is different from that published on the preceding Business Day. In the event that The Wall Street Journal shall, for any reason, fail or cease to publish the Prime Rate, Lender shall choose a reasonably comparable index or source to use as the basis for the Prime Rate and provide prompt written notice thereof to Borrower.

"**Prime Rate Loans**" means Loans, which accrue interest by reference to the Prime Rate, in accordance with the terms of this Agreement.

"**Prime Rate Margin**" means [2.00%] per annum with respect to the Loans and other Obligations.

"**Proceeds**" means "proceeds" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Property Insurance Policy**" means any insurance policy maintained by any Credit Party covering losses with respect to tangible real or personal property or improvements or losses from business interruption.

"**Real Estate Limit**" means an amount equal to [$26,811,400].

"**Real Property**" means the real property of Borrower or any of the Subsidiaries, together with the related rights more particularly described in Exhibit G hereto, including without limitation all buildings, structures and other improvements thereon, and all licenses, easements and appurtenances related thereto.

"**Reinvestment Reserve**" has the meaning set forth in Section 2.1(d).

"**Reserves**" means such amounts as Lender may from time to time establish and revise, in each case in the exercise of its reasonable credit judgment exercised in good faith, reducing the amount of Loans which would otherwise be available to Borrower under the lending formula(s) provided for herein: (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in the good faith exercise of its reasonable credit judgment, adversely affect, or could reasonably be expected to adversely affect, any of: (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of any Credit Party or (iii) the Liens and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), (b) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of any Credit Party to Lender is or may have been incomplete, inaccurate or misleading in any material respect, (c) to reflect accrued and unpaid interest and fees or (d) to reflect the amount of existing tax liens, judgments, mechanic's liens and similar liens and claims, if any. To the extent Lender may, in accordance with any other terms hereof, revise the lending formula(s) used to determine the Borrowing Base or establish new criteria or revise existing criteria for Eligible Accounts or Eligible Inventory, Lender shall not also establish a Reserve for the same purpose. The amount of any Reserve

-17-

established by Lender shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as determined by Lender in good faith. Without limitation of the foregoing, Lender shall have the right to establish Reserves relating to matters such as (1) the dilution of Accounts, with dilution referring to all actual and potential offsets to an Account, (2) accruals for sales taxes collected from customers, (3) physical inventory shrink adjustments and monthly shrink reserves, (4) lumber pricing markups, (5) volume rebates from vendors, (6) material decline in the appraised value of fixed assets and (7) purchase discounts. As of the Closing Date, Lender has established special Reserves in the amounts from time to time of (x) the accrued and unpaid amount of the Carveout, and (y) the amount of accrued and unpaid cash interest in respect of the Swap Notes to the extent that Borrower has agreed or has been ordered to pay such amounts on a current basis. Lender will provide Borrower with prompt notice of the imposition of new Reserve categories after the Closing Date.

"**Responsible Officer**" means any of the Chief Executive Officer, Chief Financial Officer or Secretary of Borrower.

"**Restricted Distribution**" means as to any Person (i) any dividend or other distribution on any equity interest in such Person (except those payable solely in its equity interests of the same class) or (ii) any payment on account of (a) the purchase, redemption, retirement, defeasance, surrender or acquisition of any equity interests in such Person or any claim respecting the purchase of sale of any equity interest in such Person or (b) any option, warrant or other right to acquire any equity interests in such Person.

"**Scheduled Appraised Value**" means, for each Scheduled Real Property, the amount set forth on Exhibit E hereto with respect to such parcel of Real Property.

"**Scheduled Real Property**" means the Real Property of Borrower listed on Exhibit E.

"**Security Agreement**" means the Debtor-in-Possession Security Agreement dated as of the date hereof between Borrower and Lender, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Security Documents**" means any agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (i) Guarantees payment or performance of all or any portion of the Obligations and/or (ii) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Lender, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Stated Rate**" has the meaning set forth in Section 2.5(b).

"**Subordinated Debt**" means Debt of Borrower owing to the holders of the Subordinated Notes in an aggregate principal amount on the Closing Date of [$21,123,000][1] (together with capitalized interest, fees, costs and other amounts) incurred pursuant to the terms of the Subordinated Debt Documents.

---

1    Amounts to be confirmed.

"**Subordinated Debt Documents**" means the Subordinated Debt Indenture and the Subordinated Notes.

"**Subordinated Debt Indenture**" means the Indenture dated October 15, 1993 between Borrower, as issuer, and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Subordinated Notes**" means Borrower's 11 5/8% Senior Subordinated Notes due 2003, dated as of October 15, 1993 and issued by Borrower pursuant to the Subordinated Debt Indenture, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Subsequent Budget**" has the meaning provided in Section 4.1(v).

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, limited partnership or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person.  Unless otherwise specified, the term Subsidiary shall refer to a Subsidiary of Borrower.

"**Success Fee**" has the meaning provided in Section 2.2(e).

"**Supporting Obligations**" means "supporting obligations" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Swap Debt**" means Debt of Borrower owing to the holders of the Swap Notes in an original principal amount of [$42,833,000] and the principal amount as of the Closing Date of [$35,571,823.47] (exclusive of capitalized interest, fees, costs and other amounts) incurred pursuant to the terms of the Swap Debt Documents.[2]

"**Swap Debt Documents**" means the Swap Notes, the Swap Indenture and the Swap Lien Subordination Agreement.

"**Swap Indenture**" means the Indenture dated February 26, 2003 between Borrower and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

["**Swap Lien Subordination Agreement**" means the Swap Lien Subordination Agreement dated February 26, 2003 among Borrower, Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services, Inc. and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.][3]

"**Swap Notes**" means Borrower's Senior Secured Notes due 2005, dated as of February 26, 2003 and issued by Borrower pursuant to the Swap Indenture, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

---

[2]   Amounts to be confirmed

[3]   *Discuss:* We must review.

**"Taxes"** has the meaning set forth in Section 2.6.

**"Termination Date"** has the meaning set forth in Section 2.1(c).

**"UCC"** means the Uniform Commercial Code of the State of Illinois or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

**"Unused Line Fee"** has the meaning set forth in Section 2.2(b).

**"Vehicles"** means motor vehicles now or hereafter owned by Borrower and required to be titled pursuant to applicable law.

Section 1.2        Accounting Terms and Determinations.

Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including without limitation determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent (except for changes concurred with by Borrower's independent public accountants) with the most recent audited consolidated financial statements of Borrower and its Consolidated Subsidiaries delivered to Lender; provided that if (a) Borrower shall object to determining compliance with the provisions of this Agreement on such basis by written notice delivered to Lender at the time of delivery of required financial statements due to any change in GAAP or the rules promulgated with respect thereto or (b) Lender shall so object in writing by written notice delivered to Borrower within sixty (60) days after delivery of such financial statements, then such calculations shall be made on a basis consistent with the most recent financial statements delivered by Borrower to Lender as to which no such objection shall have been made. All amounts used for purposes of financial calculations required to be made herein shall be without duplication.

Section 1.3        Other Definitional Provisions.

References in this Agreement to "Articles", "Sections", "Annexes" or "Exhibits" shall be to Articles, Sections, Annexes or Exhibits of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified herein, references to any Person include the successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.

## ARTICLE 2
## LOANS

Section 2.1        Loans.

(a) <u>Loans and Borrowings</u>.

On the terms and subject to the conditions set forth herein, Lender agrees to make revolving loans to Borrower from time to time as set forth herein ("**Loans**") requested by Borrower hereunder, provided that after giving effect thereto, the Loans Outstanding shall not exceed the Loan Limit.  Within the foregoing limits, Borrower may borrow under this Section 2.1(a), prepay or repay Loans as required or permitted under this Section 2.1 and reborrow Loans pursuant to this Section 2.1(a).

(b) <u>Advancing Loans</u>.

(i)        Borrower shall deliver to Lender a Notice of Borrowing with respect to each proposed borrowing, such Notice of Borrowing to be delivered no later than 12:00 noon (New York City time) (i) on the day of such proposed borrowing, in the case of Prime Rate Loans in an aggregate principal amount equal to or less than $3,500,000, (ii) on the Business Day prior to such proposed borrowing, in the case of Prime Rate Loans in an aggregate principal amount greater than $3,500,000 and (iii) on the third (3rd) Business Day prior to such proposed borrowing, in the case of all LIBOR Loans.  Once given, except as provided in Section [2.2(g)(ii)], a Notice of Borrowing shall be irrevocable and Borrower shall be bound thereby.

(ii)        Borrower hereby authorizes Lender to make Loans (other than LIBOR Loans) based on telephonic notices made by any Person which Lender, in good faith, believes to be acting on behalf of Borrower.  Borrower agrees to deliver to Lender a Notice of Borrowing in respect of each Loan requested by telephone no later than one Business Day following such request.  If the Notice of Borrowing differs in any respect from the action taken by Lender, the records of Lender shall govern absent manifest error.  Borrower further hereby authorizes Lender to make Loans based on electronic notices made by any Person which Lender, in good faith, believes to be acting on behalf of Borrower, but only after Lender shall have established procedures acceptable to Lender for accepting electronic Notices of Borrowing, as indicated by Lender's written confirmation thereof.  Unless otherwise specified in the applicable Notice of Borrowing, each Loan shall be advanced to Borrower's Account.

(c) <u>Mandatory Loan Repayments and Prepayments</u>.

(i)        The Loan Commitment shall terminate upon the earliest to occur of (i) the Commitment Expiry Date, (ii) the date on which Lender elects to terminate the Loan Commitment pursuant to Section 9.2, (iii) the occurrence of an Event of Default under Section 9.1(p), or (iv) the effective date of a confirmed Bankruptcy Plan (such earliest date being the "**Termination Date**"), and there shall become due and Borrower shall pay on the Termination Date, the entire outstanding principal amount of each Loan, together with accrued and unpaid interest thereon to but excluding the Termination Date.

-21

(ii)    Any prepayment of a Loan on a day other than the last day of an Interest Period therefor shall include interest on the principal amount being repaid and shall be subject to Section 2.2(g)(ii).

(iii)    If at any time the Loans Outstanding exceed the Loan Limit, then, on the next succeeding Business Day, Borrower shall repay the Loans in an aggregate amount equal to such excess.

(d) Mandatory Prepayments.  There shall become due and payable and Borrower shall prepay Loans in the following amounts and at the following times:

(i)    on the date on which any Credit Party (or Lender as loss payee or assignee) receives any payment which constitutes Major Casualty Proceeds, an amount equal to the amount of such payment; provided, that the recipient (other than Lender) of any payment which constitutes Major Casualty Proceeds may reinvest such payment within one hundred eighty (180) days, in replacement assets comparable to the assets giving rise to such payment; provided, that the aggregate amount which may be reinvested by Borrower and its Subsidiaries pursuant to the preceding proviso may not exceed $250,000 in any Fiscal Year; provided, further, that if the applicable Credit Party does not intend to reinvest such payment, or if the time period set forth in this sentence expires without such Credit Party having reinvested such payment, Borrower shall promptly prepay the Loans in an amount equal to such payment;

(ii)    promptly upon receipt by any Credit Party of the proceeds from the issuance and sale of any Debt or equity securities (other than (1) proceeds of Debt securities expressly permitted pursuant to Section 5.1, (2) proceeds of the issuance of equity securities by Borrower received before the Closing Date, (3) proceeds from the issuance of equity securities to employees or directors of any Credit Party and (4) proceeds of the issuance of equity securities to Borrower or any Subsidiary), an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance and sale; and

(iii)    promptly upon receipt by any Credit Party of the proceeds of any Asset Disposition, an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Asset Disposition; provided, that (A) at such time as the aggregate Net Cash Proceeds of Asset Dispositions of Scheduled Real Property paid to Lender for application to the Obligations exceeds the Real Estate Limit, the balance of such Net Cash Proceeds shall be used by Borrower to prepay the Swap Debt as provided in Section 5.5(b)(i), (B) no prepayment shall be required pursuant to this Section 2.1(d)(iii) unless and until the aggregate Net Cash Proceeds received during any Fiscal Year from Asset Dispositions (other than Asset Dispositions of Real Property) exceeds $50,000 (in which case all Net Cash Proceeds in excess of such amount shall be used to make prepayments pursuant to this Section 2.1(d)(iii)), and (C) the recipient of such Net Cash Proceeds may reinvest such Net Cash Proceeds, within one hundred twenty (120) days, in replacement fixed assets of a kind then used or usable in the business of such Credit Party, in which case Borrower shall not be required to make any prepayment pursuant to this Section 2.1(d)(iii).  If the applicable Credit Party does not intend to so reinvest such Net Cash Proceeds, or if the period set forth in the immediately preceding sentence expires without such Credit Party having reinvested such Net Cash Proceeds, Borrower shall prepay the Loans in an amount equal to such Net Cash Proceeds.