## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) **Chapter 11** |
| | ) |
| **WICKES INC.,** | ) **Case No. 04 B 02221** |
| | ) |
| **Debtor.** | ) **Honorable Bruce W. Black** |

## AMENDMENT TO FINAL ORDER AUTHORIZING DEBTOR TO: (A) INCUR POSTPETITION DEBT; (B) GRANT LIENS AND PROVIDE SECURITY, ADEQUATE PROTECTION AND OTHER RELIEF TO MERRILL LYNCH CAPITAL, A DIVISION OF MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC., AS AGENT; AND (C) PROVIDE ADEQUATE PROTECTION TO THE BANK OF NEW YORK, AS INDENTURE TRUSTEE

This matter came before this Court on the motion of Wickes Inc. ("Debtor") that this Court enter an order amending that certain Final Order Authorizing Debtor To: (A) Incur Postpetition Debt; (B) Grant Liens And Provide Security, Adequate Protection And Other Relief To Merrill Lynch Capital, A Division Of Merrill Lynch Business Financial Services Inc., As Agent; And (C) Provide Adequate Protection To The Bank Of New York, As Indenture Trustee, entered on March 25, 2004 ("Final Financing Order"). The Court has considered the record in this Case and the statements of counsel in regard to Debtor's motion.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      The Final Financing Order is amended as follows:

    (a) Exhibit C to the Final Financing Order shall be deemed replaced with the agreement attached hereto as Exhibit A.

    (b) The following phrase shall be deleted from Definition 29 (Postpetition Lenders): "and Highland Crusader Offshore Partners, L.P., California Public Employees' Retirement System".

2.      Except as set forth herein, the terms of the Final Financing Order are not altered and shall remain in full force and effect.

3. The terms of this Order were negotiated in good faith and at arms' length, and the Postpetition Debt being extended under the Final Financing Order, as amended hereby, is being extended in good faith, as that term is used in Code § 364(e).

4. If any or all of the provisions of this Order or the Final Financing Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such subsequent order shall not affect the priority, validity, enforceability or effectiveness of any lien, security interest, priority, or other benefit authorized hereby with respect to any Postpetition Debt incurred prior to the effective date of such subsequent order, and all such liens, security interests, priorities and other benefits shall be governed in all respects by the provisions of the Final Financing Order, as amended hereby.

DATED:  March 25, 2004

_Bruce W. Black_

Honorable Bruce W. Black
United States Bankruptcy Judge

# EXHIBIT A

Revised Postpetition Loan Agreement

**AMENDED AND RESTATED
DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

**DATED AS OF MARCH __, 2004**

**AMONG**

**WICKES INC.,**
**Chapter 11 Debtor and Debtor-In-Possession, as Borrower,**

**MERRILL LYNCH CAPITAL,**
**a Division of Merrill Lynch Business Financial Services Inc.,**
**as Agent, Collateral Agent, Book Manager, Lead Arranger and as a Lender,**

**AND**

**THE ADDITIONAL LENDERS
FROM TIME TO TIME PARTY HERETO**



# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS...................................................................................... 1
Section 1.1    Certain Defined Terms.................................................................. 1
Section 1.2    Accounting Terms and Determinations. ..................................... 26
Section 1.3    Other Definitional Provisions. ................................................... 27

ARTICLE 2 LOANS AND LETTERS OF CREDIT .................................................. 27
Section 2.1    Term Loan; Additional Term Loan.............................................. 27
Section 2.2    Revolving Loans. ....................................................................... 31
Section 2.3    Interest, Interest Calculations and Certain Fees......................... 33
Section 2.4    Notes. ....................................................................................... 37
Section 2.5    Letters of Credit and Letter of Credit Fees. ............................... 37
Section 2.6    General Provisions Regarding Payment; Loan Account. ............. 40
Section 2.7    Maximum Interest....................................................................... 41
Section 2.8    Taxes. ....................................................................................... 41
Section 2.9    Ancillary Services...................................................................... 42
Section 2.10   Exercise of Discretion................................................................ 43

ARTICLE 3 REPRESENTATION AND WARRANTIES .......................................... 43
Section 3.1    Existence and Power................................................................... 43
Section 3.2    Organization and Governmental Authorization; No Contravention......... 43
Section 3.3    Binding Effect............................................................................ 44
Section 3.4    Capitalization. ........................................................................... 44
Section 3.5    Financial Information.................................................................. 44
Section 3.6    Litigation................................................................................... 45
Section 3.7    Ownership of Property................................................................ 45
Section 3.8    No Default.................................................................................. 45
Section 3.9    Labor Matters............................................................................. 45
Section 3.10   Regulated Entities. ..................................................................... 46
Section 3.11   Margin Regulations.................................................................... 46
Section 3.12   Compliance With Laws............................................................... 46
Section 3.13   Taxes. ....................................................................................... 46
Section 3.14   Compliance with ERISA............................................................. 47
Section 3.15   Brokers...................................................................................... 47
Section 3.16   Budgets. .................................................................................... 47
Section 3.17   Employment, Equityholders and Subscription Agreements. ......... 48
Section 3.18   Compliance with Environmental Requirements; No Hazardous
               Materials. ................................................................................. 48
Section 3.19   Intellectual Property................................................................... 49
Section 3.20   Real Property Interests................................................................ 49
Section 3.21   Matters Relating to Collateral...................................................... 50
Section 3.22   Swap Lien Subordination Agreement............................................ 50
Section 3.23   [Intentionally Omitted] ............................................................... 50
Section 3.24   Full Disclosure........................................................................... 50

Section 3.25   Representations and Warranties Incorporated from Other Operative
Documents. ........................................................................................... 50
Section 3.26   Subsidiaries. ......................................................................................... 51

ARTICLE 4 AFFIRMATIVE COVENANTS.......................................................................... 51
Section 4.1   Financial Statements and Other Reports..................................................... 51
Section 4.2   Payment and Performance of Obligations. ................................................. 56
Section 4.3   Conduct of Business and Maintenance of Existence. ................................. 56
Section 4.4   Maintenance of Property; Insurance. .......................................................... 56
Section 4.5   Compliance with Laws. ............................................................................... 57
Section 4.6   Inspection of Property, Books and Records................................................. 58
Section 4.7   Use of Proceeds.......................................................................................... 58
Section 4.8   Lenders' Meetings...................................................................................... 58
Section 4.9   Hazardous Materials; Remediation. ............................................................ 59
Section 4.10   Further Assurances.................................................................................... 59
Section 4.11   Cooperation.............................................................................................. 59
Section 4.12   Consultants............................................................................................... 59

ARTICLE 5 NEGATIVE COVENANTS ............................................................................... 60
Section 5.1   Debt............................................................................................................ 60
Section 5.2   Liens........................................................................................................... 60
Section 5.3   Restricted Distributions. ............................................................................ 61
Section 5.4   Restrictive Agreements. .............................................................................. 61
Section 5.5   Payments and Modifications of Certain Debt.............................................. 62
Section 5.6   Consolidations, Mergers and Sales of Assets. ............................................ 63
Section 5.7   Purchase of Assets, Investments................................................................. 63
Section 5.8   Transactions with Affiliates......................................................................... 64
Section 5.9   Modification of Organizational Documents. .............................................. 64
Section 5.10   Fiscal Year. ............................................................................................... 64
Section 5.11   Conduct of Business. ................................................................................. 64
Section 5.12   Prepetition Loan Documents...................................................................... 64
Section 5.13   Lease Payments......................................................................................... 65
Section 5.14   Bank Accounts. ......................................................................................... 65
Section 5.15   Hedging Transactions................................................................................ 65
Section 5.16   Payments to Prepetition Unsecured Creditors. .......................................... 65
Section 5.17   Pension Plan Payments. ............................................................................ 65

ARTICLE 6 ACCOUNTS AND INVENTORY REPRESENTATIONS, WARRANTIES,
COVENANTS AND AGREEMENTS...................................................................... 66
Section 6.1   Accounts and Account Collections............................................................. 66
Section 6.2   Inventory.................................................................................................... 68

ARTICLE 7 PERFORMANCE COVENANTS ...................................................................... 68
Section 7.1   Free Cash Flow. ......................................................................................... 69
Section 7.2   Operating Expenses. .................................................................................. 69
Section 7.3   Inventory Purchases. .................................................................................. 70
Section 7.4   Inventory Sales........................................................................................... 71

ARTICLE 8 CONDITIONS .............................................................................. 72
    Section 8.1    Conditions to Effectiveness of this Agreement. ........................... 72
    Section 8.2    Conditions to Each Loan, Support Agreement and Letter of Credit......... 74

ARTICLE 9 EVENTS OF DEFAULT ............................................................... 75
    Section 9.1    Events of Default. ....................................................................... 75
    Section 9.2    Acceleration and Suspension or Termination of Revolving Loan
                Commitment. ............................................................................. 78
    Section 9.3    Cash Collateral. ......................................................................... 79
    Section 9.4    Default Rate of Interest and Suspension of LIBOR Rate Options............ 79
    Section 9.5    Setoff Rights. ............................................................................. 80
    Section 9.6    Application of Proceeds. ............................................................ 80

ARTICLE 10 EXPENSES, INDEMNITY, TAXES AND RIGHT TO PERFORM ................... 81
    Section 10.1    Expenses. .................................................................................. 81
    Section 10.2    Indemnity. ................................................................................. 82
    Section 10.3    Taxes. ........................................................................................ 83
    Section 10.4    Right to Perform. ....................................................................... 83

ARTICLE 11 AGENT ........................................................................................ 83
    Section 11.1    Appointment and Authorization. ............................................... 83
    Section 11.2    Agent and Affiliates. ................................................................. 83
    Section 11.3    Action by Agent. ....................................................................... 84
    Section 11.4    Consultation with Experts........................................................... 84
    Section 11.5    Liability of Agent....................................................................... 84
    Section 11.6    Indemnification. ........................................................................ 85
    Section 11.7    Right to Request and Act on Instructions. .................................. 85
    Section 11.8    Credit Decision. ......................................................................... 85
    Section 11.9    Collateral Matters....................................................................... 86
    Section 11.10 Agency for Perfection. ............................................................ 86
    Section 11.11 Notice of Default..................................................................... 86
    Section 11.12 Successor Agent....................................................................... 86
    Section 11.13 Disbursements of Revolving Loans; Payment........................... 87
    Section 11.14 Collateral Agent. ..................................................................... 89

ARTICLE 12 MISCELLANEOUS ..................................................................... 90
    Section 12.1    Survival. .................................................................................... 90
    Section 12.2    No Waivers. ............................................................................... 90
    Section 12.3    Notices. ..................................................................................... 90
    Section 12.4    Severability. .............................................................................. 90
    Section 12.5    Amendments and Waivers. ........................................................ 90
    Section 12.6    Assignments; Participations........................................................ 92
    Section 12.7    Headings. ................................................................................... 94
    Section 12.8    Confidentiality. .......................................................................... 94
    Section 12.9    GOVERNING LAW; SUBMISSION TO JURISDICTION. .................... 94
    Section 12.10 WAIVER OF JURY TRIAL........................................................ 95
    Section 12.11 Publication; Advertisement....................................................... 95
    Section 12.12 Counterparts; Integration. ....................................................... 96
    Section 12.13 Effect of Amendment and Restatement. .................................... 96

## ANNEXES AND EXHIBITS

### ANNEXES

Annex A       -       Commitment Annex
Annex B       -       Closing Checklist

### EXHIBITS

Exhibit A     -       Assignment Agreement
Exhibit B     -       Compliance Certificate
Exhibit C     -       Borrowing Base Certificate
Exhibit D     -       Notice of Borrowing
Exhibit E     -       Scheduled Appraised Values
Exhibit F     -       Existing Support Agreements
Exhibit G     -       Real Property Collateral

## AMENDED AND RESTATED
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

AMENDED AND RESTATED DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of March __, 2004 among WICKES INC., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession, as Borrower, the financial institutions from time to time parties hereto, each as a Lender (collectively, the "Lenders"), and MERRILL LYNCH CAPITAL, a division of Merrill Lynch Business Financial Services Inc., individually as a Lender and as Agent, Collateral Agent, Book Manager and Lead Arranger.

### RECITALS:

WHEREAS, on the Original Closing Date, pursuant to the terms of the Original DIP Agreement, certain of the Lenders agreed to extend certain term credit and working capital facilities to Borrower to provide working capital financing for Borrower, to provide funds for other general business purposes of Borrower and to refinance Borrower's Prepetition Obligations;

WHEREAS, Borrower, Lenders and Agent have agreed to amend and restate in its entirety the Original DIP Agreement on the terms, and subject to the conditions, contained herein;

WHEREAS, Borrower desires to secure all of its Obligations under the Financing Documents by reaffirming its prior grant to Agent, for the benefit of Agent and Lenders, of a security interest in and lien upon all of its personal and real property, including without limitation all of the outstanding capital stock or other equity securities, as applicable, of each Subsidiary; and

WHEREAS, each Subsidiary is willing to guaranty (and reaffirm its prior guaranty of) all of the Obligations of Borrower to Lenders under the Financing Documents, and to reaffirm its prior grant to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon all of its personal and real property;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrower, Lenders and Agent hereby amend and restate the Original DIP Agreement as follows:

### ARTICLE 1
### DEFINITIONS

Section 1.1        Certain Defined Terms.

The following terms have the following meanings:

"9.1(s) Event" has the meaning provided in Section 9.01(s)(iii).

"**Accessions**" means "accessions" (as defined in Article 9 of the UCC) to other Collateral of Borrower and the Subsidiaries.

"**Accounts**" means "accounts" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries, including without limitation any and all rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, in each case, for purposes of calculating the Borrowing Base, net of any credits, rebates or offsets owed by Borrower to the respective customer.

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC.

"**Additional Term Loan**" has the meaning set forth in Section 2.1(a).

"**Additional Term Loan Commitment Percentage**" means, as to any Lender, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Additional Term Loan Commitment Percentage", or if different, in the most recent Assignment Agreement to which such Lender is a party.

"**Additional Term Loan Success Fee**" has the meaning set forth in Section 2.3(e).

"**Additional Term Notes**" has the meaning set forth in Section 2.4.

"**Administration Fee**" has the meaning set forth in Section 2.3(d).

"**Affiliate**" means with respect to any Person (i) any Person that directly or indirectly controls such Person, (ii) any Person which is controlled by or is under common control, direct or indirect, with such controlling Person and (iii) in the case of an individual, the parents, descendants, siblings and spouse of such individual. As used in this definition, the term "**control**" of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" means Merrill Lynch in its capacity as agent for the Lenders hereunder, as such capacity is established and subject to the provisions of Article 11 and the successors of Merrill Lynch in such capacity.

"**Agent Advances**" has the meaning set forth in Section 2.2(a)(ii).

"**Agreement**" means this Amended and Restated Debtor-In-Possession Credit Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Ancillary Services**" means any service or facility (other than any Debt and/or Letter of Credit facility) extended to Borrower or any Subsidiary by any Designated Lender

Affiliate in reliance on the agreement of a Lender to indemnify such Designated Lender Affiliate in respect of such service or facility.

"**Asset Disposition**" means any sale, lease, license or other consensual disposition by any Credit Party of any asset, but excluding (i) dispositions of Inventory in the ordinary course of business, (ii) leases of tool rental equipment in the ordinary course of business, (iii) dispositions of Cash Equivalents, and (iv) collections in respect of Accounts.

"**Assignee**" has the meaning set forth in Section 12.6(a).

"**Assignment Agreement**" means an agreement substantially in the form of Exhibit A hereto.

"**Availability Block**" means an amount equal to $10,000,000.

"**Avoidance Action Recoveries**" means any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case in respect of any Avoidance Actions.

"**Avoidance Actions**" means any and all actions in the Bankruptcy Case under any and all of Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"**Bankruptcy Case**" means the case under Chapter 11 of the Bankruptcy Code in which Borrower is the debtor and the debtor-in-possession, pending before the Bankruptcy Court.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §101 et seq., as in effect on the Filing Date and as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois having jurisdiction over the Bankruptcy Case.

"**Bankruptcy Plan**" means a final plan of reorganization for Borrower confirmed by final order of the Bankruptcy Court in the Bankruptcy Case that provides for full, final and indefeasible payment of the Obligations in immediately available funds, the satisfaction of all Letter of Credit Liabilities and the termination of the Revolving Loan Commitment or is otherwise in form and substance satisfactory to Agent and Lenders.

"**Blocked Account**" has the meaning set forth in Section 6.1(d).

"**Borrower**" means Wickes Inc., a Delaware corporation, Chapter 11 Debtor and Debtor-In-Possession.

"**Borrower's Account**" means the account specified on the signature pages hereof below Borrower's name into which Loans (other than Agent Advances, which shall be disbursed by Agent in a manner permitted by Section 2.2(a)(ii)) shall, absent other written instructions, be made, or such other account as Borrower may specify by written notice to Agent.

**"Borrowing Base"** means, as of any date of calculation, a dollar amount calculated pursuant to the Borrowing Base Certificate most recently delivered to Agent in accordance with the terms hereof, equal to the sum of (i) 85% of Eligible Accounts; plus (ii) the least of (A) 60% (subject to reduction as set forth below) of Eligible Inventory, or (B) $35,000,000; provided, that aggregate advances against otherwise Eligible Inventory in transit to Borrower, already paid for by Borrower and shipped by the vendor shall not exceed $3,000,000; minus (iii) the Availability Block; minus (iv) Reserves (including the accrued and unpaid Carveout) then established by Agent. Notwithstanding the foregoing, at all times that the Swap Indenture remains in existence, the Borrowing Base shall not exceed the sum of (a) 95% of the net book value of Borrower's Accounts and each Subsidiary's Accounts plus (b) 75% of Borrower's Inventory and each Subsidiary's Inventory minus (c) the outstanding principal balance of the Additional Term Loan. The 60% advance rate set forth above with respect to Eligible Inventory is subject to reduction if the Agent receives, from time to time, an updated appraisal from Hilco and such updated appraisal shows a reduction from 67.22% (the level set forth in the existing Hilco appraisal dated February 17, 2004) of the "Projected NOLV in the Hilco High Selling Period". Such reduction will be in an amount equal to the amount by which the percentage set forth for the "Projected NOLV in the Hilco High Selling Period", as evidenced by any such updated appraisal, is less than 67.22%. By way of example, if an updated appraisal shows a "Projected NOLV in the Hilco High Selling Period" of 63.22%, the 60% advance rate will be reduced to 56%. Agent may, from time to time, in the exercise of its reasonable credit judgment reduce or increase any percentage amount set forth in the first sentence of this definition (any such increase not to exceed the percentages established on the Closing Date) based on either: (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Agent, could reasonably be expected to adversely affect the Accounts and/or the Inventory, as determined by Agent in the exercise of its reasonable credit judgment.

**"Borrowing Base Certificate"** means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit C hereto.

**"Budget"** has the meaning provided in Section 4.1(v).

**"Business Day"** means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Chicago are authorized by law to close and, in the case of a Business Day which relates to a LIBOR Loan, a day on which dealings are carried on in the London interbank eurodollar market.

**"Capital Expenditures"** has the meaning as defined pursuant to the terms of the Compliance Certificate.

**"Capital Lease"** of any Person means any lease of any property by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

**"Carveout"** has the meaning provided in the then-applicable Financing Order.

**"Cash Collateralization"** means to pledge and deposit with or deliver to the Agent, as collateral for the Letter of Credit Liabilities, cash pursuant to documentation in form and substance reasonably satisfactory to Agent (which documents are hereby consented to by the Lenders) in an amount equal to 105% of the Letter of Credit Liabilities.

**"Cash Equivalents"** means any Investment in (i) direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, (ii) commercial paper rated at least A-1 by Standard & Poor's Ratings Service and P-1 by Moody's Investors Services, Inc., (iii) time deposits with, including certificates of deposit issued by, any office located in the United States of any bank or trust company which is organized under the laws of the United States or any State thereof and has capital, surplus and undivided profits aggregating at least $500,000,000 and which issues (or the parent of which issues) certificates of deposit or commercial paper with a rating described in clause (ii) above, (iv) repurchase agreements with respect to securities described in clause (i) above entered into with an office of a bank or trust company meeting the criteria specified in clause (iii) above, provided in each case that such Investment matures within one year from the date of acquisition thereof by any Credit Party, or (v) any money market or mutual fund which invests only in the foregoing types of investments and the liquidity of which is satisfactory to Agent.

**"Chattel Paper"** means "chattel paper" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"Closing Checklist"** means Annex B to this Agreement.

**"Closing Date"** means the date of this Agreement.

**"Closing Fee"** has the meaning provided in Section 2.3(c).

**"Code"** means the Internal Revenue Code of 1986.

**"Collateral"** means all property, now existing or hereafter acquired (and whether or not acquired or generated prior or subsequent to the Filing Date), mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to the Security Documents, including without limitation all of Borrower's and each Subsidiary's (i) Accounts; (ii) Chattel Paper; (iii) Commercial Tort Claims; (iv) Deposit Accounts, all cash, and other property deposited therein or otherwise credited thereto from time to time and other monies and property in the possession or under the control of Agent or any Lender or any affiliate, representative, agent or correspondent of Agent of any Lender; (v) Documents; (vi) General Intangibles, including without limitation any and all Intellectual Property, (vii) Goods, including without limitation any and all

Inventory, any and all Equipment and any and all Fixtures; (viii) Instruments; (ix) Investment Property; (x) Letter of Credit Rights; (xi) Supporting Obligations; (xii) any and all other personal property and interests whether or not subject to the UCC; (xiii) any and all books and records, in whatever form or medium, that at any time evidence or contain information relating to any of the foregoing properties or interests in properties or are otherwise necessary or helpful in the collection thereof or realization thereon; (xiv) all Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; (xv) all Proceeds and products of the foregoing, and all insurance pertaining to the foregoing and proceeds thereof; and (xvi) all Real Property; provided, that the Collateral shall not include any Avoidance Action Recoveries.

**"Commercial Tort Claims"** means "commercial tort claims" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"Commitment Annex"** means Annex A to this Agreement.

**"Commitment Expiry Date"** means January 21, 2005; provided, that such date may be extended for up to two (2) successive additional ninety (90) day periods through and including July 19, 2005 at the request of Borrower and the Subsidiaries and with the consent of Agent and all Lenders having one or both of a Revolving Loan Commitment and a portion of the then outstanding Term Loan, in their sole discretion.   Although the Commitment Expiry Date is January 21, 2005, subject to extension as set forth above, Borrower acknowledges that pursuant to the provisions of Section 9.1(s), it will be an Event of Default if a 9.1(s) Event occurs, and as a result, the credit facilities described herein will extend beyond July 2, 2004 or such later date mandated by Section 9.1(s) due to unavailability of the Bankruptcy Court or lack of notice only if the Event of Default resulting from the 9.1(s) Event (and each other Event of Default occurring on or before July 2, 2004 or such later date mandated by Section 9.1(s) due to unavailability of the Bankruptcy Court or lack of notice) is waived by all Lenders.

**"Commitment Fee"** has the meaning provided in Section 2.3(c).

**"Committee"** means the official committee appointed to represent unsecured creditors in the Bankruptcy Case pursuant to Bankruptcy Code Section 1102.

**"Compliance Certificate"** means a certificate, duly executed by a Responsible Officer, appropriately completed and substantially in the form of Exhibit B hereto.

**"Concentration Account"** has the meaning set forth in Section 6.1(d).

**"Consolidated Subsidiary"** means at any date any Subsidiary or other Person the accounts of which would be consolidated with those of Borrower in its consolidated financial statements if such statements were prepared as of such date.

**"Continuing Director"** means a director who either is a member of Borrower's board of directors as the date hereof or who became a director subsequent to such

-6-

date and whose election was duly approved by a majority of the Continuing Directors then on the board of directors of Borrower.

"**Controlled Group**" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"**Credit Exposure**" means any period of time during which the Revolving Loan Commitment is outstanding or any Loan, Reimbursement Obligation or other Obligation remains unpaid or any Letter of Credit or Support Agreement remains outstanding; provided, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim with respect thereto.

"**Credit Party**" means Borrower and each Subsidiary.

"**Debt**" of a Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid in the ordinary course of business, (iv) all Capital Leases of such Person, (v) all liabilities arising under Interest Rate Agreements and Lumber Hedging Agreements of such Person, (vi) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit or similar instrument, (vii) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (viii) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (ix) "earnouts" and similar payment obligations and (x) all Debt of others Guaranteed by such Person.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement or reimbursement required pursuant to the terms of any Financing Documents.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Deposit Account Control Agreement**" means an agreement, in form and substance satisfactory to Agent, among Agent, Borrower or a Subsidiary of Borrower maintaining a Deposit Account at any bank, and such bank, which agreement provides that (x) such bank shall comply with instructions originated by Agent directing disposition of the

funds in such Deposit Account without further consent by Borrower or such Subsidiary (as applicable), and (y) such bank shall agree that it shall have no Lien on, or right of setoff against, such Deposit Account or the contents thereof, other than in respect of commercially reasonable fees and other items expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including (i) as to any such agreement pertaining to any Blocked Account, providing that all items received or deposited in such Blocked Account are the property of Agent, and that such bank shall wire, or otherwise transfer, including by reverse ACH transfer, in immediately available funds, on a daily basis to the Concentration Account all funds received or deposited into such Blocked Account and (ii) as to any such agreement pertaining to the Concentration Account, providing that all items received or deposited in the Concentration Account are the property of Agent, and that such bank shall wire or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited in the Concentration Account.

"**Designated Lender Affiliates**" means any Affiliate of Agent or any Lender that (i) from time to time makes Ancillary Services available to Borrower or any Subsidiary and (ii) in the case of an Affiliate of a Lender other than Merrill Lynch, is expressly identified in writing by Agent, in its sole discretion, as a Designated Lender Affiliate.

"**Documents**" means "documents" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Effective Date**" means the date upon which all conditions contained in Section 8.1 have first been satisfied.

"**Eligible Account**" means any Account of Borrower that Agent, in its reasonable credit judgment exercised in good faith, deems to be an Eligible Account. Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(i)    it does not arise from the actual and bona fide sale and delivery of goods or the performance of services by Borrower in the ordinary course of its business, which transactions are completed substantially in accordance with the terms and provisions contained in any documents related thereto;

(ii)    (a) Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever (including any Account that arises from a sale on consignment, guaranteed sale, sale and return, sale on approval or other terms under which payment by the Account Debtor may be conditioned or contingent) or (b) Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(iii)    an invoice relating to such Account, acceptable to Agent in form and substance, has not been sent by Borrower to the applicable Account Debtor;

(iv)    it is unpaid more than thirty (30) days after the due date therefor, or (except as provided in clause (v) below) it is unpaid more than seventy-one (71) days after the date of the original invoice therefor;

(v)    it is unpaid more than thirty (30) days after the due date therefor, or it is unpaid more than one hundred twenty (120) days after the date of the original invoice therefor, provided that Accounts unpaid between seventy-two (72) days and one hundred twenty (120) days after the original invoice date shall be ineligible under this clause (v) to the extent the aggregate amount thereof exceeds eight percent (8%) of the dollar amount of all Accounts of Borrower;

(vi)    it is owed by an Account Debtor obligated in respect of Accounts constituting more than ten percent (10%) of the aggregate dollar amount of all Accounts (but the portion of the Accounts not in excess of the applicable percentage may be deemed Eligible Accounts); provided that Agent may, in its reasonable credit judgment exercised in good faith, may increase such percentage to a percentage greater than ten percent (10%) but not in excess of fifteen percent (15%);

(vii)    it is the obligation of an Account Debtor if twenty percent (20%) or more of the dollar amount of all Accounts owing by that Account Debtor are ineligible because they are unpaid more than thirty (30) days after the due date thereof;

(viii)    it consists of progress billings (such that the obligation of the Account Debtors with respect to such Account is conditioned upon Borrower's satisfactory completion of any further performance under the agreement giving rise thereto), bill and hold invoices or retainage invoices (such that the Account Debtor is permitted to hold all or a portion of the payment thereof until completion of the applicable project), except as to bill and hold invoices, if Agent shall have received an agreement in writing from the Account Debtor, in form and substance satisfactory to Agent, confirming the unconditional obligation of the Account Debtor to take the goods related thereto and pay such invoice;

(ix)    it arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity which has any common officer or director with any Credit Party;

(x)    and to the extent that such Account exceeds any credit limit established by Agent, in its reasonable credit judgment exercised in good faith;

(xi)    it is payable in any currency other than U.S. dollars;

(xii)    and to the extent that any Credit Party has a payable, or is liable, for goods sold or services rendered by the applicable Account Debtor to such Credit Party, but only to the extent of such payable or liability;

(xiii)    and to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account;

-9-

(xiv)   it (a) is not owned by Borrower or (b) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Agent, on behalf of itself and Lenders and other than the Carveout;

(xv)   it is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state or municipality or department, agency or instrumentality thereof unless Agent, in its sole discretion, has agreed to the contrary in writing and Borrower, if necessary or required by Agent, has complied in a manner acceptable to Agent with the Federal Assignment of Claims Act of 1940 or any applicable state statute or municipal ordinance of similar purpose and effect, with respect to such obligation;

(xvi)   it is the obligation of an Account Debtor located in a foreign country unless (a) the Account Debtor has delivered to Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to Agent and payable only in the United States of America and in U.S. dollars, sufficient to cover such Account, in form and substance satisfactory to Agent and, if required by Agent, the original of such letter of credit has been delivered to Agent or Agent's agent, and Borrower has assigned the proceeds of such letter of credit to Agent pursuant to documentation in form and substance acceptable to Agent or otherwise named Agent as transferee beneficiary thereunder, as Agent may specify, (b) such Account is subject to credit insurance payable to Agent issued by an insurer and on terms and in an amount acceptable to Agent, or (c) such Account is otherwise acceptable in all respects to Agent (subject to such limits or lending formulae with respect thereto as Agent may determine);

(xvii)   any facts, events or occurrences exist which, in the reasonable credit judgment of Agent exercised in good faith, could reasonably be expected to impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder, including without limitation (a) Accounts owing by Account Debtors as to which Borrower has suspended further sales due to rejection of a credit application or increased credit limit request, or due to unauthorized delinquent sales or lack of creditworthiness; provided, however, that Borrower's internal coding of an Account or an Account Debtor to indicate that Borrower is reviewing, or has requested current information from the Account Debtor with respect to, such Account Debtor's financial condition, shall not in and of itself be a basis for rendering any Account ineligible pursuant to this clause; and (b) Accounts placed for collection;

(xviii)   any proceedings or actions known to any Credit Party (or to Agent) are threatened or pending against the Account Debtor with respect to such Account which could reasonably be expected to have a material adverse change in any such Account Debtor's financial condition (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(xix)   Agent's Lien therein, on behalf of itself and Lenders, is not a first priority perfected Lien, or as to which the goods giving rise thereto are not, and were not

at the time of the applicable sale, subject to any Lien in favor of Agent, on behalf of itself and Lenders;

(xx)    to the extent that it consists of a debit to clear customer credit balances, an accrual for credit memos relating to dilution, a finance or delinquency charge, a framing installation or other installation charge relating to services not yet completed by Borrower and accepted by the Account Debtor, or an installation use tax;

(xxi)   any of the representations or warranties pertaining to such Account set forth in any Financing Document is untrue in any material respect; and

(xxii)  to the extent that such Account is evidenced by a judgment, Instrument or Chattel Paper;

provided, that Agent may, from time to time, in the exercise of its reasonable credit judgment, change the criteria for Eligible Accounts set forth in the Borrowing Base Certificate, based on either:  (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Agent, could reasonably be expected to adversely affect the Accounts as determined by Agent in the exercise of its reasonable credit judgment in good faith.  For purposes of this Agreement, the net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts less any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time.  Any Accounts which are not Eligible Accounts shall nevertheless be part of the Collateral.

"**Eligible Inventory**" means any Inventory of Borrower that Agent, in its reasonable credit judgment exercised in good faith, deems to be Eligible Inventory.  Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory if:

(i)     it is not owned by Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments, the rights of a surety that has issued a bond to assure performance with respect to that Inventory, except the Liens in favor of Agent, on behalf of itself and Lenders, except for the Carveout and except for the reclamation rights of sellers of Inventory (which are addressed in the Financing Orders));

(ii)    it is not of a type held for sale in the ordinary course of Borrower's business;

(iii)   it consists of work-in-process Inventory;

(iv)    it is placed on consignment, it has been direct-shipped to the customer but has not yet been invoiced;

        (v)    it is in transit, unless or it has been paid for in full by Borrower and is in transit to one of Borrower's locations;

        (vi)    it consists of power equipment and machinery rented or to be rented to customers;

        (vii)    in Agent's reasonable determination or in the determination of Borrower's management, it is excess, obsolete, unsaleable, shopworn, seconds, damaged or unfit for sale;

        (viii)    it consists of display items, samples or packing or shipping materials, manufacturing supplies or replacement or spare parts;

        (ix)    it is not covered by casualty insurance acceptable to Agent;

        (x)    it is bill and hold Inventory;

        (xi)    it consists of vendor managed Inventory or other Inventory delivered to Borrower but not yet invoiced to Borrower;

        (xii)    it is (a) not located on premises owned by Borrower or (b) is located on premises leased by Borrower, or stored with a bailee, warehouseman, processor or similar Person, unless Agent has given its prior consent thereto and unless (i) a Lien waiver and collateral access agreement, in form and substance satisfactory to Agent has been delivered to Agent, together with any and all duly authorized UCC financing statements required by Agent naming such Person as debtor, Borrower as secured creditor and Agent as assignee or (ii) Reserves satisfactory to Agent have been established with respect thereto (which will be in the amount of at least two (2) month's rental and other charges relating to such location), or (c) located at any site if the aggregate book value of Inventory at any such location is less than $200,000;

        (xiii)    Agent's Lien therein, on behalf of itself and Lenders, is not a first priority perfected Lien;

        (xiv)    any of the representations or warranties pertaining to such Inventory set forth in any Financing Document is untrue in any material respect;

        (xv)    it consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available; and

        (xvi)    it is covered by a negotiable document of title, unless such document has been delivered to Agent;

provided, that Agent may, from time to time, in the exercise of its reasonable credit judgment exercised in good faith, change the criteria for Eligible Inventory set forth in the Borrowing Base Certificate, based on either: (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing

Date to the extent Agent has no written notice thereof from a Credit Party prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or, in the reasonable credit judgment of Agent, could reasonably be expected to adversely affect the Inventory as determined by Agent in the exercise of its reasonable credit judgment in good faith. For purposes of this Agreement, the amount of Eligible Inventory shall be determined on a first-in, first-out, lower of cost or market basis in accordance with GAAP. Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

"**Emergency Financing Order**" means the financing order previously entered in the Bankruptcy Case authorizing Borrower to obtain the financing and to grant the Liens contemplated by and described in the Original DIP Agreement.

"**Environmental Laws**" means any and all federal, state, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements and governmental restrictions, whether now or hereafter in effect, relating to the environment or the effect of the environment on human health or to emissions, discharges or releases of pollutants, contaminants, Hazardous Materials or wastes into the environment, including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, Hazardous Materials or wastes or the clean-up or other remediation thereof.

"**Equipment**" means, collectively, "equipment" and "fixtures" (as each term is defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Event of Default**" has the meaning set forth in Section 9.1.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day and (ii) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"**Field Examination Fee**" has the meaning set forth in Section 2.3(g).

"**Filing Date**" means January 20, 2004.

"**Final Financing Order**" means a final order entered in the Bankruptcy Case after the satisfaction of the fifteen (15) day notice period contained in Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, authorizing Borrower to obtain the financing and to grant the Liens contemplated by and described in this Agreement, in form and substance

substantially similar to the Emergency Financing Order and otherwise in form and substance satisfactory to Agent and Lenders, as amended, modified or supplemented from time to time with the prior consent of all Lenders; provided, however, that if the purpose of such amendment, modification or supplement is solely to reflect an amendment, modification or supplement to this Agreement, then such amendment, modification or supplement of the Final Financing Order shall only require the approval of such number of Lenders as would be required to approve such amendment, modification or supplement under Section 12.5 of the Agreement.

"**Financing Documents**" means this Agreement, the Notes, the Security Documents, the Information Certificate, the applicable Financing Order, the Swap Lien Subordination Agreement and all other documents, instruments and agreements contemplated herein or thereby and executed concurrently herewith or at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Financing Order**" means the Emergency Financing Order or the Final Financing Order, as applicable.

"**Fiscal Year**" means a fiscal year of Borrower, ending on the last Saturday of each calendar year.

"**Fixtures**" means "fixtures" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Free Cash Flow**" means, for any period, Borrower's (i) aggregate cash sales, collections in respect of Accounts and other cash received during such period <u>minus</u> (ii) the sum of (a) materials purchases during such period, <u>plus</u> (b) Operating Expenses during such period, plus (c) financing fees paid during such period, plus (d) cash interest expense paid during such period, plus (c) unfinanced Capital Expenditures during such period, plus (f) taxes paid or accrued during such period.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" means "general intangibles" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Goods**" means "goods" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other

-14-

Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"**Hazardous Materials**" means (i) any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) petroleum, its derivatives, by-products and other hydrocarbons, and (v) any other toxic, radioactive, caustic or otherwise hazardous substance regulated under Environmental Laws.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personality, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**HSBC**" means HSBC Bank USA (formerly known as Marine Midland Bank).

"**Imagine**" means Imagine Investments, Inc., a Delaware corporation.

"**Imagine Parties**" means, collectively, Imagine, Consolidated National Corporation, a Florida corporation and their respective Affiliates.

"**Indemnitees**" has the meaning set forth in Section 10.2.

"**Information Certificate**" means that certain Information Certificate dated on or about March 8, 2004 executed by Borrower and delivered to Agent.

"**Instrument**" means an "instrument" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Intellectual Property**" means, with respect to any Person, all patents, trademarks, trade names, copyrights, technology, know-how and processes, and all applications therefor, used in or necessary for the conduct of business by such Person.

"**Interest Period**" means, as to any LIBOR Loan, the period commencing on the date such Loan is borrowed or continued as, or converted into, a LIBOR Loan and ending on the date one (1), two (2) or three (3) months thereafter, as selected by Borrower pursuant to Section 2.3(j); provided, that: (a) if any Interest Period would otherwise end on a day that

is not a Business Day, such Interest Period shall be extended to the following Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day; (b) any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; (c) Borrower may not select any Interest Period for a Revolving Loan which would extend beyond the Commitment Expiry Date; and (d) Borrower may not select any Interest Period for the Term Loan if, after giving effect to such selection, the aggregate principal amount of the Term Loan having Interest Periods ending after any date on which an installment of the Term Loan is scheduled to be repaid would exceed the aggregate principal amount of the Term Loan scheduled to be outstanding after giving effect to such repayment.

"**Interest Rate Agreement**" shall mean any interest rate protection agreement, interest rate future, interest rate option, interest rate swap, interest rate cap or other interest rate hedge or arrangement under which Borrower or any Subsidiary is a party or beneficiary and that is entered into in relation to interest on Debt of Borrower or such Subsidiary.

"**Inventory**" means "inventory" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Investment**" means any investment in any Person, whether by means of acquiring or holding securities, capital contribution, loan, time deposit, advance, Guarantee or otherwise.

"**Investment Property**" means "investment property" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**LC Issuer**" means Merrill Lynch or a bank or trust company reasonably acceptable to Merrill Lynch, as issuer of one or more Letters of Credit outstanding at any time.

"**Lender**" means each of (i) Merrill Lynch, (ii) each other Person party hereto in the capacity of a lender, (iii) each other Person that becomes a holder of a Note pursuant to Section 12.6, (iv) Agent, to the extent of any Agent Advances and other Revolving Loans made by Agent which have not been settled among the Lenders pursuant to Section 11.13, and (v) the respective successors of all of the foregoing, and Lenders means all of the foregoing. In addition to the foregoing, for the purpose of identifying the Persons entitled to share in the Collateral and the proceeds thereof under, and in accordance with the provisions of, this Agreement and the Security Documents, the term "Lender" shall include Designated Lender Affiliates.

"**Letter of Credit**" means a standby letter of credit issued for the account of Borrower by an LC Issuer which expires by its terms within one year after the date of issuance and in any event at least thirty (30) days prior to the Commitment Expiry Date. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its

expiry date for one or more successive one (1) year periods provided that the LC Issuer that issued such Letter of Credit has the right to terminate such Letter of Credit on each such annual expiration date and no renewal term may extend the term of the Letter of Credit to a date that is later than the thirtieth (30th) day prior to the Commitment Expiry Date.

"**Letter of Credit Liabilities**" means, at any time of calculation, the sum of (i) the amount then available for drawing under all outstanding Letters of Credit (without regard to whether any conditions to drawing thereunder can then be met), <u>plus</u> (ii) the aggregate unpaid amount of all reimbursement obligations in respect of previous drawings made under such Letters of Credit.

"**Letter of Credit Rights**" means "letter of credit rights" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**LIBOR**" means, with respect to any LIBOR Loan for any Interest Period, a rate per annum (rounded upwards, if necessary, to the nearest 1/16 of 1%) equal to (i) the rate of interest which is identified and normally published by Bloomberg Professional Service Page BBAM 1 as the offered rate for loans in U.S. dollars for the applicable Interest Period under the caption British Bankers Association LIBOR Rates as of 11:00 a.m. (London time), on the second full Business Day next preceding the first day of such Interest Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by (ii) the sum of one <u>minus</u> the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein). If Bloomberg Professional Service no longer reports the LIBOR or Agent determines in good faith that the rate so reported no longer accurately reflects the rate available to Agent in the London Interbank Market or if such index no longer exists or if Page BBAM 1 no longer exists or accurately reflects the rate available to Agent in the London Interbank Market, Agent may select a replacement index or replacement page, as the case may be.

"**LIBOR Loans**" means any Loans which accrue interest by reference to the LIBOR, in accordance with the terms of this Agreement.

"**LIBOR Margin**" means 3.25% per annum with respect to the Revolving Loans and other Obligations (other than the Term Loan and the Additional Term Loan) and 4.00% per annum with respect to the Term Loan.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset. For the purposes of this Agreement and the other Financing Documents, Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Loans**" means the Term Loan, the Additional Term Loan and the Revolving Loans, or any combination of the foregoing, as the context may require.

"**Lumber Hedging Agreement**" means any lumber futures contract or similar agreement or arrangement entered into by Borrower or any Subsidiary and designed to protect Borrower or such Subsidiary against fluctuations in the price of lumber actually used in the ordinary course of Borrower's business.

"**Major Casualty Proceeds**" means (i) the aggregate insurance proceeds received in connection with one or more related events under any Property Insurance Policy or (ii) any award or other compensation with respect to any condemnation of property (or any transfer or disposition of property in lieu of condemnation).

"**Margin Stock**" has the meaning assigned thereto in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a material adverse effect upon, any of (i) the financial condition, operations, business, properties or prospects of the Credit Parties, taken as a whole, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, or (iv) the existence, perfection or priority of any security interest granted in any Financing Document or the value of any material Collateral.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7(b).

"**Merrill Lynch**" means Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., and its successors.

"**Multiemployer Pension Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any member of the Controlled Group may have any liability.

"**Net Borrowing Availability**" means, at any time, the positive amount, if any, by which the Revolving Loan Limit at such time exceeds the Revolving Loan Outstandings at such time.

"**Net Cash Proceeds**" means, with respect to any transaction or event, an amount equal to the cash proceeds received by the Credit Party from or in respect of such transaction or event (including proceeds of any non-cash proceeds of such transaction), less (i) any out-of-pocket expenses reasonably incurred by such Person in connection therewith

and (ii) in the case of an Asset Disposition, the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such Asset Disposition and any taxes paid or payable by such Person in respect of such Asset Disposition.

"**Notes**" means the Term Notes, the Additional Term Notes and the Revolving Loan Notes, or any combination of the foregoing, as the context may require.

"**Notice of Borrowing**" means a written notice of a Responsible Officer, appropriately completed and substantially in the form of Exhibit D hereto, which shall include a written certification to the effect that (a) the proposed Loan and its intended use are consistent with the terms of this Agreement, and is necessary in order to satisfy Borrower's obligations in the ordinary course of business or as otherwise permitted under the Financing Documents, (b) all conditions to borrowing contained in this Agreement and the other Financing Documents have been satisfied in all material respects, and (c) no Event of Default or Default is in existence.

"**Notice of LC Credit Event**" means a written notice from a Responsible Officer to Agent with respect to any issuance, increase or extension of a Letter of Credit specifying: (i) the date of issuance or increase of a Letter of Credit; (ii) the expiry date of such Letter of Credit; (iii) the proposed terms of such Letter of Credit, including the face amount; and (iv) the transactions or additional transaction or transactions that are to be supported or financed with such Letter of Credit or increase thereof, and which shall also contain certifications similar to those contained in the Notice of Borrowing form.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. The Obligations shall include, without limitation, each of the Loans, all obligations, liabilities and indebtedness arising from or in connection with all Letters of Credit, all Support Agreements and all Ancillary Services.

"**Operating Expenses**" means for any period, all operating expenses of Borrower for such period as reflected in the applicable Budget.

"**Operative Documents**" means the Financing Documents, the Subordinated Debt Documents and the Swap Debt Documents.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

"**Original Closing Date**" means January 21, 2004.

"**Original DIP Agreement**" means the Debtor-In-Possession Credit Agreement dated as of January 21, 2004 among Borrower, certain of the Lenders and Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services Inc., as Agent, Collateral Agent, Book Manager and Lead Arranger, as amended, supplemented and otherwise modified through the Closing Date.

"**Participant**" has the meaning set forth in Section 12.6(b).

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by notice to Borrower.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any "employee benefit pension plan", as such term is defined in Section 3(1) of ERISA, and any "employee welfare benefit plan", as such term is defined in Section 3(2) of ERISA, in each case which is subject to Title IV of ERISA (other than a Multiemployer Pension Plan), and to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Permitted Contest**" means a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made; provided that compliance with the obligation that is the subject of such contest is effectively stayed during such challenge.

"**Permitted Liens**" means Liens permitted pursuant to Section 5.2.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust, hedge fund or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"**Prepetition Agent**" means Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services, Inc.

"**Prepetition Collateral**" means all collateral securing the Prepetition Obligations.

"**Prepetition Credit Agreement**" means the Credit Agreement dated as of February 26, 2003 among Prepetition Agent, individually and as Agent, Collateral Agent,

Book Manager and Lead Arranger, the Prepetition Lenders from time to time party thereto and Wickes Inc., as amended through the Filing Date.

**"Prepetition Lenders"** means the lenders under the Prepetition Credit Agreement.

**"Prepetition Loan Documents"** means the Prepetition Credit Agreement and all other agreements, instruments or documents evidencing or securing the Prepetition Obligations.

**"Prepetition Obligations"** means all of the Debt and obligations outstanding as of the Filing Date under the Prepetition Loan Documents.

**"Prepetition Revolving Loans"** means revolving loans made pursuant to the Prepetition Credit Agreement.

**"Prime Rate"** means a variable per annum rate, as of any date of determination, equal to the greater of (i) the Federal Funds Rate plus one-half of one percent (0.50%) per annum and (ii) the rate from time to time published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in The Wall Street Journal of a Prime Rate that is different from that published on the preceding Business Day. In the event that The Wall Street Journal shall, for any reason, fail or cease to publish the Prime Rate, Agent shall choose a reasonably comparable index or source to use as the basis for the Prime Rate and provide prompt written notice thereof to Borrower.

**"Prime Rate Loans"** means Loans, which accrue interest by reference to the Prime Rate, in accordance with the terms of this Agreement.

**"Prime Rate Margin"** means 2.00% per annum with respect to the Revolving Loans and other Obligations (other than the Term Loan and the Additional Term Loan) and 2.75% per annum with respect to the Term Loan.

**"Proceeds"** means "proceeds" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

**"Property Insurance Policy"** means any insurance policy maintained by any Credit Party covering losses with respect to tangible real or personal property or improvements or losses from business interruption.

**"Pro Rata Share"** means (i) with respect to a Lender's right to receive payments of principal, interest and fees with respect to the Term Loan, the Term Loan Commitment Percentage of such Lender, (ii) with respect to a Lender's obligation to make Revolving Loans, such Lender's right to receive payments of principal, interest and fees with respect thereto, such Lender's right to receive the Unused Line Fee described in Section 2.3(b), and such Lender's obligation to share in Letter of Credit Liability and to receive the

related Letter of Credit fee described in Section 2.5(b), the Revolving Loan Commitment Percentage of such Lender, (iii) with respect to a Lender's right to receive payments of principal, interest and fees with respect to the Additional Term Loan, the Additional Term Loan Commitment Percentage of such Lender and (iv) for all other purposes (including without limitation the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by dividing (x) the sum of the Revolving Loan Commitment Amount of such Lender (or, in the event the Revolving Loan Commitment shall have been terminated, such Lender's then existing Revolving Loan Outstandings), plus such Lender's then outstanding principal amount of the Term Loan, plus such Lender's then outstanding principal amount of the Additional Term Loan by (y) the sum of the Revolving Loan Commitment (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings of all Lenders), plus the then outstanding principal amount of the Term Loan, plus the then outstanding principal balance of the Additional Term Loan.

"**Real Estate Limit**" means an amount equal to $26,811,400.

"**Real Property**" means the real property of Borrower or any of the Subsidiaries, together with the related rights more particularly described in Exhibit G hereto, including without limitation all buildings, structures and other improvements thereon, and all licenses, easements and appurtenances related thereto.

"**Reference Rate**" means a variable per annum rate, as of any date of determination, equal to the greater of (i) four percent (4.00%) and (ii) the Prime Rate.

"**Reimbursement Obligations**" means, at any date, the obligations of Borrower then outstanding to reimburse Merrill Lynch for payments made by Merrill Lynch under a Support Agreement or under a Letter of Credit issued by Merrill Lynch as LC Issuer.

"**Reinvestment Reserve**" has the meaning set forth in Section 2.1(c).

"**Required Lenders**" means at any time Lenders holding (i) sixty-six and two-thirds percent (66-2/3%) or more of the sum of the Revolving Loan Commitment and the outstanding principal balance of the Term Loan or (ii) if the Revolving Loan Commitment has been terminated, sixty-six and two-thirds percent (66-2/3%) or more of the sum of (x) the aggregate outstanding principal balance of the Revolving Loans and the Term Loan plus (y) the aggregate amount of Reimbursement Obligations.

"**Reserves**" means such amounts as Agent may from time to time establish and revise, in each case in the exercise of its reasonable credit judgment exercised in good faith, reducing the amount of Revolving Loans, Letters of Credit and Support Agreements which would otherwise be available to Borrower under the lending formula(s) provided for herein: (a) to reflect events, conditions, contingencies or risks which, as determined by Agent in the good faith exercise of its reasonable credit judgment, adversely affect, or could reasonably be expected to adversely affect, any of: (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of any Credit Party or

(iii) the Liens and other rights of Agent or any Lender in the Collateral (including the enforceability, perfection and priority thereof), (b) to reflect Agent's good faith belief that any collateral report or financial information furnished by or on behalf of any Credit Party to Agent is or may have been incomplete, inaccurate or misleading in any material respect, (c) to reflect accrued and unpaid interest and fees or (d) to reflect the amount of existing tax liens, judgments, mechanic's liens and similar liens and claims, if any.  To the extent Agent may, in accordance with any other terms hereof, revise the lending formula(s) used to determine the Borrowing Base or establish new criteria or revise existing criteria for Eligible Accounts or Eligible Inventory, Agent shall not also establish a Reserve for the same purpose.  The amount of any Reserve established by Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as determined by Agent in good faith.  Without limitation of the foregoing, Agent shall have the right to establish Reserves relating to matters such as (1) the dilution of Accounts, with dilution referring to all actual and potential offsets to an Account, (2) accruals for sales taxes collected from customers, (3) physical inventory shrink adjustments and monthly shrink reserves, (4) lumber pricing markups, (5) volume rebates from vendors, (6) material decline in the appraised value of fixed assets and (7) purchase discounts.  As of the Closing Date, Agent has established special Reserves in the amounts from time to time of (y) the aggregate amount owing by Borrower to Irene Solondz in respect of the certain Promissory Note dated September 30, 2001 in the original amount of $950,000 and secured by a mortgage Lien on Borrower's Kenvil, New Jersey property, and (z) the accrued and unpaid amount of the Carveout.  Agent will provide Borrower with prompt notice of the imposition of new Reserve categories after the Closing Date.  Notwithstanding the foregoing, the reserve described in clause (z) above shall not be reduced by Agent without the consent of all Lenders.  In the event that the Agent establishes any Reserve hereunder, the Agent shall have the ability, in its sole discretion, to eliminate all or any portion of such Reserve, if doing so would not result in an overadvance.

"**Responsible Officer**" means any of the Chief Executive Officer, Chief Financial Officer or Secretary of Borrower.

"**Restricted Distribution**" means as to any Person (i) any dividend or other distribution on any equity interest in such Person (except those payable solely in its equity interests of the same class) or (ii) any payment on account of (a) the purchase, redemption, retirement, defeasance, surrender or acquisition of any equity interests in such Person or any claim respecting the purchase of sale of any equity interest in such Person or (b) any option, warrant or other right to acquire any equity interests in such Person.

"**Revolving Loan Borrowing**" means a borrowing of a Revolving Loan.

"**Revolving Loan Commitment**" means the sum of each Lender's Revolving Loan Commitment Amount.

"**Revolving Loan Commitment Amount**" means, as to any Lender, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column

"Revolving Loan Commitment Amount", or, if different, in the most recent Assignment Agreement to which such Lender is a party.

"**Revolving Loan Commitment Percentage**" means, as to any Lender, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage", or, if different, in the most recent Assignment Agreement to which such Lender is a party.

"**Revolving Loan Limit**" means, at any time, the lesser of (i) the Borrowing Base, plus any Agent Advances and (ii) the Revolving Loan Commitment.

"**Revolving Loan Note**" has the meaning set forth in Section 2.4.

"**Revolving Loan Outstandings**" means at any time of calculation the sum of the then existing aggregate (i) outstanding principal amount of Revolving Loans, and (ii) Letter of Credit Liabilities.

"**Revolving Loans**" has the meaning set forth in Section 2.2(a), and includes all Agent Advances.

"**Scheduled Appraised Value**" means, for each Scheduled Real Property, the amount set forth on Exhibit E hereto with respect to such parcel of Real Property.

"**Scheduled Real Property**" means the Real Property of Borrower listed on Exhibit E.

"**Security Documents**" means any agreement, document or instrument heretofore executed, executed concurrently herewith or executed at any time hereafter pursuant to which one or more Credit Parties or any other Person either (i) Guarantees payment or performance of all or any portion of the Obligations and/or (ii) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of the Lenders, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Settlement Date**" has the meaning set forth in Section 11.13(a)(ii).

"**Stated Rate**" has the meaning set forth in Section 2.7(b).

"**Subordinated Debt**" means Debt of Borrower owing to the holders of the Subordinated Notes in an aggregate principal amount on the Closing Date of $21,123,000 (together with capitalized interest, fees, costs and other amounts) incurred pursuant to the terms of the Subordinated Debt Documents.

"**Subordinated Debt Documents**" means the Subordinated Debt Indenture and the Subordinated Notes.

-24-

"**Subordinated Debt Indenture**" means the Indenture dated October 15, 1993 between Borrower, as issuer, and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Subordinated Notes**" means Borrower's 11 5/8% Senior Subordinated Notes due 2003, dated as of October 15, 1993 and issued by Borrower pursuant to the Subordinated Debt Indenture, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, limited partnership or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person. Unless otherwise specified, the term Subsidiary shall refer to a Subsidiary of Borrower.

"**Success Fee**" has the meaning provided in Section 2.3(e).

"**Supermajority Lenders**" means at any time Lenders holding (i) eighty percent (80%) or more of the sum of the Revolving Loan Commitment and the outstanding principal balance of the Term Loan or (ii) if the Revolving Loan Commitment has been terminated, eighty percent (80%) or more of the sum of (x) the aggregate outstanding principal balance of the Revolving Loans and the Term Loan plus (y) the aggregate amount of Reimbursement Obligations.

"**Support Agreement**" has the meaning set forth in Section 2.5(a).

"**Supporting Obligations**" means "supporting obligations" (as defined in Article 9 of the UCC) of Borrower and the Subsidiaries.

"**Swap Debt**" means Debt of Borrower owing to the holders of the Swap Notes in an original principal amount of $42,833,000 and the principal amount as of the Original Closing Date of $36,571,823.47, as stated by the holders thereof (exclusive of capitalized interest, fees, costs and other amounts), incurred pursuant to the terms of the Swap Debt Documents.

"**Swap Debt Documents**" means the Swap Notes, the Swap Indenture and the Swap Lien Subordination Agreement.

"**Swap Indenture**" means the Indenture dated February 26, 2003 between Borrower and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Swap Lien Subordination Agreement**" means the Swap Lien Subordination Agreement dated February 26, 2003 among Borrower, Prepetition Agent and HSBC, as trustee, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Swap Notes**" means Borrower's Senior Secured Notes due 2005, dated as of February 26, 2003 and issued by Borrower pursuant to the Swap Indenture, as amended, supplemented or otherwise modified prior to the date hereof or from time to time hereafter.

"**Taxes**" has the meaning set forth in Section 2.8.

"**Term Loan**" has the meaning set forth in Section 2.1.

"**Term Loan Commitment Percentage**" means, as to any Lender, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Percentage", or, if different, in the most recent Assignment Agreement to which such Lender is a party.

"**Term Note**" has the meaning set forth in Section 2.4.

"**Termination Date**" has the meaning set forth in Section 2.2(c).

"**UCC**" means the Uniform Commercial Code of the State of Illinois or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**Unused Line Fee**" has the meaning set forth in Section 2.3(b).

"**Vehicles**" means motor vehicles now or hereafter owned by Borrower and required to be titled pursuant to applicable law.

Section 1.2      Accounting Terms and Determinations.

Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including without limitation determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent (except for changes concurred with by Borrower's independent public accountants) with the most recent audited consolidated financial statements of Borrower and its Consolidated Subsidiaries delivered to Agent and each of the Lenders; provided that if (a) Borrower shall object to determining compliance with the provisions of this Agreement on such basis by written notice delivered to Agent and the Lenders at the time of delivery of required financial statements due to any change in GAAP or the rules promulgated with respect thereto or (b) Agent or the Required Lenders shall so object in writing by written notice delivered to Borrower within sixty (60) days after delivery of such financial statements, then such calculations shall be made on a basis consistent with the most recent financial statements delivered by Borrower to the Lenders as to which no such objection shall have been made. All amounts used for purposes of financial calculations required to be made herein shall be without duplication.

Section 1.3        Other Definitional Provisions.

References in this Agreement to "Articles", "Sections", "Annexes" or "Exhibits" shall be to Articles, Sections, Annexes or Exhibits of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified herein, references to any Person include the successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.

## ARTICLE 2
## LOANS AND LETTERS OF CREDIT

Section 2.1        Term Loan; Additional Term Loan.

(a)        Term Loan/Additional Term Loan Amounts.  On the terms and subject to the conditions set forth herein, certain Lenders hereby agree to make a term loan to Borrower on the Effective Date in an original aggregate principal amount of $22,375,000 (the "Term Loan"), the proceeds of which will be used to refinance a like amount of outstanding Obligations. Each Lender's obligation to fund the Term Loan shall be limited to such Lender's Term Loan Commitment Percentage of the Term Loan, and no Lender shall have any obligation to fund any portion of the Term Loan required to be funded by any other Lender, but not so funded. Borrower shall not have any right to reborrow any portion of the Term Loan that is repaid or prepaid from time to time.

On the terms and subject to the conditions set forth herein, certain Lenders hereby agree to make an additional term loan to Borrower on the date of entry of the Final Financing Order in an original aggregate principal amount of $15,000,000 (together with increases to the principal amount thereof pursuant to Section 2.3(i) hereof, the "Additional Term Loan"). Each Lender's obligation to fund the Additional Term Loan shall be limited to such Lender's Additional Term Loan Commitment Percentage of the Additional Term Loan, and no Lender shall have any obligation to fund any portion of the Additional Term Loan required to be funded by any other Lender, but not so funded. Borrower shall not have any right to reborrow any portion of the Additional Term Loan that is repaid or prepaid from time to time.

(b)        Scheduled Repayments.  There shall become due and payable, and Borrower shall repay the Term Loan through, scheduled payments on each date set forth below, each equal to the applicable installment amount set forth below (or, if less, the outstanding amount of the Term Loan):

### Term Loan

| Date | Installment Amount |
|---|---|
| September 30, 2004 | $400,000 |
| December 31, 2004 | $400,000 |
| January 21, 2005 | $21,575,000 |

Notwithstanding the payment schedules set forth above, the outstanding principal amount of the Term Loan, and all accrued and unpaid interest thereon, shall become immediately due and payable in full on the Termination Date; provided, that if the Commitment Expiry Date is extended (as provided in the definition of such term) an additional installment of $400,000 will be due on March 31, 2005 and June 30, 2005, as applicable, with the balance of the Term Loan due on the extended Commitment Expiry Date.

There shall become due and payable, and Borrower shall repay the Additional Term Loan, and all accrued and unpaid interest thereon, on the earlier of (i) September 30, 2005, and (ii) the effective date of a confirmed Bankruptcy Plan.

(c)   Mandatory Prepayments.   There shall become due and payable and Borrower shall prepay the Term Loan (and the Revolving Loans and the Additional Term Loan, to the extent required by Section 2.1(e)) in the following amounts and at the following times:

(i)   on the date on which any Credit Party (or Agent as loss payee or assignee) receives any payment which constitutes Major Casualty Proceeds, an amount equal to the amount of such payment; provided, that the recipient (other than Agent) of any payment which constitutes Major Casualty Proceeds may reinvest such payment within thirty (30) days, in replacement assets comparable to the assets giving rise to such payment; provided, that the aggregate amount which may be reinvested by Borrower and its Subsidiaries pursuant to the preceding proviso may not exceed $250,000 in any Fiscal Year; provided, further, that if the applicable Credit Party does not intend to reinvest such payment, or if the time period set forth in this sentence expires without such Credit Party having reinvested such payment, Borrower shall promptly prepay the Loans in an amount equal to such payment;

(ii)   promptly upon receipt by any Credit Party of the proceeds from the issuance and sale of any Debt or equity securities (other than (1) proceeds of Debt securities expressly permitted pursuant to Section 5.1, (2) proceeds of the issuance of equity securities by Borrower received before the Closing Date, (3) proceeds from the issuance of equity securities to employees or directors of any Credit Party and (4) proceeds of the issuance of equity securities to Borrower or any Subsidiary), an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance and sale; and

(iii)   promptly upon receipt by any Credit Party of the proceeds of any Asset Disposition, an amount equal to one hundred percent (100%) of the Net Cash

Proceeds of such Asset Disposition; provided, that (A) at such time as the aggregate Net Cash Proceeds of Asset Dispositions of Scheduled Real Property paid to Agent for application to the Obligations exceeds the Real Estate Limit, the balance of such Net Cash Proceeds shall be used by Borrower to prepay the Swap Debt as provided in Section 5.5(b)(i), (B) no prepayment shall be required pursuant to this Section 2.1(c)(iii) unless and until the aggregate Net Cash Proceeds received during any Fiscal Year from Asset Dispositions (other than Asset Dispositions of Real Property) exceeds $50,000 (in which case all Net Cash Proceeds shall be used to make prepayments pursuant to this Section 2.1(c)(iii)), and (C) the recipient of such Net Cash Proceeds may reinvest up to $250,000 of such Net Cash Proceeds, within thirty (30) days, in replacement fixed assets (other than real property) of a kind then used or usable in the business of such Credit Party, in which case Borrower shall not be required to make any prepayment pursuant to this Section 2.1(c)(iii). If the applicable Credit Party does not intend to so reinvest such Net Cash Proceeds, or if the period set forth in the immediately preceding sentence expires without such Credit Party having reinvested such Net Cash Proceeds, Borrower shall prepay the Loans (or to the extent that the aggregate Net Cash Proceeds of Asset Dispositions of Scheduled Real Property paid to Agent for application to the Obligations exceeds the Real Estate Limit, the Swap Debt, to the extent provided in Section 5.5(b)(i)) in an amount equal to such Net Cash Proceeds.

Any amounts permitted to be reinvested pursuant to the preceding clauses (i) or (iii) shall be immediately applied by Borrower as a prepayment against then outstanding Revolving Loans, and Agent shall establish a Reserve (the **"Reinvestment Reserve"**) against the Revolving Loan Limit in an amount equal to such permitted reinvestment amount. So long as no Event of Default then exists, Agent shall permit Revolving Loan Borrowings to finance the making of reinvestments permitted pursuant to the preceding clauses (i) and (iii), and shall concurrently reduce the Reinvestment Reserve by an equivalent amount.   Any remaining portion of the Reinvestment Reserve shall be reduced to zero (0) upon the expiration of the applicable reinvestment periods pursuant to the preceding clauses (i) and (iii) and the Loans shall be immediately prepaid by such amount in the manner provided above in this Section 2.1(c).

(d)      Optional Prepayments.  Subject to the provisions of Section 2.1(e)(iii), Borrower may from time to time, on at least three (3) Business Days prior written notice to Agent and the Committee specifying the date and amount of such prepayment, prepay the Term Loan in whole or in part; provided that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.  Following a repayment in full of all Obligations (other than those pertaining to the Additional Term Loan) in immediately available funds, the satisfaction in full of all Letter of Credit Liabilities (or the Cash Collateralization thereof) and the termination of the Revolving Loan Commitment, subject to the provisions of Section 2.1(e)(iii), Borrower may from time to time, on at least one (1) Business Day's prior notice to Agent specifying the date and amount of such prepayment, prepay the Additional Term Loan in whole or in part.  No payment pursuant to this Section 2.1(d) shall reduce the amount of any payment required by Section 2.1(c).

(e)     <u>All Prepayments</u>.

(i)     Any prepayment of a LIBOR Loan on a day other than the last day of an Interest Period therefor shall include interest on the principal amount being repaid and shall be subject to Section 2.3(j)(iv). All prepayments of a Loan shall be applied first to that portion of such Loan comprised of Prime Rate Loans and then to that portion of such Loan comprised of LIBOR Loans, in direct order of Interest Period maturities. Subject to the provisions of the immediately following clause (ii), all prepayments of the Term Loan shall be applied in the inverse order of maturity to the remaining installments thereof. Following the payment in full of the Term Loan, any remaining amounts required by Section 2.1(c) to be used to prepay the Term Loan shall instead be applied as a repayment of the outstanding Revolving Loans, and shall permanently reduce the Revolving Loan Commitment. Following payment in full of all Obligations (other than those pertaining to the Additional Term Loan) in immediately available funds, the satisfaction in full of all Letter of Credit Liabilities (or the Cash Collateralization thereof) and termination of the Revolving Loan Commitment, any remaining amounts required by Section 2.1(c) to be used to prepay the Loans shall be applied to prepay the Additional Term Loan.

(ii)     Notwithstanding anything to the contrary in the immediately preceding clause (i), (w) Major Casualty Proceeds shall be allocated between outstanding Revolving Loans and the Term Loan in the same proportion as (1) the current market value of the Collateral consisting of cash and Inventory lost or damaged and giving rise to such Major Casualty Proceeds bears to (2) the current market value of all Collateral (other than cash and Inventory) lost or destroyed and giving rise to such Major Casualty Proceeds; (x) the Net Cash Proceeds of Asset Dispositions of Scheduled Real Property, other Real Property and Equipment shall be first applied to the Term Loan; and (y) the Net Cash Proceeds of all Asset Dispositions involving property other than Equipment and Real Property shall be applied to the Revolving Loans, rather than the Term Loan, and amounts applied to the Revolving Loans shall reduce the Revolving Loan Commitment. Application of Major Casualty Proceeds and the Net Cash Proceeds of Asset Dispositions allocated pursuant to the immediately preceding sentence shall otherwise be made in accordance with the provisions of Section 2.1(c)(i). No Major Casualty Proceeds or Net Cash Proceeds of Asset Dispositions shall be applied to the Additional Term Loan unless and until all Obligations (other than those pertaining to the Additional Term Loan) have been repaid in full in immediately available funds, and all Letter of Credit Liabilities (or the Cash Collateralization thereof) have been satisfied in full and the Revolving Loan Commitment has been terminated.

(iii)     Borrower shall give prior written notice to Agent at least one (1) Business Day prior to each mandatory prepayment pursuant to Section 2.1(c) and each voluntary prepayment pursuant to Section 2.1(d) and Agent shall promptly notify each Lender of such notice.

Section 2.2      Revolving Loans.

(a)    <u>Revolving Loans and Borrowings</u>.

(i)     On the terms and subject to the conditions set forth herein, each Lender severally agrees to make revolving loans to Borrower from time to time as set forth herein equal to such Lender's Revolving Loan Commitment Percentage of revolving loans (**"Revolving Loans"**) requested by Borrower hereunder, provided that after giving effect thereto, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit. Within the foregoing limits, Borrower may borrow under this Section 2.2(a)(i), prepay or repay Revolving Loans as required or permitted under this Section 2.2 and reborrow Revolving Loans pursuant to this Section 2.2(a)(i).

(ii)     Subject to the limitations set forth in this Section 2.2(a)(ii), Agent is hereby authorized by Borrower and Lenders, from time to time in Agent's sole discretion, (A) after the occurrence of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 8.2 have not been satisfied (including without limitation the condition precedent that the Revolving Loan Outstandings not exceed the Borrowing Base <u>plus</u> any other then outstanding Agent Advances), to make Revolving Loans to Borrower on behalf of the Lenders which Agent, in its reasonable business judgment, deems necessary or desirable (1) to preserve or protect the business conducted by Borrower, the Collateral, or any portion thereof, (2) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, (3) to pay any amount chargeable to Borrower pursuant to the terms of this Agreement, including required principal payments on the Term Loan, interest payments and costs, fees and expenses as described in Section 10.1 and/or Section 10.4 or (4) to satisfy payment obligations under Letters of Credit and Support Agreements (any of the advances described in this Section 2.2(a)(ii) being hereafter referred to as **"Agent Advances"**); provided, that (i) Agent Advances may only be made with the prior approval of Supermajority Lenders, except for Agent Advances applied in the manner described in the preceding clauses (3) and (4), (ii) Agent Advances shall be made solely as Prime Rate Loans, (iii) the aggregate amount of Agent Advances outstanding at any time, exclusive of those made pursuant to the preceding clauses (3) and (4), shall not exceed $3,000,000, and (iv) Agent shall be prohibited from making Agent Advances to the extent the making thereof would cause the Revolving Loan Outstandings (inclusive of Agent Advances) to exceed the Revolving Loan Commitment. In no event will the Agent be permitted to make Agent Advances if as a result thereof the sum of the Revolving Loan Outstandings and the outstanding Additional Term Loan would exceed the formula set forth in the second sentence of the definition of the term "Borrowing Base".

(b)    <u>Advancing Revolving Loans</u>.

(i)     Borrower shall deliver to Agent a Notice of Borrowing with respect to each proposed Revolving Loan Borrowing (other than Agent Advances), such Notice of Borrowing to be delivered no later than noon (Chicago time) (i) on the day of such proposed borrowing, in the case of Prime Rate Loans in an aggregate principal amount equal

-31-

to or less than $3,500,000, (ii) on the Business Day prior to such proposed borrowing, in the case of Prime Rate Loans in an aggregate principal amount greater than $3,500,000 and (iii) on the third (3rd) Business Day prior to such proposed borrowing, in the case of all LIBOR Loans. Once given, except as provided in Section 2.3(j)(ii), a Notice of Borrowing shall be irrevocable and Borrower shall be bound thereby.

(ii)    Borrower hereby authorizes Lenders and Agent to make Revolving Loans (other than LIBOR Loans) based on telephonic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower. Borrower agrees to deliver to Agent a Notice of Borrowing in respect of each Revolving Loan requested by telephone no later than one (1) Business Day following such request. If the Notice of Borrowing differs in any respect from the action taken by Agent and Lenders, the records of Agent and the Lenders shall govern absent manifest error. Borrower further hereby authorizes Lenders and Agent to make Revolving Loans based on electronic notices made by any Person which Agent, in good faith, believes to be acting on behalf of Borrower, but only after Agent shall have established procedures acceptable to Agent for accepting electronic Notices of Borrowing, as indicated by Agent's written confirmation thereof. Unless otherwise specified in the applicable Notice of Borrowing, each Revolving Loan shall be advanced to Borrower's Account.

(c)    <u>Mandatory Revolving Loan Repayments and Prepayments</u>.

(i)    The Revolving Loan Commitment shall terminate upon the earliest to occur of (i) the Commitment Expiry Date, (ii) the date on which Agent or Required Lenders elect to terminate the Revolving Loan Commitment pursuant to Section 9.2, (iii) the occurrence of an Event of Default under Section 9.1(q), or (iv) the effective date of a confirmed Bankruptcy Plan (such earliest date being the **"Termination Date"**), and there shall become due and Borrower shall pay on the Termination Date, the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid interest thereon to but excluding the Termination Date.

(ii)    If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrower shall repay the Revolving Loans or cash collateralize Letter of Credit Liabilities in the manner specified in Section 2.5(e) or cancel outstanding Letters of Credit, or any combination of the foregoing, in an aggregate amount equal to such excess.

(d)    <u>Optional Revolving Loan Commitment Reductions</u>. Borrower may from time to time, on at least three (3) Business Days prior written notice to Agent and the Committee specifying the date and amount of such reduction, permanently reduce the Revolving Loan Commitment in part; provided that (i) each reduction shall be in an amount equal to $1,000,000 or a higher integral multiple of $1,000,000 and (ii) the aggregate amount of such reductions shall not exceed $10,000,000.

Section 2.3        Interest, Interest Calculations and Certain Fees.

(a)    Interest.  From and following the Effective Date, depending upon Borrower's election from time to time, subject to the terms hereof, to have portions of the Loans (other than the Additional Term Loan) accrue interest determined by reference to the Prime Rate or the LIBOR, the Loans (other than the Additional Term Loan) and the other Obligations (other than contingent obligations in respect of Letters of Credit and Support Agreements that have not yet been drawn) shall bear interest at the applicable rates set forth below:

(i)    If a Prime Rate Loan, or any other Obligation other than a LIBOR Loan and other than the Additional Term Loan, then at the sum of the Prime Rate plus the applicable Prime Rate Margin.

(ii)    If a LIBOR Loan, then at the sum of the LIBOR plus the applicable LIBOR Margin.

From and following the Effective Date, the Additional Term Loan shall bear interest at the per annum rate equal to the Reference Rate plus nine and one-eighth of one percent (9.125%).

(b)    Unused Line Fee.  From and following the Closing Date, Borrower shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans, in accordance with their respective Pro Rata Shares, a fee (the "**Unused Line Fee**") in an amount equal to (1) (a) the Revolving Loan Commitment less (b) the average daily balance of the Revolving Loan Outstandings during the preceding calendar month, multiplied by (2) one-half of one percent (0.50%) per annum.  The Unused Line Fee is to be paid monthly in arrears on the first day of each calendar month.  Any "Unused Line Fee" which is accrued as of the Closing Date under the Original DIP Agreement shall remain outstanding and shall be due and payable on April 1, 2004.

(c)    Closing Fee and Commitment Fee.  On the Effective Date, Borrower shall pay to Agent, for the benefit of the holders of the Additional Term Loan, in accordance with their respective Pro Rata Shares, a closing fee (the "**Closing Fee**") equal to $150,000. On the earlier of the Termination Date and July 2, 2004, Borrower shall pay to Agent, for the benefit of the holders of the Revolving Loan Commitment and the Term Loan, in accordance with their respective Pro Rata Shares, a commitment fee (the "**Commitment Fee**") equal to $1,000,000.

(d)    Administration Fee.  Borrower shall pay to Agent, for the sole account of Agent, an administration fee (the "**Administration Fee**") equal to, if the Commitment Expiry Date is extended as provided in this Agreement, $62,500 on the first day of each successive ninety (90) day extension period.  Each portion of the Administration Fee shall be fully earned when due and payable and shall not be subject to rebate, refund or proration for any reason.

(e)    Success Fees.  Upon repayment in full of the Obligations other than the Additional Term Loan and all amounts pertaining thereto (whether through a refinancing of the Obligations, a sale of Collateral or otherwise), Borrower shall pay to Agent, for the benefit of the Lenders, in accordance with their respective Pro Rata Shares (but solely with respect to their Revolving Loan Commitment Percentage and Term Loan Commitment Percentage), a success fee (the **"Success Fee"**) equal to $500,000.  Upon repayment in full of the Additional Term Loan and all amounts pertaining thereto (whether through a refinancing of the Obligations, a sale of Collateral or otherwise), Borrower shall pay to Agent, for the benefit of the Lenders, in accordance with their respective Pro Rata Shares (but solely with respect to their Additional Term Loan Commitment Percentage), a success fee (the **"Additional Term Loan Success Fee"**) equal to $225,000.  The Success Fee and the Additional Term Loan Success Fee shall be fully earned when due and payable and shall not be subject to rebate, refund or proration for any reason.  If any Lender participates in any financing of Borrower in connection with Borrower's emergence from the Bankruptcy Case, the amount of the Success Fee and the Additional Term Loan Success Fee paid to such Lender will be credited against any closing fee payable to such Lender in respect of such emergence financing.

(f)    [Intentionally Omitted]

(g)    Field Examination Fee.  Upon demand of the holders of the Additional Term Loan, Borrower shall pay to such holders, an aggregate field examination fee (the **"Field Examination Fee"**) equal to $1,500 per day per examiner plus reasonable out-of-pocket expenses (other than charges for each examiner, which charges shall be satisfied from the $1,500 per day per examiner amount) incurred by such holders, plus costs and charges of third party appraisers and third party professionals employed by such holders to review, audit and monitor the assets of Borrower and its Subsidiaries.

(h)    Computation of Interest and Related Fees; Interest Payment Dates.  All interest and fees under each Financing Document shall be calculated on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.  The date of funding of a Prime Rate Loan and the Additional Term Loan and the first day of an Interest Period with respect to a LIBOR Loan shall be included in the calculation of interest.  The date of payment of a Prime Rate Loan and the Additional Term Loan and the last day of an Interest Period with respect to a LIBOR Loan shall be excluded from the calculation of interest.  If a Loan is repaid on the same day that it is made, one (1) days' interest shall be charged.  Interest on all Prime Rate Loans and the Additional Term Loan is payable in arrears on the first day of each calendar month and on the maturity of such Loans, whether by acceleration or otherwise.  Interest on LIBOR Loans shall be payable on the last day of the applicable Interest Period.  In addition, interest on LIBOR Loans is due on the maturity of such Loans, whether by acceleration or otherwise.  All accrued and unpaid interest under the Original DIP Agreement, as of the Closing Date, shall be due and payable on April 1, 2004.

(i)    Interest Paid In-Kind.  Notwithstanding anything to the contrary set forth in this Section 2.3, until all Obligations (other than the Additional Term Loan and all interest and fees pertaining thereto) have been repaid and the Revolving Loan Commitment

has been terminated a portion of the interest accruing on the Additional Term Loan equal to five and five-eighths of one percent (5.625%) per annum shall not be paid in cash, but instead shall be paid in-kind by being added to the outstanding principal balance of the Additional Term Loan on each date on which interest is payable hereunder. Once paid in-kind, such amount shall bear interest as provided hereunder. Interest paid in-kind shall be evidenced by the then existing Additional Term Loan Notes without necessity for the issuance of any additional promissory note or any addendum or endorsement to the then existing Additional Term Loan Notes.

(j)   LIBOR Provisions.

(i)   LIBOR Election. Borrower may request that Revolving Loans to be made be LIBOR Loans, that outstanding portions of Revolving Loans and outstanding portions of each Term Loan be converted to LIBOR Loans and that all or any portion of a LIBOR Loan be continued as a LIBOR Loan upon expiration of the applicable Interest Period. Any such request will be made by submitting a Notice of Borrowing to Agent. Once given, and except as provided in clause (ii) below, a Notice of Borrowing shall be irrevocable and Borrower shall be bound thereby. Upon the expiration of an Interest Period, in the absence of a new Notice of Borrowing submitted to Agent not less than three (3) Business Days prior to the end of such Interest Period, the LIBOR Loan then maturing shall be automatically converted to a Prime Rate Loan. There may be no more than six (6) LIBOR Loans outstanding at any one time. Loans which are not requested as LIBOR Loans in accordance with this Section 2.3(j)(i) shall be Prime Rate Loans. Agent will notify Lenders, by telephonic or facsimile notice, of each Notice of Borrowing received by Agent not less than two (2) Business Days prior to the first day of the Interest Period of the LIBOR Loan requested thereby.

(ii)   Inability to Determine LIBOR. In the event, prior to commencement of any Interest Period relating to a LIBOR Loan, Agent shall determine or be notified in writing by Required Lenders that adequate and reasonable methods do not exist for ascertaining LIBOR, Agent shall promptly provide notice of such determination to Borrower and Lenders (which shall be conclusive and binding on Borrower and Lenders). In such event (1) any request for a LIBOR Loan or for a conversion to or continuation of a LIBOR Loan shall be automatically withdrawn and shall be deemed a request for a Prime Rate Loan, (2) each LIBOR Loan will automatically, on the last day of the then current Interest Period relating thereto, become a Prime Rate Loan and (3) the obligations of Lenders to make LIBOR Loans shall be suspended until Agent or Required Lenders determine that the circumstances giving rise to such suspension no longer exist, in which event Agent shall so notify Borrower and Lenders.

(iii)   Illegality. Notwithstanding any other provisions hereof, if any law, rule, regulation, treaty or directive or interpretation or application thereof shall make it unlawful for any Lender to make, fund or maintain LIBOR Loans, such Lender shall promptly give notice of such circumstances to Agent, Borrower and the other Lenders. In such an event, (1) the commitment of such Lender to make LIBOR Loans or convert Prime Rate Loans to LIBOR Loans shall be immediately suspended and (2) such Lender's

outstanding LIBOR Loans shall be converted automatically to Prime Rate Loans on the last day of the Interest Period thereof or at such earlier time as may be required by law.

(iv)    <u>LIBOR Breakage Fee</u>.  Upon (i) any default by Borrower in making any borrowing of, conversion into or continuation of any LIBOR Loan following Borrower's delivery to Agent of any applicable Notice of Borrowing or (ii) any payment of a LIBOR Loan on any day that is not the last day of the Interest Period applicable thereto (regardless of the source of such prepayment and whether voluntary, by acceleration or otherwise), Borrower shall pay Agent, for the benefit of all Lenders that funded or were prepared to fund any such LIBOR Loan, an amount equal to the amount of any losses, expenses and liabilities (including, without limitation, any loss (including interest paid) in connection with the re-employment of such funds) that any Lender may sustain as a result of such default or such payment.  For purposes of calculating amounts payable to a Lender under this paragraph, each Lender shall be deemed to have actually funded its relevant LIBOR Loan through the purchase of a deposit bearing interest at LIBOR in an amount equal to the amount of that LIBOR Loan and having a maturity and repricing characteristics comparable to the relevant Interest Period; provided, however, that each Lender may fund each of its LIBOR Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this subsection.

(v)    <u>Increased Costs</u>.  If, after the Closing Date, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:  (i) shall impose, modify or deem applicable any reserve (including any reserve imposed by the Board of Governors of the Federal Reserve System, or any successor thereto, but excluding any reserve included in the determination of the LIBOR pursuant to the provisions of this Agreement), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by any Lender; or (ii) shall impose on any Lender any other condition affecting its LIBOR Loans, its Notes or its obligation to make LIBOR Loans; and the result of anything described in clauses (i) above and (ii) is to increase the cost to (or to impose a cost on) such Lender of making or maintaining any LIBOR Loan, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or under its Notes with respect thereto, then upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrower shall pay directly to such Lender such additional amount as will compensate such Lender for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is one hundred eighty (180) days prior to the date on which such Lender first made demand therefor.

(k)    <u>Capital Adequacy</u>.  If any Lender shall reasonably determine that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any change in the interpretation or administration thereof by any

governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or the compliance by any Lender or any Person controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder or under any Letter of Credit or Support Agreement to a level below that which such Lender or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by such Lender or such controlling Person to be material, then from time to time, upon demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrower shall pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is one hundred eighty (180) days prior to the date on which such Lender first made demand therefor.

Section 2.4        Notes.

The portion of the Term Loan made by each Lender shall be evidenced by a promissory note executed by Borrower (a **"Term Note"**), the portion of the Additional Term Loan made by each Lender shall be evidenced by a promissory note executed by Borrower (an **"Additional Term Note"**) and the portion of the Revolving Loans made by each Lender shall be evidenced by a promissory note executed by Borrower (a **"Revolving Loan Note"**) in an original principal amount equal to such Lender's Pro Rata Share of the Term Loan, the Additional Term Loan and the Revolving Loan Commitment, respectively.

Section 2.5        Letters of Credit and Letter of Credit Fees.

(a)        Letter of Credit. On the terms and subject to the conditions set forth herein, Agent will prior to the Termination Date (i) issue Letters of Credit as LC Issuer or (ii) issue letters of credit or guarantees (each, a **"Support Agreement"**) to induce an LC Issuer to issue or increase the amount of, or extend the expiry date of, a Letter of Credit so long as:

(i)        Agent shall have received a Notice of LC Credit Event at least two (2) Business days before the relevant date of issuance or increase; and

(ii)        After giving effect to such issuance or increase (x) the aggregate Letter of Credit Liabilities under all Letters of Credit do not exceed $10,000,000 and (y) the Revolving Loan Outstandings do not exceed the Revolving Loan Limit.

As of the Closing Date, the Support Agreements listed on Exhibit F hereto have been issued and are outstanding pursuant to the Prepetition Credit Agreement or the Original DIP Agreement (collectively, the **"Existing Support Agreements"**). Borrower, Agent and

Lenders hereby agree that each Existing Support Agreement shall be deemed to have been issued under this Agreement and shall constitute a Support Agreement for all purposes hereunder.

(b)   Letter of Credit Fee.  Borrower shall pay to Agent, for the benefit of the Lenders which have committed to make Revolving Loans, a letter of credit fee with respect to the Letter of Credit Liabilities for each Letter of Credit, computed for each day from the date of issuance of such Letter of Credit to the date that is the last day a drawing is available under such Letter of Credit, at a rate per annum equal to the LIBOR Margin then applicable to Revolving Loans.  Such fee shall be payable in arrears on the first (1st) Business Day of each calendar month prior to the Termination Date and on such date.  In addition, Borrower agrees to pay promptly to the LC Issuer any fronting or other fees that it may charge in connection with any Letter of Credit.  Any "Letter of Credit Fee" which is accrued as of the Closing Date under the Original DIP Agreement shall remain outstanding and shall be due and payable on April 1, 2004.

(c)   Reimbursement Obligations of Borrower.  If Agent shall make a payment to an LC Issuer pursuant to a Support Agreement or if Merrill Lynch as LC Issuer makes a payment in respect of a draw on a Letter of Credit, Borrower shall promptly reimburse Agent for the amount of such payment and, to the extent that so doing would not, to Agent's knowledge, cause the Revolving Loan Outstandings to exceed the Revolving Loan Limit, Borrower shall be deemed to have requested a Revolving Loan, the proceeds of which will be used to satisfy such Reimbursement Obligations.  Borrower shall pay interest, on demand, on all amounts so paid by Agent for each day until Borrower reimburses Agent therefor at a rate per annum equal to the sum of two percent (2%) plus the interest rate applicable to Revolving Loans (which are Prime Rate Loans) for such day.

(d)   Reimbursement and Other Payments by Borrower.  The obligations of Borrower to reimburse Agent pursuant to Section 2.5(c) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including the following:

(i)   any lack of validity or enforceability of, or any amendment or waiver of or any consent to departure from, any Letter of Credit or any related document;

(ii)   the existence of any claim, set-off, defense or other right which Borrower may have at any time against the beneficiary of any Letter of Credit, the LC Issuer (including any claim for improper payment), Agent, any Lender or any other Person, whether in connection with any Financing Document or any unrelated transaction, provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(iii)   any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

-38-

(iv)    any affiliation between the LC Issuer and Agent; or

(v)    to the extent permitted under applicable law, any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

(e)    Deposit Obligations of Borrower.  In the event any Letters of Credit are outstanding at the time that Borrower prepays or is required to repay the Obligations (other than the Additional Term Loans and all amounts pertaining thereto) in full or the Revolving Loan Commitment is terminated, Borrower shall (1) deposit with Agent for the benefit of all Lenders with a portion of the Revolving Loan Commitment cash in an amount equal to one hundred and five percent (105%) of the aggregate outstanding Letter of Credit Liability to be available to Agent to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related thereto and (2) prepay the fee payable under Section 2.5(b) with respect to such Letters of Credit for the full remaining terms of such Letters of Credit. Upon termination of any such Letter of Credit, the unearned portion of such prepaid fee attributable to such Letter of Credit shall be refunded to Borrower, together with the deposit described in the preceding clause (1) to the extent not previously applied by Agent in the manner described herein.

(f)    Participations in Support Agreements and Letters of Credit.

(i)    Concurrently with the issuance of each Letter of Credit, Agent shall be deemed to have sold and transferred to each Lender, and each Lender shall be deemed irrevocably and unconditionally to have purchased and received from Agent, without recourse or warranty, an undivided interest and participation in, to the extent of such Lender's Pro Rata Share of the Revolving Loan Commitment, Agent's Support Agreement liabilities and obligations in respect of such Letters of Credit, Merrill Lynch's liabilities and obligation in respect of Letters of Credit issued by it as LC Issuer and Borrower's Reimbursement Obligations with respect to such Support Agreements and Letters of Credit. If Borrower does not pay any Reimbursement Obligation when due, then Borrower shall be deemed to have immediately requested that Lenders make a Revolving Loan which is a Prime Rate Loan in a principal amount equal to such Reimbursement Obligation. Agent shall promptly notify Lenders of such deemed request and each Lender shall make available to Agent its Pro Rata Share of such Loan. The proceeds of such Loan shall be paid over by Agent to the LC Issuer for the account of Borrower in satisfaction of reimbursement obligations then owing by Borrower to such LC Issuer in respect of outstanding Letters of Credit.

(ii)    If Agent makes any payment or disbursement under any Support Agreement or if Merrill Lynch makes any payment in respect of a draw on a Letter of Credit issued by it as LC Issuer, and (x) Borrower has not reimbursed Agent in full for such payment or disbursement in accordance with Section 2.5(c), (y) a Revolving Loan may not be made pursuant to the immediately preceding clause (i) or (z) any reimbursement received by Agent from Borrower is or must be returned or rescinded upon or during any bankruptcy or reorganization of any Credit Party or otherwise, each Lender shall be irrevocably and unconditionally obligated to pay to Agent its Pro Rata Share of such payment or

disbursement (but no such payment shall diminish the Obligations of Borrower under Section 2.5(c)). To the extent any Lender shall not have made such amount available to Agent by noon (Chicago time) on the Business Day on which such Lender receives notice from Agent of such payment or disbursement, such Lender agrees to pay interest on such amount to Agent forthwith on demand accruing daily at the Federal Funds Rate, for the first three (3) days following such Lender's receipt of such notice, and thereafter at the Prime Rate plus the Prime Rate Margin in respect of Revolving Loans. Any Lender's failure to make available to Agent its Pro Rata Share of any such payment or disbursement shall not relieve any other Lender of its obligation hereunder to make available to Agent such other Lender's Pro Rata Share of such payment, but no Lender shall be responsible for the failure of any other Lender to make available to Agent such other Lender's Pro Rata Share of any such payment or disbursement.

Section 2.6       General Provisions Regarding Payment; Loan Account.

(a)     All payments to be made by Borrower under any Financing Document, including payments of principal and interest on the Notes, and all fees, expenses, indemnities and reimbursements, shall be made without set-off or counterclaim, in lawful money of the United States of America and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. Borrower shall make all payments in immediately available funds to the Payment Account before noon (Chicago time) on the date when due. Notwithstanding anything to the contrary set forth in this Section 2.6(a), Agent shall be permitted, in its sole discretion, but subject to the limitations set forth in Section 2.2(a)(ii), to satisfy any of the payment obligations described in this Section 2.6(a) through the making of Agent Advances.

(b)     Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by the Lenders hereunder or under any other Financing Document, and all payments thereon made by Borrower. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Agent's most recent printout or other written statement, shall be conclusive and binding evidence of the amounts due and owing to Agent by Borrower absent clear and convincing evidence to the contrary, subject to review by the Bankruptcy Court; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay all amounts owing hereunder or under any other Financing Document. Unless Borrower notifies Agent in writing of any objection to any such printout or statement (specifically describing the basis for such objection) within thirty (30) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein.

Section 2.7      Maximum Interest.

(a)     In no event shall the interest charged with respect to the Notes or any other obligations of Borrower under any Financing Document exceed the maximum amount permitted under the laws of the State of Illinois or of any other applicable jurisdiction.

(b)     Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the **"Stated Rate"**) would exceed the highest rate of interest permitted under any applicable law to be charged (the **"Maximum Lawful Rate"**), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; provided, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have received had the Stated Rate been (but for the operation of this provision) the interest rate payable. Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply.

(c)     In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrower.

(d)     In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.

Section 2.8      Taxes.

(a)     All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp, documentary, excise, property or franchise taxes and other taxes, fees, duties, levies, withholdings or other charges of any nature whatsoever imposed by any taxing authority, excluding taxes imposed on or measured by Agent's or any Lender's net income by the jurisdictions under which Agent or such Lender is organized or conducts business (all non-excluded items being called **"Taxes"**). If any withholding or deduction from any payment to be made by Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then Borrower will: (a) pay directly to the relevant authority the full amount required to be so withheld or deducted; (b) promptly forward to Agent an official receipt or other documentation satisfactory to Agent evidencing such payment to such authority; and (c) pay to Agent for the account of Agent and Lenders

-41-

such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent and each Lender will equal the full amount Agent and such Lender would have received had no such withholding or deduction been required.  If any Taxes are directly asserted against Agent or any Lender with respect to any payment received by Agent or such Lender hereunder, Agent or such Lender may pay such Taxes and Borrower will promptly pay such additional amounts (including any penalty, interest or expense) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted so long as such amounts have accrued on or after the day which is one hundred eighty (180) days prior to the date on which Agent or such Lender first made demand therefor.

(b)    If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Agent, for the account of Agent and the respective Lenders, the required receipts or other required documentary evidence, Borrower shall indemnify Agent and Lenders for any incremental Taxes, interest or penalties that may become payable by Agent or any Lender as a result of any such failure.

(c)    Each Lender that (i) is organized under the laws of a jurisdiction other than the United States of America and (ii)(A) is a party hereto on the Closing Date or (B) becomes an assignee of an interest under this Agreement under Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall execute and deliver to Borrower and Agent one or more (as Borrower or Agent may reasonably request) Forms W-8ECI, W-8BEN, W-8IMY (as applicable) or other applicable form, certificate or document prescribed by the United States Internal Revenue Service certifying as to such Lender's entitlement to exemption from withholding or deduction of Taxes.  Borrower shall not be required to pay additional amounts to any Lender pursuant to this Section 2.8 to the extent that the obligation to pay such additional amounts would not have arisen but for the failure of such Lender to comply with this paragraph.

Section 2.9    Ancillary Services.

Borrower may from time to time request, and Agent or any Lender that is an Affiliate of a Designated Lender Affiliate may, in its sole discretion, from time to time arrange for Borrower to obtain from Agent or any Designated Lender Affiliate, Ancillary Services although Borrower is not required to do so.  To the extent Ancillary Services are provided, Borrower agrees to indemnify and hold Agent and Lenders harmless from any and all costs and obligations now or hereafter incurred by Agent or any Lenders which arise from the indemnity given by Agent or any Lender to any Designated Lender Affiliates related to such Ancillary Services.  The agreement contained in this Section 2.9 shall survive termination of this Agreement.  Borrower acknowledges and agrees that the obtaining of Ancillary Services (a) is in the sole and absolute discretion of Agent and each Designated Lender Affiliate, and (b) is subject to all rules and regulations of Agent and each applicable Designated Lender Affiliate.